# 23-7506-cv

## United States Court of Appeals

*for the*

## Second Circuit

BAI WEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CAO XIAOLING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CAO YAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

ROBERT S. LANDY
AMY C. BROWN
STEPHEN R. HALPIN III
BRYAN W. MCCRACKEN
FORD O'BRIEN LANDY LLP
*Attorneys for Plaintiffs-Appellants*
275 Madison Avenue, 24th Floor
New York, New York 10016
(212) 858-0040

CP COUNSEL PRESS   (800) 4-APPEAL • (326855)

CAO YEQIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN BIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN WEILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN FANGZHOU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHU MIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, FENG YING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, GAO GUANGFENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, GU DANHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HAN MINGYUAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU LAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU MIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU WENSHU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development, HUANG HUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HUANG WEI,

Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HUANG XIUWEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG GUOSHUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG PEIYU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG XUEFEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JING LILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HAN WENSHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, KIT PING JACKY KWOK, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LAI YONGHE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LAU KWAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI HUILING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI JINLONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI LIQIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI MINGHUA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI PEIJUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI QINGHUA,

Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI XUE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI YUHAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI YUHUAI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIANG WEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIN SHUANGPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIN YONGQIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU JINGHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU MING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU WENJIE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU ZHE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MA AIQIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MA ZHANHUA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MAO ZHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, NI LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, PING JIE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, QI PEIXIN, Individually and derivatively on behalf of George

Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WU LIANGLIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, QUE WEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, REN RONGRONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHAN DANDAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHAN WEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHEN CONGYING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHEN HUIYU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHI YIQUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SHU LINGLI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SONG CHAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SONG XIAOYING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SUN HAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SUN XIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SUN YAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, SUN YUXIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, TAN MANFANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund,

LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, TENG LEZHI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WAN LILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YINGMING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG CHAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG CHUANHONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG NINGHONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YATAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG JIANPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WU DING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XIONG XIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XU JIEPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XU MINXIA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG MENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG XUELI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund,

LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YE QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YE XIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YIN YOUGENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YING JIANFENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YU QIZHEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YU ZHAOHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YVONNE ZHU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG HUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG PINGJUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG QIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG SHOUTAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG XUEMEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG YUESHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG YUMEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG ZEYU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHAO JIAXU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and

George Washington Bridge Bus Station and Infrastructure Development Fund,
Phase II, LLC, ZHAO MENGSHI, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, ZHAO YANG YANG, Individually and derivatively on
behalf of George Washington Bridge Bus Station and Infrastructure Development
Fund, LLC and George Washington Bridge Bus Station and Infrastructure
Development Fund, Phase II, LLC,

*Plaintiffs-Appellants,*

– v. –

NEW YORK CITY REGIONAL CENTER, LLC,

*Defendant-Appellee.*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

QUESTIONS PRESENTED....................................................................1

STATEMENT OF THE CASE ................................................................2

I.  The Allegations of the Complaint...................................................2

    A. NYCRC aims to fund redevelopment of the George Washington Bridge bus station through the EB-5 visa program............................................2

    B. NYCRC solicits investments in Fund 1 with a series of oral and written misrepresentations. ..........................................................................4

    C. Defaults under the Permanent Loan Agreement begin. .................9

    D. NYCRC forms Fund 2 and solicits additional investors after a cost overrun renders Fund 1 short of the necessary funds for the Project. .......................10

    E. GWBDC collapses and enters bankruptcy. ..................................14

II. The Commencement of the Lawsuit and NYCRC's Motion to Dismiss ...........15

SUMMARY OF ARGUMENT ...............................................................16

STANDARD OF REVIEW ...................................................................21

ARGUMENT .....................................................................................21

I.  It Was Error to Dismiss the Fraudulent Inducement Claims as Barred by the Statute of Limitations.......................................................................21

    A. The district court erred in finding the existence of "inquiry notice" as a matter of law based on representations contained in the offering memoranda because NYCRC withheld the offering memoranda from most investors....24

B. The district court erred in finding the existence of "inquiry notice" as a matter of law based on representations contained in the Offering Memoranda because the Offering Memoranda could not have alerted Investors to the full scope of the fraud and contained misrepresentations of their own. ..............31

C. The district court erred in finding the existence of "inquiry notice" as a matter of law because of the allegations that NYCRC concealed material information from Investors. ...........................................................35

II. The District Court Erred in Finding that the Business Judgment Rule Precluded the Investors' Breach of Fiduciary Duty Claims ................................................37

CONCLUSION .......................................................................................41

## TABLE OF AUTHORITIES

*Bice v. Robb*,
   324 Fed. App'x 79 (2d Cir. 2009) ...................................................22

*Bild v. Konig*,
   2011 WL 666259 (E.D.N.Y. Feb. 14, 2011) .....................................22

*BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*,
   603 F. App'x 57 (2d Cir. 2015) ........................................................22

*Brundage v. Pension Assoc. Ret. Plan, LLC.*,
   2019 WL 2465146 (S.D.N.Y. June 13, 2019) ..............................26, 27

*Carbon Cap. Mgmt., LLC v. Am. Express Co.*,
   88 A.D.3d 933 (2d Dep't 2011) ........................................................21

*Crewe v. Rich Dad Educ. LLC*,
   884 F. Supp. 2d 60 (S.D.N.Y. 2012) ................................................28

*Dodds v. Cigna Securities, Inc.*,
   12 F.3d 346 (2d Cir. 1993) ...............................................................27

*Emigrant Mortg. Co., Inc. v. Pub. Adm'r of Kings Cnty.*,
   207 A.D.3d 437 (2d Dep't 2022) ......................................................29

*Fleisher v. Phoenix Life Ins. Co.*,
   997 F. Supp. 2d 230 (S.D.N.Y. 2014) ..............................................40

*Holcomb v. TWR Express, Inc.*,
   782 N.Y.S.2d 840 (2d Dep't 2004) ..............................................26, 29

*In re Ampal-Am. Israel Corp.*,
   543 B.R. 464 (Bankr. S.D.N.Y. 2016) ..............................................39

*In re Eur. Gov't Bonds Antitrust Litig.*,
   2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) .....................................36

*In re Exect. Telecard Ltd. Sec. Litig.*,
   913 F. Supp. 280 (S.D.N.Y. 1996) ...................................................28

*Kassab v. Marco Shoes Inc.*,
    282 A.D.2d 316 (1st Dep't 2001) ..........................................................29

*Kenol v. Nelson*,
    581 N.Y.S.2d 415 (2d Dep't 1992) ........................................................26

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................23

*Marx v. Akers*,
    666 N.E.2d 1034 (N.Y. 1996) ................................................................38

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) .....................................................37

*Pokoik v. Pokoik*,
    146 A.D.3d 474 (1st Dep't 2017) ..........................................................38

*Revell v. Guido*,
    101 A.D.3d 1454 (3d Dep't 2012) .........................................................23

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (2d Cir. 1979) ..................................................................35

*Sharma v. Walia*,
    201 A.D.3d 609 (1st Dep't 2022) ..........................................................27

*Shklovskiy v. Khan*,
    273 A.D.2d 371 (2d Dep't 2000) ...........................................................27

*Siebert v. Nives*,
    871 F. Supp. 110 (D. Conn. 1994) .........................................................37

*ST Microelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
    648 F.3d 68 (2d Cir. 2011) ....................................................................23

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ..................................................................22

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*,
   517 F.3d 104 (2d Cir. 2008)..................................................................21

Statutes and Rules:

N.Y. C.P.L.R. 213(8) ................................................................21, 23, 36

## JURISDICTIONAL STATEMENT

The district court possessed subject-matter jurisdiction over this action pursuant to the "mass action" provisions of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.) and 28 U.S.C. § 1332. On September 28, 2023, the district court issued an Opinion and Order (the "Order") dismissing the Complaint filed by plaintiffs on August 30, 2022 (the "Complaint").

On October 20, 2023, Plaintiffs–Appellants timely noticed an appeal of the district court's Order. A-1576-77. This Court has appellate jurisdiction over this appeal from a final order pursuant to 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1.     Did the district court err in dismissing the fraudulent inducement claims on statute of limitations grounds, based on a finding that the plaintiffs had inquiry notice of the alleged fraud at the time they made their investments?

2.     Did the district court err in dismissing the derivative breach of fiduciary duty claims as prohibited by the business judgment rule, based on a finding that the Complaint failed to plead self-interest on the part of the managing members of the LLCs in which plaintiffs invested?

## STATEMENT OF THE CASE

**I.    The Allegations of the Complaint**

**A.    NYCRC aims to fund redevelopment of the George Washington Bridge bus station through the EB-5 visa program.**

The EB-5 visa program allows a foreign investor to obtain lawful permanent residency in the United States, i.e., a "green card," by investing $500,000 in a qualifying project and demonstrating that the investment created at least ten full-time U.S. jobs. A-46 ¶ 4. U.S. Citizenship and Immigration Services ("USCIS") administers the EB-5 visa program and has approved various "Regional Centers"—private companies that pool investments from foreign investors and use such capital to finance projects within an approved geographic region for the dual purpose of qualifying the investors for green cards and generating a financial return for the investors. *Id.* ¶ 4. Defendant-Appellee New York City Regional Center ("NYCRC"), formed in 2008, is one such entity. *Id.*

By early 2011, NYCRC had identified China as a fertile market for potential EB-5 investors. NYCRC entered an agreement with SJM Partners, Inc. ("SJM") to raise EB-5 financing from Chinese investors for a project (the "Project") to redevelop the bus station located at the east end of the George Washington Bridge in Manhattan (the "Station") under the auspices of the Port Authority of New York and New Jersey (the "Port Authority"), which owns and operates the Station. A-46 ¶ 3, A-52 ¶ 32, A-53 ¶ 40, A-54 ¶ 49. The Port Authority had identified the

2

Station's retail space and its bus terminal as requiring upgrades that could enhance their revenue generation, and had determined that building additional retail in the Station could act as a catalyst to create jobs in the Washington Heights neighborhood. A-53 ¶ 41; *see also* A-53-55 ¶¶ 40–52.

To facilitate the pooling of EB-5 investment funds to finance the Project, NYCRC established George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("Fund 1") in or about March 2011. A-50 ¶ 20, A-55 ¶ 53. NYCRC was both the "manager" and "initial member" of Fund 1. A-55 ¶ 53. Pursuant to Fund 1's operating agreement, non-managing membership interests were limited to a total of 144 potential EB-5 visa program investors and cost $540,500 each. A-55 ¶ 54. Of that amount, $500,000 was considered a capital investment, and the remaining $40,500 per membership interest was payable to NYCRC under a schedule of fees. *Id*. As such, NYCRC would be entitled to approximately $5.83 million after selling all the membership units to investors. *Id*. NYCRC was also entitled to an annual management fee of 2% of total capital under management ($1.44 million/year) to be paid out of interest income. A-55 ¶ 55.

In July 2011, Fund 1 entered a Permanent Loan Agreement with GWBDC, an affiliate of SJM, that provided for an up-to $72 million loan, depending on how many EB-5 investors NYCRC could find during a defined period. A-56 ¶ 59. The

Permanent Loan Agreement also set forth several "defined events of default," which would become relevant as the Project progressed. A-57 ¶ 62.

**B.     NYCRC solicits investments in Fund 1 with a series of oral and written misrepresentations.**

Given how the EB-5 visa program operates, foreign investors are never repeat customers. A-48 ¶ 9. Rather, once investors commit their capital to an EB-5 project, they can expect to receive their return on that investment and the green card that motivated their investment in the first place. *Id*. The Regional Center in question, here NYCRC, then moves on to its next project and next investor group for funding. *Id*. The key, then, from NYCRC's perspective, is to develop a comprehensive investment strategy that will successfully attract the desired number of investors. *Id*.

In this case, NYCRC enlisted the support of several China-based marketing agencies, including Qiaowai Group ("Qiaowai") and Wailian Group ("Wailian"), to solicit potential investors in person during carefully choreographed seminars and meetings. A-58 ¶ 63. NYCRC tightly controlled the flow of information to these agencies who then, at NYCRC's direction, carefully filtered what information was delivered to potential investors and in what manner. A-58 ¶ 64.

More specifically, NYCRC executives met with Qiaowai, Wailian, and other local agencies for the purpose of providing trainings on exactly what to say and what not say to prospective investors. A-58 ¶¶ 64-65. During these trainings,

NYCRC told the agencies that they should not provide the formal investment documents, including the unregistered offering memoranda, to potential investors—and should not even discuss the substance of the documents with potential investors. *Id.* Instead, NYCRC supplied the agencies with marketing materials, written in Chinese, that the agencies in turn reviewed with potential investors. A-58 at ¶ 65. The material usually consisted of attractive, color brochures or slides that inevitably contained material misrepresentations about the investment, which the agencies repeated orally to potential investors. *Id.*

The misrepresentations to potential investors included:

- Fund 1 would have the first lien mortgage on both the retail and infrastructure (bus terminal) portions of the Station. (In fact, the security interest only related to the lease for the retail portion, not a mortgage interest on any real property, as the entire terminal is the property of the Port Authority).

- If the borrower of EB-5 funds were to default on its loan from Fund 1, the Fund could take possession of the Station's bus terminal and redevelop it into additional retail space. (This was false because the bus terminal portion of the Station was not collateral pledged to secure the EB-5 loan.)

- The value of the collateral (again misrepresented to include the entire bus station) was worth more than twice the anticipated $72 million EB-5 investment. (This was false, as the appraisal NYCRC possessed, but did not disclose, showed that the collateral would be worth significantly less.)

- All funds paid by the Port Authority to improve the Station would increase the value of the collateral because Fund 1 would maintain its position as the senior secured creditor on the entire Project (which, again, was false).

- Construction on the Project had already commenced using public funds (This was false, as construction had not yet begun).

- The "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project. (This was false. The $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million in funds it was providing for the bus terminal. None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.)

- Skanska was the general contractor and as one of the largest contractors in the world had provided the developer a completion guarantee, which was a pledge secured by its own assets to complete the construction Project within budget and on time. (This was false, as Skanska was no longer involved in the Project at this time.)

A-59 ¶ 70.

An audio recording of one training for employees of Qiaowai, which is attached as Exhibit 1 to the Complaint, captured many of these misrepresentations in real-time. A-249-281. That training, which took place on June 28, 2022 was led by Gregg Hayden ("Hayden"), Director of Global Markets for NYCRC, and Lin Wu ("Wu"), Director of Marketing and Business Development for NYCRC. A-60-61 ¶¶ 71-72. During the training, Hayden spoke in English, and Wu translated Hayden's statements into Mandarin for the agency attendees. Hayden can be heard making the following statements during the training:

- "A good rule to remember is don't answer questions [from clients] with documents. Respond to the question as you know you are confident you've been given all the information."

- "Again, repeating again, government-owned land, minimizing risk by involving government, a lot of support. As you know from all of our projects, we have a huge amount of government money that does not need to be repaid, something that should always be repeated to your client. Not having to repay that money allows us to provide first mortgage security to your client."

- "This is a $358 million project for the city or Port Authority of New York and New Jersey. The project's already begun. It's going to happen anyway regardless of EB-5."

- "Your collateral to the firstly sold mortgage security for your investors is the George Washington Bridge Bus Station and the retail that's created in that bus station, all assignments of rent, leases, operating accounts, furnitures and fixtures. Very, very good collateral in this project."

- "Here's the pie chart that we always like to use. EB-5 in yellow, $70 million representing only 19% of total project costs. Minimal risk, very low exposure, government providing $277 million plus for this particular project. And that money is all free, does not need to be repaid. Make no mistake and be very confident, this is not a government bond. Bonds need to be repaid."

- "As always first lease hold mortgage on the George Washington Bridge bus station and related retail, including all rents, leases, furniture, fixtures, and operating accounts, very significant, very safe, its first highest priority ahead of all government and SJM. The safest EB-5 project on the market today."

- "I can tell you that the value of this collateral is well in excess of two times the EB-5 investment."

- "[Skanska is] the fifth largest contracting company in the world. They have bonding and insurance exceeding $7 billion and they 100% guarantee completion of this project and all its components."

A-61 ¶ 73 (quoting Ex. 1 to Complaint, A-249 to A-281). These statements were

false and specifically designed to induce EB-5 investments in Fund 1. And they

were repeated to large groups of potential Chinese investors throughout the spring, summer, and fall of 2011 to secure investments in Fund 1. *See* A-59-66 ¶¶ 70–75.

Per NYCRC's explicit instructions, most prospective investors did not receive the offering memorandum for Fund I (the "Fund 1 OM"). A-58 ¶ 67. The few prospective investors who did received Fund 1 OM received it in English (which they could not understand). In any event, the Fund 1 OM was also designed to mislead investors. *See* A-58 ¶ 67. It showed the EB-5 investment as constituting a small portion (< 20%) of the $365 million project as a whole, giving the impression that EB-5 investment dollars would be used right alongside the substantial "government" (i.e., Port Authority) funding to improve and expand the bus station, bridge and retail space together. A-400, 405. It did not disclose that the government funding would be used only for station redevelopment and infrastructure improvement—not the retail mall portion of project that the EB-5 investment dollars would be funding. A-58 ¶ 68; A-400 to A-409. And it devoted pages to describing, in detail, the ways in which the Project would transform and modernize bus station operations, again giving the impression that EB-5 investors were acquiring an interest in the project as a whole and lending credence to the representations that Fund 1 would hold a first lien mortgage on both the retail and public property comprising the Station.

8

By the end of 2011, all 144 slots in Fund 1 had been filled by EB-5 investors, including by 89 of Plaintiffs-Appellants (the "Phase I Investors"), in reliance on the misrepresentations by NYCRC and its agents. *See* A-66 ¶¶ 75–76; A-75-242 (setting forth individualized allegations). Many of the Phase I investors did not receive copies of the subscription agreement they were given to sign, only the signature pages themselves. *See*, *e.g.*, A-83, A-130, A-156, A-170. Very few were given the Fund 1 OM referenced in the agreement. *See, e.g.*, A-130. Moreover, the signature page of the subscription agreement which investors did see, made no reference to the existence of the OM or any other documents. Once NYCRC collected the investors' signatures and received their investments, Fund 1 advanced the capital to GWBDC under the Permanent Loan Agreement and began collecting its fees. A-66 ¶ 76.

### C. Defaults under the Permanent Loan Agreement begin.

What followed over the next several years was a series of events that should have triggered NYCRC to declare defaults under the Permanent Loan Agreement and to move to preserve and protect the capital entrusted to NYCRC by its investors. *See* A-66-67 ¶¶ 76–86. More interested in preserving its revenue stream, NYCRC did nothing. *Id*.

The first event of default was triggered on October 22, 2012 by Superstorm Sandy, which caused significant damage to the Station and further delayed the

construction that investors were told already had begun the year before. A-66 ¶¶ 78-79. Not only did NYCRC fail to declare the natural disaster as an event of default, but it made no mention of the storm and its impact on the Project in investor newsletters distributed in 2012 and 2013. A-66 ¶ 79.

Construction finally began in the fall of 2013, after the project developer succeeded in engaging another general contractor Tutor Perini, to replace Skanska. A-67 ¶ 81. Around the same time, however, NYCRC learned that the retail portion of the project would cost $119 million, as opposed to the approved amount of $102 million. A-67 ¶ 83. This constituted another event of default under the Permanent Loan Agreement. *Id*. Again, NYCRC did not report the shortfall to Phase I investors or declare a default based upon it. A-67 ¶ 84. It simply continued to collect its fees. A-67 ¶ 85.

### D. NYCRC forms Fund 2 and solicits additional investors after a cost overrun renders Fund 1 short of the necessary funds for the Project.

Indeed, on or about September 6, 2013, in anticipation of and as a hopeful solution to the cost overrun, NYCRC established George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("Fund 2").[1] A-67 ¶ 87. NYCRC subsequently prepared and executed an operating agreement for Fund 2 that was substantially similar to Fund 1, except that the administrative fees

---

[1] Fund 1 and Fund 2 are together referenced as the "Development Funds."

to NYCRC were increased to $49,000 per investor and the management fee was increased to 3%. A-68 ¶ 89. NYCRC also engineered another loan agreement with the developer in connection with Fund 2, but the agreement offered much less protection to investors than did the Permanent Loan Agreement because it was secured only by a lien on the developer's ownership interests in the special purpose vehicle it had established for the Project—interests which would be worthless in the event of insolvency. *See* A-68-69 ¶¶ 91–95, 99.

In selling prospective investors on Fund 2, NYCRC made, directly and through its marketing agents, misrepresentations that were substantially similar to those made to Fund 1 Investors, including that:

- That "Phase 1" of the Project – funded by Fund 1 – was complete. In fact, there were no "phases" of the project, just a significant cost overrun that exhausted the Fund 1 loan prior to completion.

- Fund 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (just as Fund 1 had).

- If the borrower of the EB-5 funds were to default on its loan, the Fund 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space.

- The value of the Fund 2 collateral was worth more than twice the total Fund 2 EB-5 investment.

- All funds paid by the Port Authority to improve the station would increase the value of the collateral because the Fund 2 investors would maintain their position as the senior secured creditor on the entire Project.

- The "government" was providing $48.2 million for the Project and the developer was providing $9.2 million, so the $19 million from the EB-5 investments comprised less than 25% of the total capital for "Phase 2," but the EB-5 investors would obtain a first lien on the entire Project.

A-70 ¶ 100.

NYCRC also concealed, directly or through its agents, that:

- The collateral for Fund 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency).

- That the very existence of Fund 2 would constitute and Event of Default with respect to the loan agreement that governed the Fund 1 investment.

A-71 ¶ 101.

Notably, the Offering Memorandum for Fund 2 (the "Fund 2 OM")[2] said nothing about the Phase 1 shortfall. Instead, the Fund 2 OM misrepresented that newly raised capital would finance infrastructure redevelopment including "a series of additional base building upgrades and code modifications necessary to continue the transformation of this critical transportation facility into a modern transit hub." A-1210. And again, the Fund 2 OM portrayed the infrastructure and retail development as part and parcel of the same, large "government-funded" project when, in actuality, EB-5 dollars were used only in connection with the

---

[2] The Fund 1 OM and Fund 2 OM are together referenced as the "offering memoranda."

retail space—not the public property on which investors were led to believe they had a first-lien mortgage. A-1209 to A-1211.

Eighteen of Plaintiffs-Appellants relied on these misrepresentations and invested in Fund 2 (the "Phase II Investors").[3] A-50 ¶ 22; *see also* A-75 to 242 (individualized allegations). As with Fund 1, NYCRC acted as sole managing member of Fund 2, and all investors purchased non-managing member interests. And as was the case with Fund 2, NYCRC did not provide most Phase II investors the Fund 2 OM, or even the subscription agreement that referenced it. *See, e.g.*, A-89, A-91, A-105, A-114, A-124, A-133, A-135, A-141, A-145, A-146, A-155, A-170.

As money for Fund 2 rolled in, NYCRC continued to mislead Phase I and Phase II investors about the Project. For example, in September 2014, NYCRC sent an investor update in Chinese that touted several specific milestones achieved in the construction process and reported on retail lease commitments, but did not disclose the cost overruns, the needs for increased capital, or the fact that construction on the Project had only begun in late 2013. A-71 ¶ 103. NYCRC maintained the charade for the next several years, failing to disclose, among other things that: (1) legal proceedings had been initiated against GWBDC (the borrower of Plaintiffs' funds) alleging mismanagement, defective design, and other material

---

[3] The Phase I and Phase II Investors are together referenced as the "Investors."

deviations from the construction contract, A-72 ¶ 105–06; (2) due to project delays, the Port Authority had modified aspects of the Project in a way that financially impaired Plaintiffs' investments, A-72 ¶¶ 108–09; (3) the Port Authority and other lenders had temporarily halted funding, A-72 ¶ 109; and (4) GWBDC had been fined significant sums of money for failing to finish the Project on time, A-73 ¶ 113. These constituted additional events of default under the loan agreements, all of which NYCRC failed to disclose or act upon for the benefit of the Investors. A-72 ¶ 110.

### E.    GWBDC collapses and enters bankruptcy.

In October 2019, GWBDC filed for bankruptcy protection. A-73 ¶ 116. Later that month, Fund 1 Investors learned for the first time about the existence of Fund 2. *See* A-68 ¶ 88. After the bankruptcy petition was filed, NYCRC met with investors and reiterated its misrepresentations regarding the collateral pledged to Fund 1 and Fund 2, undoubtedly to prevent the investors from taking formal legal action and to conceal the falsity of its earlier misrepresentations. A-73 ¶ 117. It was not until approximately April 2021, after certain investors retained separate counsel and worldwide pandemic lockdowns had begun to soften, that the Investors possessed sufficiently complete information to recognize that NYCRC had misled them in connection with their investment decisions, misled them in connection with the status and progress of the Project, and misled them regarding

the protection their supposed security interests provided them in connection with the bankruptcy. A-244 ¶ 118.

## II. The Commencement of the Lawsuit and NYCRC's Motion to Dismiss

The Investors entered a tolling agreement with NYCRC that began September 1, 2021. A-244 ¶ 119. Plaintiffs filed the Complaint on August 30, 2022, thereby ending the tolling period. A-44. The Complaint asserted two counts of fraudulent inducement against NYCRC (one brought by the Phase I Investors and a second brought by the Phase II Investors), alleging that the Investors reasonably relied on the misrepresentations made by NYCRC in deciding to invest in Funds 1 and 2. A-242 to A-245. The Complaint also asserted two counts of breach of fiduciary duty against NYCRC (again, one claim brought by each Investor group) for its failure to call defaults under the terms of the applicable loan agreements. A-245 to A-247.

On October 31, 2022, NYCRC moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A-39. On September 28, 2023, the district court issued an Opinion and Order granting NYCRC's motion to dismiss. SPA-2. With respect to the fraud claims, the court concluded that the Investors had inquiry notice of NYCRC's alleged fraud as of the date they made their investments in the Development Funds and, as such, the fraud claims were barred by New York's six-year statute of limitations. SPA 21-29. The court

15

dismissed the breach of fiduciary duty claims on the ground that NYCRC's decision not to call defaults under the loan agreements was protected by the business judgment rule. SPA 33-42. The Investors timely filed a Notice of Appeal on October 20, 2023. A-1576.

## SUMMARY OF ARGUMENT

The Complaint recites a textbook case of fraudulent inducement. NYCRC recruited unsophisticated, Chinese nationals in search of U.S. residency to fund a government-backed redevelopment of a landmark bus station—an opportunity portrayed as exceedingly safe and low-risk. It hired Chinese-based marketing agencies to lie to the Investors, in their native language, about the amount of "free" government funding available for the project and the nature and value of the collateral that would secure their investments. It instructed those same agencies to withhold from Investors the English-language offering documents that described the true nature and value of the collateral securing the investment, and the risks associated with the investment. And then, after giving Investors oral assurances in Chinese (the only language they could understand) and concealing from most Investors the English-language offering materials (which they could not understand anyway), NYCRC secured their commitments to invest by presenting them with the signature pages of the documents they purposefully withheld from them. It was not until the development company created for the purpose of the project collapsed

16

that Investors could even begin to appreciate that what they had been sold as an exceedingly safe, over-secured investment was a total loss.

The district court dismissed the Investors' fraud claims not because the Investors failed to plead any element of their *prima facie* case, but because, according to the court, the Investors were on "inquiry notice" of the alleged fraud as of the date they invested in the Development Funds and, as such, their fraud claims were barred by the statute of limitations. Specifically, the court concluded that, because the (withheld) offering memoranda for the Development Funds disclosed the nature of the collateral securing the investments—i.e., for Fund 1, a leasehold mortgage on the retail space and, for Fund 2, a lien on the shares that the developers owned in the Project—the Investors were on notice that their investments were not secured by a first mortgage lien on the real property itself, as they had been told before investing. SPA-22-24. That disclosure, the court said, put the Investors on constructive notice of the misrepresentations about the collateral securing their investments and rendered the fraud claims, brought more than six years after the date of their investments, untimely. SPA-24. This was error for at least three reasons:

*First*, most Investors were *never* given a copy of the offering memoranda that purportedly would have put them on notice of the fraud. NYCRC directed the marketing agencies to answer Investors' questions orally and with colorful

marketing brochures, *without* reference to the offering memoranda and related agreements. Investors were provided only with the subscription agreement's signature page, which did *not* reference the offering memoranda or any other agreements incorporated into the body of the subscription agreement itself. The district court dismissed the import of these facts, citing case law holding that investors are charged with knowledge of the documents they sign, even if provided incomplete versions of the documents and in a language they cannot read. SPA-25-26. But in none of the cases relied on by the district court were investors deemed to have notice of the contents of not only the agreement they signed, but other complex and lengthy documents which were written in English legalese and merely incorporated by reference into a portion of the signed agreement that itself was intentionally withheld.  To foreclose fraud claims arising in such circumstances would be tantamount to giving perpetrators a step-by-step instruction manual on how to defraud investors without fear of liability, namely (1) target a group of unsophisticated, non-English speaking investors; (2) lie to them in their native language about the nature of the investment and risks associated with it; (3) withhold the documents that might, if translated, alert them to the falsity of the oral representations; and (4) to secure the investment, give them a mostly blank page to sign, knowing that they will be charged with full knowledge of the other

documents that are referenced only in the withheld pages of the signed instrument. That is not the law. And it cannot, and should not, become the law.

*Second*, contrary to the district court's conclusion otherwise, the offering memoranda would not have put Investors on notice of the entire fraud even if they had been given access to, read and understood the documents. This is true for all Investors, but especially Phase II Investors who were led to believe that the purpose of their investments was to fund a second phase of development when, in reality, the investments were necessary to cover a shortfall caused by preexisting cost overruns. Nothing in the Fund 2 OM would have alerted the Phase II Investors to that significant fact.

*Third*, a finding of inquiry notice was improper given the steps that NYCRC took to conceal from Investors the operative fund documents and material information, including information about project delays, cost overruns and other events of default under the loan agreements. NYCRC regularly circulated Chinese-language updates to Investors that said nothing about the delays, financial difficulties, and the impact of those problems on their investments. In fact, NYCRC continued to conceal material information from Investors even after the developer filed for bankruptcy, reiterating in meetings that the value of the collateral securing the loans was more than adequate to make the Investors whole. For these reasons, it was error for the district court to find that the Investors were

on inquiry notice of the fraud at the time of their investments and, accordingly, that the fraud claims were time-barred.

With respect to the fiduciary duty claims premised on NYCRC's failure to declare defaults under the loan agreements, the district court erred in concluding that NYCRC's decisions not to declare defaults were protected by the business judgment rule. SPA-41. The district court correctly recognized that a manager loses its ability to invoke the protection of the business judgment rule when it is self-interested in the transaction in question. SPA-34. It incorrectly concluded, however, that a manager's motivation to receive substantial management fees cannot support a finding of self-interest. SPA-37-38. As the district court noted, a manager is self-interested in a transaction where it will receive a direct financial benefit from the transaction that is different than the benefit available to members generally. SPA-34. NYCRC was the *only* managing member of the Development Funds, and the *only* member who stood to earn substantial, annual management fees—which ultimately totaled over $13 million—so long as the loan agreements remained outstanding. It was a benefit that NYCRC received only by virtue of its managerial authority over the Funds, and a benefit unavailable to the non-managing members who relied on NYCRC to protect them. That is the definition of self-interest and, for that reason, the district court erred in finding that the business judgment rule precludes the Investors' breach of fiduciary duty claims.

## STANDARD OF REVIEW

A district court's grant of a motion to dismiss is subject to *de novo* review, accepting as true all factual allegations in the complaint and construing all reasonable inferences in the non-movant's favor. *See, e.g., Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

## ARGUMENT

### I.   It Was Error to Dismiss the Fraudulent Inducement Claims as Barred by the Statute of Limitations.

Under New York law, a claim for fraud must be commenced "the greater of six years from the date the cause of action accrued, or two years from the time the plaintiff… could with reasonable diligence have discovered it." N.Y. C.P.L.R. 213(8). Where a plaintiff alleges that he was fraudulently induced into making an investment, the fraud claim accrues at the time the investment was made. *Carbon Cap. Mgmt., LLC v. Am. Express Co.*, 88 A.D.3d 933, 939 (2d Dep't 2011).

The Investors made their investments in the Development Funds over the periods July to October 2011 (Phase I, A-293 to A-382) and April to September 2014 (Phase II, A-1166 to A-1188). The district court found that, as of those dates, the Investors were on "inquiry notice" that NYCRC had lied to them about the collateral securing their investments—which the court treated as the "crux" of the fraud claims—because the offering memoranda made clear that the investments were secured only by a leasehold mortgage on the retail space, not a first lien

mortgage on the real property itself. [SPA-22.] Taking the allegations of the Complaint as true, however, it was error to find the existence of inquiry notice as a matter of law and to dismiss the fraud claims as untimely on that basis.

To begin with, the determination of when a statute of limitations begins to run is typically a factual one. *See Bice v. Robb*, 324 Fed. App'x 79, 81 (2d Cir. 2009). Accordingly, unless the complaint alleges facts that create "an ironclad defense," a statute of limitations argument "must await factual development." *Bild v. Konig*, 2011 WL 666259, at *3 (E.D.N.Y. Feb. 14, 2011).

Likewise, whether a plaintiff had in its possession sufficient facts to place it on inquiry notice of fraud is "often inappropriate for resolution on a motion to dismiss." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 412 (2d Cir. 2008) (internal quotation omitted) (reversing order granting motion to dismiss fraud claims as untimely based on improper factual inference that investors could have discovered fraud based on press reports); *see also BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57, 58 (2d Cir. 2015) ("Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors.") (internal quotation marks and citation omitted). Courts should be "decidedly reluctant" to foreclose fraud claims as untimely on a motion to dismiss "absent a

manifest indication that plaintiffs could have learned the facts underpinning their allegations" more than six years before filing. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168-69 (2d Cir. 2005) (internal quotation omitted) (district court erred in dismissing fraud claims as untimely based on finding of inquiry notice as a matter of law).[4,5] As set forth above and in more detail below, such a "manifest indication" is altogether absent here.

---

[4] The plaintiffs in *Lentell* asserted federal securities fraud claims against the defendant and, as such, were subject to a one-year statute of limitations. 396 F.3d at 170. Because the Investors assert common law fraud claims against NYCRC, the six-year statute set forth in N.Y. C.P.L.R. 213(8) applies here, as noted above.

[5] Indeed, the district court acknowledged that the question of whether a plaintiff exercised "reasonable diligence" to discover the fraud upon being put on inquiry notice is similar to the question of whether a plaintiff has adequately pleaded the "reasonable reliance" necessary for a fraud claim. SPA-29 at n.13. The district court also acknowledged that "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." *Id.* (citing *ST Microelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011). While the district court stated that there is a distinction between between "reasonable diligence" and "reasonable reliance," it did not explain why "reasonable diligence" is any less a question of fact than is "reasonable reliance." Both are objective standards, and New York courts have recognized that both present questions of fact that are for the jury to answer. *See Revell v. Guido*, 101 A.D.3d 1454, 1458 (3d Dep't 2012). In any event, because the district court dismissed the fraud claim after finding that inquiry notice existed as a matter of law, it did not reach the issue of whether the Complaint adequately pled reasonable reliance—which it does. *Id.*

**A. The district court erred in finding the existence of "inquiry notice" as a matter of law based on representations contained in the offering memoranda because NYCRC withheld the offering memoranda from most investors.**

Despite the litany of lies NYCRC and its agents told the Investors, the district court focused its attention on only one, namely the misrepresentation that Development Funds' loans to GWBDV would be secured by a first lien mortgage on both the retail and bus terminal portions of the Station itself. SPA-23. In the court's view, the misrepresentation about the collateral securing the investments was the "crux" of the Investors' fraud claims and the "other alleged misrepresentations" concerning "the value of the collateral, the extent and benefits of the government investment in the bus terminal portion of the Station, and the progress made on the Station redevelopment" would have been of "no particular significance" unless the Investors believed that the Funds held first lien mortgages on the entire Station. SPA-24. The district court then concluded that the Investors were on inquiry notice of the "crux" of the fraud as soon as they signed the signature pages of the subscription agreements. Th district court's logic was as follows: (i) by signing the signature, page Investors had constructive knowledge of the remainder of the document, (ii) because the withheld portion of the subscription agreements incorporated the withheld offering memoranda by reference, Investors also had constructive knowledge of the contents of the offering memoranda, and (iii) because the offering memoranda made clear that the

24

Development Funds' loans to GWBDV were not secured by a first lien mortgage on either the retail or bus terminal portions of the Station, as the Investors had been told by NYCRC and its marketing agents, Investors had constructive notice of the "crux" of the fraud when they signed the one-page document they were presented by NYCRC. SPA-21.[6]

The vast majority of Investors never saw the offering memoranda until late 2021 because NYCRC purposefully withheld the documents and instructed its agents not to discuss them with Investors. In fact, in most cases, NYCRC did not even give Investors a copy of the entire subscription agreement for the fund in which they were invested but, instead, presented Investors with a signature page that contained no substantive content whatsoever—merely a line for the signature and date. This was in keeping with the "rule of thumb" NYCRC gave to its marketing agents: "[D]on't answer questions with documents." A-61 ¶ 73; A-255. It was a strategy NYCRC rightly assumed would work, given that the target audience was comprised of non-English speaking individuals who were participating in the EB-5 investment program for purposes of gaining U.S. residency. A-46. The perfect prey, so to speak.

---

[6] The Fund 1 OM stated that the loan to GWBDV would be secured by a "leasehold mortgage" on the "retail space that makes up the Broadway Marketplace at GWB." SPA-22; A-413. The Fund 2 OM stated that, in the event of default, Fund 2 would have "contractual remedies" against GWBDV with recourse against its ownership interests in the Project. SPA 22; A-1226.

The district court dismissed the significance of the fact that Investors either never received the Fund 1 OM or Fund 2 OM or, if they did, were unable to comprehend the document given their inability to read English. In so doing, the court relied upon a combination of familiar rules that, together, it reasoned, rendered these handicaps irrelevant. Specifically, the court relied upon three non-controversial propositions: (1) a party who executes a contract is "presumed to know its contents" and to assent to its terms, *Holcomb v. TWR Express, Inc*., 782 N.Y.S.2d 840 (2d Dep't 2004); (2) the presumption of knowledge applies even when a party to a contract receives only a portion of an agreement, as it is incumbent on the party to request and read the remainder, *Brundage v. Pension Assoc. Ret. Plan, LLC*. 2019 WL 2465146 (S.D.N.Y. June 13, 2019); and (3) a claim of illiteracy in the English language does not defeat the presumption of knowledge, as it is the responsibility of the illiterate party to have the contract read or otherwise interpreted for him, *Kenol v. Nelson*, 581 N.Y.S.2d 415 (2d Dep't 1992). SPA-24 to 27.

While standing for unremarkable legal propositions on their own, the collection of cases relied upon by the district court does not compel the conclusion, as a matter of law *in this case* that the Investors were on inquiry notice of the alleged fraud at the time of their investments and that that their fraud claims are time-barred as a result.

In many of the cases cited in the district court's Order, the plaintiffs were presumed to have knowledge of the falsity of the oral representations on which they claimed to rely because they were actually provided with the documents that plainly contradicted those representations. *See Dodds v. Cigna Securities, Inc*., 12 F.3d 346, 350-51 (2d Cir. 1993) (plaintiff was provided with prospectuses that disclosed in clearly marked sections the illiquidity risks associated with the limited partnerships in which she invested); *Sharma v. Walia*, 201 A.D.3d 609, 609-10 (1st Dep't 2022) (plaintiff signed forms for real estate closings acknowledging each time that she had received master lease and sublease for premises and understood terms and conditions of lease documents); *Shklovskiy v. Khan*, 273 A.D.2d 371, 372 (2d Dep't 2000) (plaintiff could not credibly claim that he was misinformed about nature of one release when he acknowledged validity of second release he signed contemporaneously with the first). Again, that was not the case here. Most plaintiffs never received the offering memoranda—and most did not even receive the subscription agreements that referenced their existence.

In other cases cited by the district court, where the plaintiff did not receive a complete copy of the relevant document but was charged with knowledge of its entire contents, the portion of the document the plaintiff did receive explicitly referred to the contractual provision about which the plaintiff disclaimed knowledge. *See Brundage*, 2019 WL 2465146, at *3-4 (arbitration clause was

enforceable against plaintiff who was not provided with portion of agreement containing arbitration values because on "both of the signature pages of that agreement, in bold and about half a page above the signature lines, [were] clear references to the arbitration agreement and citations to where to find it"); *Crewe v. Rich Dad Educ. LLC*, 884 F. Supp. 2d 60, 73 (S.D.N.Y. 2012) (arbitration clause contained in Terms and Conditions addendum to agreement was enforceable where plaintiff was provided copy of Terms and Conditions, initialed representation that said, "YES, I received the Terms and Conditions of this agreement," and separately initialed disclosure acknowledging that the agreement contained an arbitration clause).

That same is not true in this case. The subscription agreement signature pages provided to Investors made no reference to the existence of the offering memoranda, much less what they said about the collateral securing the investments. A-288 to A-336 (Phase I Investors); A-337 to A-382 (Phase II Investors). And the subscription agreements themselves made only two references to the offering memoranda, which were not emphasized with subject headings or bold-face type that would have drawn the Investors' attention to them. These differences distinguish the disclosures made to Investors here from those at issue in the cases relied upon the district court to find (improperly) inquiry notice as a matter of law. *See In re Exect. Telecard Ltd. Sec. Litig.*, 913 F. Supp. 280, 285

28

(S.D.N.Y. 1996) (financial disclosures *did not* put investors on inquiry notice of fraud where "[u]nlike the *Dodds* case, the information was not printed in uppercase bolded typeface. Nor was it referenced numerous times in the reports' table of contents").

In addition, none of the cases relied upon by the district court involving a non-English speaking plaintiff also involved circumstances in which the defendant concealed from that plaintiff a copy of the English-language document the plaintiff was charged with understanding. *See Holcomb*, 11 A.D.3d at 514 (plaintiff injured in car accident could not avoid effect of release signed by non-English speaking independent contractor); *Emigrant Mortg. Co., Inc. v. Pub. Adm'r of Kings Cnty*., 207 A.D.3d 437, 442 (2d Dep't 2022) (estate of non-English speaking individual could not avoid foreclosure on estate property where deceased had executed note in favor of plaintiff that reflected the existence of the mortgage); *see also Kassab v. Marco Shoes Inc*., 282 A.D.2d 316, 316 (1st Dep't 2001) (non-English speaking plaintiff failed to raise triable issue of fact as to whether sublease contained misrepresentations because it was incumbent upon him to have sublease explained to him). Unlike those cases, here the district court held non-English speaking Investors responsible for knowing the contents of English-language documents with which they were never provided, at NYCRC's instruction.

Relatedly and perhaps most importantly, *none* of the cases relied upon by the district court involved the circumstances present here, in which a defendant *purposefully withheld from a non-English speaking plaintiff the very document that, according to the court, would have alerted the plaintiff to the fraudulent scheme*. As the transcribed audio recording attached to the Complaint demonstrates, NYCRC made a conscious decision *not* to provide Investors with formal fund documentation and went so far as to instructing its marketing agents to answer any questions asked by Investors *without reference to the documents at all*, to secure the funding it needed for the Project. A-61 ¶ 73; A-255. To bar fraud claims by non-English speaking investors under these circumstances—i.e., by charging them with presumptive knowledge of fraud based on disclosures in documents they never received and written in a language they did not understand—would create incentives of the most perverse sort. In the future, NYCRC or other Regional Centers could comfortably recruit foreign investors with misleading oral representations and marketing brochures knowing that, once they put their signature on the subscription agreement, they would be deemed to know and understand the terms of all the other documents referenced in the subscription agreement—which they purposefully did not provide to them. That is not and should not be the law.

**B. The district court erred in finding the existence of "inquiry notice" as a matter of law based on representations contained in the Offering Memoranda because the Offering Memoranda could not have alerted Investors to the full scope of the fraud and contained misrepresentations of their own.**

The district court's finding of inquiry notice as a matter of law was also erroneous because, even if the Investors had received copies of the offering memoranda from NYCRC (and had been able to read and understand them), they would not have been able to discern that many of NYCRC's oral representations about the Project, on which they relied when deciding to make their investments, were untrue. While the offering memoranda may have contradicted what Investors were told about the collateral securing the loans, they did nothing to correct the myriad of other misrepresentations made by NYCRC and its agents. The additional misrepresentations to Phase I Investors included the following:

- The "government" and EB-5 were together funding the entire $358 million Project, with the EB-5 dollars representing less than 20% of the total financing and the remainder representing "free" money that the developer would not need to repay.

- The project had already begun and would happen with or without EB-5 capital.

- Skanska, one of the largest contractors in the world, had provided the developer with a completion guarantee, which was a pledge secured by its own assets to complete the Project within budget and on time.

A-59 ¶ 70; A-61 ¶ 73.

Each of these representations was false. Specifically:

31

- The Port Authority was funding only the repair and improvement of the George Washington bridge and bus terminal—not the retail space for which the EB-5 funds would be used.

- At the time of the Phase I investments, the project had not yet begun, and would not begin for almost two years.

- Skanska had already abandoned the Project and the developer had not yet engaged a replacement.

A-59 ¶ 70. None of the misrepresentations was corrected by any provision of the Fund 1 OM.

Phase II investors were likewise told that the "government" was funding the majority of the Project, and led to believe that both EB-5 and Port Authority dollars would be funding the station redevelopment and infrastructure improvement when, in fact, the EB-5 investments funded only improvements to the retail space—which were not backed at all by "government" dollars. A-70 ¶ 100. The Fund 2 OM did not correct this misrepresentation.

Perplexingly, the district court disregarded the significance of these misrepresentations, reasoning that they would have been important to Investors only if they had reasonably believed what they were told about the collateral securing the loans. SPA-23-24. But each statement was crafted to convince Investors that the EB-5 investments were safe, conservative investments that would generate a certain return: the Project was already underway, it was being financed by "free" government funding and guaranteed to be on-time and on-budget by one

32

of the largest general contractors in the world. It is unclear why the district court concluded that these representations were meaningless, and the Complaint adequately alleges that Investors reasonably relied upon them. A-243 ¶¶ 113, 119.

In fact, the offering memoranda were themselves misleading. Both the Fund 1 OM and Fund 2 OM emphasized the significance and size of the government funding, and devoted pages upon pages to the work being done to redevelop and modernize the Station and substantially improve infrastructure. A-399 to A-409 (Fund 1 OM); A-1207 to 1211 (Fund 2 OM). The extensive focus on redevelopment of the Station itself gave credence to NYCRC's representations that the Development Funds' loans to GWBDV would be secured by first lien mortgages on the real property (both public and retail) comprising the Station.

Indeed, the Fund 1 OM included a version of the "pie chart" that NYCRC encouraged its agents to use emphasize the substantial "free" government funding that backed the Project. A-405. The pie chart showed EB-5 investors contributing $72 million of the $365 million project (i.e., less than 20%) and left potential investors with the impression that the $72 million would be used to finance the same work that the Port Authority was financing, namely the redevelopment of the Station, improvements to infrastructure, and the expansion of the retail space. *Id*. Depicting the funding as part of the same "pie" also aligned with what Investors were being told about the nature and value of the collateral securing the loans—

that they were secured by a first lien mortgage on the real property being redeveloped with the combination of government and EB-5 funding. Thus, even if the Phase I Investors had read the Fund 1 OM from front to back, and understood every word of it, they still could have reasonably believed the lies NYCRC repeatedly fed them about nature and value of the collateral securing the loans.[7] Accordingly, the district court erred in concluding that the Phase I Investors were on inquiry notice of the fraud at the time they made the investments because of the disclosures contained in the Fund 1 OM.

The Fund 2 OM was also, and especially, misleading because it omitted material information about the very purpose of the second capital raise. The Fund 2 OM pretended that the new capital would fund a separate, Phase II stage of the Project (A-1207), which would include "a series of additional base building upgrades and code modifications necessary to continue the transformation of this critical transportation facility into a modern transit hub." A-1210. The truth was that the second capital raise was necessary to cover the sizeable shortfall generated by the retail renovations performed to date. The Fund 2 OM outright concealed this fact, and concealed the project delays, cost overruns, and loan defaults that were

---

[7] The Phase I Investors were never told about the existence of Fund 2, and did not discover it until GWBDV filed for bankruptcy. A-68 ¶ 88. They obviously could not have discovered the existence of Fund 2, or the cost overruns and financing shortfall that necessitated Fund 2's creation, from the Fund 1 OM, which pre-dated the creation of Fund 2 by over two years.

beleaguering the Project at the time the NYCRC was working to secure investments by the Phase II Investors. The Phase II Investors would have had no way of knowing about any of these problems even if they had received, read and understood the Fund 2 OM. Consequently, the Fund 2 OM could not possibly have put the Phase II Investors on inquiry notice of the full scale of NYCRC's fraud.

**C. The district court erred in finding the existence of "inquiry notice" as a matter of law because of the allegations that NYCRC concealed material information from Investors.**

As a final matter, the district court erroneously found that the Investors were on inquiry notice of the fraud at the instant they invested in the Development Funds, and their claims time-barred, given everything NYCRC did to cover up its serial misrepresentations. "[A]ctive concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct of the opposing party." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2d Cir. 1979). The Complaint presents ample evidence of concealment sufficient to toll the six-year statute of limitations.

NYCRC's cover up started with NYCRC's efforts to recruit the Investors without giving them access to the fund documentation, and without even answering questions by referring to the documents. A-61 ¶ 73; A-255. In addition, when the Project ran into financial trouble, NYCRC actively concealed it from the Investors with Chinese-language marketing updates that said nothing of project

delays, cost overruns and defaults under the loan agreements. A-71 ¶¶ 101, 103.

Because of that concealment, the Investors did not learn about NYCRC's lies until,

following GWBDV's bankruptcy, their attorneys put the pieces together.[8] A-244 ¶

118. Even after the bankruptcy, NYCRC met with Investors and reiterated its

misrepresentations about the collateral that secured their investors to reassure them

that there was capital to fund the returns they expected. A-73 ¶ 117.

Given the active concealment of the project delays and financial stress,

together with the reassurances given by NYCRC even after GWBDV entered

bankruptcy, it was error for the district court to find, as a matter of law, that the

Investors were on notice of the fraud at the time of their investments and dismiss

the fraud claims as time-barred. *See In re Eur. Gov't Bonds Antitrust Litig.*, 2022

WL 768680, at *14 (S.D.N.Y. Mar. 14, 2022) ("[G]iven the self-concealment of

the wrongdoing, Plaintiffs' lack of knowledge regarding any possible injury, and

Defendants' promises of fair trading, the due diligence question is too fact-

intensive to support dismissal at this time."); *Milman v. Box Hill Sys. Corp.*, 72 F.

Supp. 2d 220, 228-29 (S.D.N.Y. 1999) (declining to dismiss plaintiffs' claims as

---

[8] The bankrupty filing in October 2019 was the absolute earliest date on which Investors could have uncovered the full scope of the fraud, given the misleading project updates NYCRC circulated each year and the fact that Phase I Investors did not even know about the existence of Fund 2 (itself a default under the Permanent Loan Agreement) until the bankruptcy commenced. The Investors entered a tolling agreement with NYCRC that began on September 1, 2021 (A-244 ¶ 119), which was prior to the two-year discovery period provided for by N.Y. C.P.L.R. 213(8).

time-barred where disclosures defendants claimed to have put plaintiffs on inquiry notice were "tempered with positive statements"); *Siebert v. Nives*, 871 F. Supp. 110, 114-15 (D. Conn. 1994) (disclosures in annual report did not put plaintiffs on inquiry notice of fraud where report contained "reassurances that would serve to calm shareholders' suspicions that something might be 'amiss' including statements which reassure investors that the loss reserves were 'adequate' and that lending practices were 'conservative'").

The district court rejected the notion that the doctrine of fraudulent concealment could toll the Investors' fraud claims because they were not "reasonably diligent" in investigating the possible claims once the offering memoranda put them on inquiry notice of the fraud. SPA-28. As discussed above, however, the offering memoranda would *not* have alerted the Investors to the full scope of the fraud, and themselves contained both misrepresentations and omissions designed to dupe the Investors into subscribing in the Development Funds in the first place. Accordingly, it was improper to find the existence of inquiry notice as a matter of law, and to find the doctrine of fraudulent concealment inapplicable on the basis of the allegations of the Complaint alone.

## II. The District Court Erred in Finding that the Business Judgment Rule Precluded the Investors' Breach of Fiduciary Duty Claims

The district court erred in concluding that NYCRC's decisions not to declare defaults under the loan agreements were protected by the business judgment rule

SPA-41. NYCRC was uniquely interested in ensuring that GWBDV continued to make the interest payments under the loan agreements because the interest payments were what funded NYCRC's management fees. A-67 ¶¶ 80, 82, 85, 87; A-72 ¶ 107; A-73 ¶¶ 112, 114, 115. This self-interest took NYCRC's decisions with respect to declaring—or, more aptly, not declaring—defaults under the loan agreements outside the protection of the business judgment rule.

It is black-letter law that, when a manager is self-interested in a transaction, his decisions with respect to the transaction are not protected by the business judgment rule. *Pokoik v. Pokoik*, 146 A.D.3d 474, 475 (1st Dep't 2017). A manager is self-interested in a transaction where it will receive a direct financial benefit from the transaction that is different than the benefit available to members generally. *Marx v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996).

NYCRC was the *only* managing member of the Development Funds. A-55 ¶¶ 53-54. As such, it was the *only* member that stood to earn annual management fees so long as the loan agreements remained outstanding. The management fees, which totaled over $13 million (A-49 ¶ 12), were a substantial benefit that NYCRC received only by virtue of its managerial authority over the Funds, and a benefit unavailable to the non-managing members who relied on NYCRC to protect them. That is the definition of self-interest.

The district court concluded, however, that NYCRC's interest in collecting its management fees from the interest payments GWBDV made under the loan agreements was insufficient to take NYCRC's decisions with respect to the agreements outside the protection of the business judgment rule. SPA-38 (stating, "A fiduciary does not become self-interested merely because she is paid by her principal."). While ordinary compensation of a fiduciary may not rise to the level of self-interest, a steady stream of millions of dollars in management fees that can be sustained *only* by disregarding the interests of the principals (here, the Investors) certainly can. *See In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 482-83 (Bankr. S.D.N.Y. 2016) (denying motion to dismiss breach of fiduciary claim where complaint pled a "plausible claim" that defendant was self-interested with respect to payment of management fees such that she was "not entitled to avail herself of the business judgment rules based on the allegations of the Complaint.") At the very least, the Complaint sufficiently alleges self-interest on the part of NYCRC such that dismissal of the fiduciary duty claims was improper at this juncture.

Lastly, though not essential to its reasoning as to why the breach of fiduciary duty claims should be dismissed, the district court suggested that the Investors should somehow be precluded from asserting breach of fiduciary duty claims because defaults under the loan agreements may have jeopardized their green card

39

approvals—which they ultimately received. SPA-35-36. The fact, however, that Investors received Green Cards does not mean that they also were not harmed by the loss of total loss of their investments, which was the direct result of NYCRC's derelict of its fiduciary obligations to Investors. *See Fleisher v. Phoenix Life Ins. Co.*, 997 F. Supp. 2d 230, 237 (S.D.N.Y. 2014) (finding that defendant "misse[d] the point entirely" in contending that plaintiff suffered no injury because he received his "benefit of the bargain"). The EB-5 program is an investment program that requires the recipients of funds to treat investors like any other investor. The "benefit of the bargain" argument wrongly assumes the recipients of EB-5 loans may simply keep the money and do what they please with it, so long as the lenders get their U.S. residency. But Congress did not give real estate developers license to simply sell Green Cards to foreign nationals; rather, individuals must *invest* in an EB-5 project and independently satisfy all ordinary visa requirements to receive a Green Card. The Investors upheld their end of the bargain at the time they made their investments. At that point, they became investors with rights like any other, owed fiduciary duties by the entity managing their investments. There is no law that relieved NYCRC of its fiduciary obligations once a Green Card is issued. As such, the Complaint adequately pled the breach of fiduciary duty claims, and it was error for the district court to dismiss them.

## **CONCLUSION**

For all the foregoing reasons, this Court should reverse the Order dismissing

the Complaint.


Dated: February 6, 2024          Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: _/s/ Robert S. Landy_
    Robert S. Landy
    Amy C. Brown
    Stephen R. Halpin III
    Bryan W. McCracken
    275 Madison Avenue, 24th Floor
    New York, NY 10016
    Tel.: (212) 858-0040 (main)
    Fax: (212) 256-1047
    rlandy@fordobrien.com
    abrown@fordobrien.com
    shalpin@fordobrien.com

    *Counsel for Plaintiffs–Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 21(d), this document contains 9,980 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word, Version 16.79.1, in 14-point Times New Roman font.

Dated: February 6, 2024

  */s/ Robert S. Landy*
Robert S. Landy

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Lewis J.
    Liman, U.S.D.J., dated September 28, 2023,
    Appealed From ...................................................... SPA-1

Judgment, filed on September 28, 2023, Appealed
    From........................................................................ SPA-43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #:_____ | |
| DATE FILED: 09/28/2023 | |

BAI WEN, CAO XIAOLING, CAO YAN, CAO
YEQIAN, CHEN BIN, CHEN LI, CHEN QIANG, CHEN
WEILI, CHENG FANGZHOU, CHU MIN, FENG
YING, GAO GUANGFENG, GU DANHUI, HAN
MINGYUAN, HU LAN, HU MIN, HU WENSHU,
HUANG HUI, HUANG WEI, HUANG XIUWEN,
JIANG GUOSHUN, JIANG PEIYU, JIANG XUEFEN,
JING LILI, HAN WENSHENG, KIT PING JACKY
KWOK, LAI YONGHE, LAU KWAN, LI HUILING, LI
JINLONG, LI LIQIAN, LI MINGHUA, LI PEIJUN, LI
QIANG, LI QINGHUA, LI XUE, LI YUHAO, LI
YUHUAI, LIANG WEI, LIN SHUANGPING, LIN
YONGQIANG, LIU JINGHUI, LIU MING, LIU
WENJIE, LIU ZHE, MA AIQIN, MA ZHANHUA, MAO
ZHENG, NI LI, PING JIE, QI PEIXIN, WU
LIANGLIANG, QUE WEI, REN RONGRONG, SHAN
DANDAN, SHAN WEI, SHEN CONGYING, SHEN
HUIYU, SHI YIQUN, SHU LINGLI, SONG CHAO,
SONG XIAOYING, SUN HAO, SUN XIN, SUN YAN,
SUN YUXIN, TAN MANFANG, TENG LEZHI, WAN
LILI, WANG YINGMING, WANG CHAO, WANG
CHUANHONG, WANG NINGHONG, WANG YANG,
WANG YATAO, WANG JIANPING, WU DING,
XIONG XIN, XU JIEPING, XU MINXIA,YANG LI,
YANG MENG, YANG XUELI, YE QIANG, YE XIN,
YIN YOUGENG, YING JIANFENG, YU QIZHEN, YU
ZHAOHUI, YVONNE ZHU, ZHANG HUI, ZHANG
PINGJUN, ZHANG QIAN, ZHANG SHOUTAO,
ZHANG XUEMEI, ZHANG YUESHENG, ZHANG
YUMEI, ZHANG ZEYU, ZHAO JIAXU, ZHAO
MENGSHI, ZHAO YANGYANG, ZHENG HONGFEI,
ZHENG YONG, ZHOU LINA, ZHOU YIN, ZHU
FENGBO, and ZHU LIYI, individually and derivatively
on behalf of GEORGE WASHINGTON BRIDGE BUS
STATION AND INFRASTRUCTURE
DEVELOPMENT FUND, LLC and GEORGE
WASHINGTON BRIDGE BUS STATION AND
INFRASTRUCTURE DEVELOPMENT FUND, PHASE
II, LLC,

                    Plaintiffs,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

22-cv-7383 (LJL)

OPINION AND ORDER

SPA-2

```
                      -v-                              :
                                                      :
NEW YORK CITY REGIONAL CENTER, LLC,                   :
                                                      :
                          Defendant.                  :
                                                      :
---------------------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

Defendant New York City Regional Center, LLC ("Defendant") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of Plaintiffs,[1] Dkt. No. 3

("Complaint"), for failure to state a claim upon which relief can be granted, Dkt. No. 12.  For the

following reasons, the motion is granted.

**BACKGROUND**

The Court accepts the well-pleaded facts of the Complaint, as supplemented by the

documents incorporated by reference therein, as true for purposes of this motion.

Like many across the globe today, the Investor Plaintiffs—who were citizens of the

People's Republic of China—wanted to immigrate to the United States.  Dkt. No. 3 ¶ 3.  To

pursue that dream, they participated in the U.S. Citizenship and Immigration Services ("USCIS")

EB-5 visa program.  *Id.* ¶¶ 4–6.  The EB-5 program provides permanent resident status to foreign

individuals who invest $500,000 in a qualifying project that creates ten full-time jobs in the

United States.  *Id.* ¶ 5; *see also Bai v. Tegs Mgmt., LLC*, 2022 WL 602711, at *1 (S.D.N.Y.

Mar. 1, 2022) ("The applicable regulations on qualifying investments require evidence that the

petitioner has placed the required amount of capital at risk for the purpose of generating a return

---

[1] The plaintiffs are 107 individuals and two limited liability companies.  89 of these individuals
(the "Phase 1 Investors") invested in George Washington Bridge Bus Station and Infrastructure
Development Fund, LLC ("Development Fund 1") and 18 of them (the "Phase 2 Investors," and,
collectively with the Phase 1 Investors, the "Investor Plaintiffs") invested in George Washington
Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("Development Fund
2," and collectively with the Investor Plaintiffs and Development Fund 1, the "Plaintiffs").

2

on the capital placed at risk." (internal quotation marks and citations omitted)); 8 C.F.R.

§ 204.6(j).  The Investor Plaintiffs placed their funds with Defendant, a USCIS-approved

"Regional Center" that pooled capital from foreign investors and financed EB-5-qualifying

projects in a particular geographic region.  Dkt. No. 3 ¶ 4.

  One such project was the redevelopment of the George Washington Bridge Bus Station

(the "Station").  *Id.* ¶¶ 40, 49.  Built in 1963 at the eastern terminus of the George Washington

Bridge (the "Bridge") in Manhattan, on top of a stretch of Interstate 95 known as the Trans-

Manhattan Expressway, the Station is an important hub for buses in New York City.  *Id.* ¶ 40.

By 2005, the Port Authority of New York and New Jersey (the "Port Authority"), which owns

and operates the Bridge and Station, *id.* ¶ 32, recognized that the Station's retail spaces and bus

terminal required upgrades, *id.* ¶ 41.  The Port Authority also viewed those upgrades as an

opportunity to enhance revenue generation, improve the experience for bus passengers, and

create jobs in the Washington Heights neighborhood of Manhattan.  *Id.*

  After soliciting bids, the Port Authority entered into an exclusivity agreement with the

George Washington Bridge Bus Station Development Venture LLC ("GWBDV"), a private

company owned by a real estate development firm.  *Id.* ¶¶ 18–19, 42.  In 2008, after two years of

negotiations, the Port Authority announced its plan: a public-private partnership to renovate and

quadruple the size of the Station's retail spaces and modernize its bus terminal.  *Id.* ¶ 43.

GWBDV agreed to spend approximately $100 million to upgrade the retail spaces in exchange

for a 49-year lease, while the Port Authority agreed to simultaneously spend approximately

$78 million on the bus terminal.  *Id.* ¶ 44.  However, that announcement occurred at the onset of

the 2008 financial crisis, which resulted in a delay of more than two years as GWBDV sought

capital for the project.  *Id.* ¶ 45.  During that delay, the general contractor whom the Port

Authority and GWBDV had chosen for the renovations, Skanska USA Building Inc. ("Skanska"), pulled out of the project. *Id.* ¶ 47.

In 2011, to secure funding for the project, GWBDV's owner entered into an agreement with Defendant, which agreed to procure EB-5 investments from individuals in China. *Id.* ¶ 49. Defendant fulfilled that promise by engaging two Chinese companies—the Qiaowai Group ("Qiaowai") in Beijing and the Wailian Group ("Wailian") in Shanghai—to market EB-5 investments in the Station renovation project to Chinese nationals. *Id.* ¶¶ 29–30, 63. Defendant provided training and written materials to Qiaowai and Wailian for soliciting investments. *Id.* ¶¶ 64–65. But, during those trainings, Defendant's executives allegedly instructed Qiaowai and Wailian to withhold formal legal documentation regarding the investments, including the offering memorandum. *Id.* ¶ 65. Instead, the executives told Qiaowai and Wailian to distribute misleading brochures and slides. *Id.* ¶ 66.

A transcript of one of these training sessions indicates that one of Defendant's executives stated that, when soliciting investments, Qiaowai and Wailian should "keep information close to our vest," not "answer questions . . . with documents," and "not send[] anything out until [Defendant] authorize[d] it." *Id.* ¶ 73.A. He also directed them to tell prospective investors that $277 million of government capital would provide the vast majority of funding for the project and support their investments; their investments would be secured by a first mortgage on the entire Station, which was worth more than double the EB-5 investments; Skanska guaranteed completion of the project as the contractor; and the retail renovations would be complete in approximately two and a half years. *Id.* ¶ 73.B.

According to Plaintiffs, those statements were false and misleading. *Id.* ¶ 74. In fact, the Station's retail and bus terminal renovations were separate projects, with private capital

financing the former and government expenditures funding the latter. *Id.* ¶ 68. The collateral was merely a lien on the leasehold interest in the retail portion of the Station, which did not extend to the bus terminal portion of the Station or to the real property underlying the Station. *Id.* ¶ 99. And Skanska had already pulled out of the project amid the multiyear delay in securing funds. *Id.* ¶¶ 47, 69. Yet, the falsehoods were repeated to potential investors—including the Phase 1 Investors—who relied on them in deciding to place their funds with Defendant. *Id.* ¶¶ 74–75.

Only a few of the investors received the offering memorandum prior to executing subscription agreements. *Id.* ¶ 67. Those who did received a document that was in English, a language they could not understand. *Id.* That offering memorandum allegedly reiterated certain misrepresentations, namely that the EB-5 investment was a small portion of a primarily government-funded project and that Skanska would perform the construction work. *Id.* ¶¶ 68–69.

Nevertheless, Defendant obtained capital from the Phase 1 Investors. *Id.* ¶ 75. Their funds went to Development Fund 1, a limited liability company ("LLC") that Defendant established as its sole manager and initial member. *Id.* ¶ 53; *see also id.* ¶ 58 (explaining the operating agreement "irrevocably" appointed Defendant "to manage the business affairs of the Company"). Under Development Fund 1's operating agreement, investors each paid $540,500— $500,000 of which was invested as capital in the Station project and $40,500 of which went to Defendant in fees. *Id.* ¶ 54. Defendant was also entitled to an annual management fee of 2% of Development Fund 1's total capital under management. *Id.* ¶ 55. The investors, as non-managing members, were each entitled to annual distributions of $1,250 until Development Fund 1 recouped its investment to GWBDV. *Id.* ¶ 56. The investment in GWBDV was structured as a

five-year loan, with an annual interest rate of 4.75% and an option for GWBDV to extend the loan for another 810 days. *Id.* ¶¶ 59, 61. Development Fund 1 was to retain GWBDV's interest payments—less the annual management fee, operating expenses, and annual payments to members—until the final distribution, at which time the non-managing members would recover their initial capital investment, plus 50% of the retained interest, while the remainder would go to Defendant. *Id.* ¶ 57.

The loan agreement contained several defined events of default including: (a) GWBDV failing to pay interest when due; (b) GWBDV making any materially incorrect representation or warranty; (c) GWBDV becoming subject to any judgment in excess of $250,000 and not paying such judgment in 60 days (unless fully covered by insurance); (d) the "Mortgaged Property" becoming "materially injured" by a natural event; (e) the work not being "diligently and substantially completed" in accordance with the agreed "Project Cost Statement"; and (f) GWBDV's contracts with the Port Authority being materially changed without Defendant's prior approval. *Id.* ¶ 62.

By the end of 2011, Development Fund 1 had extended the loan to GWBDV and Defendant began collecting management fees. *Id.* ¶ 76. But the renovations were soon mired in difficulties. Superstorm Sandy damaged the Station in October of 2012, delaying the start of construction. *Id.* ¶ 78. Defendant, acting as the sole manager of Development Fund 1, did not declare a default on the loan based on the storm damage, and Defendant's newsletters to the Phase 1 Investors in 2012 and 2013 did not mention the storm's impact. *Id.* ¶ 79.

Construction ultimately began in autumn of 2013, after GWBDV engaged Tutor Perini Corp. ("Tutor Perini") to serve as general contractor. *Id.* By early 2014, however, it became clear that the retail renovations would cost at least $119 million instead of the originally

projected cost of $102 million.  *Id.* ¶ 83.  Yet, Defendant neither declared a default at that time nor apprised investors of the revised cost projections.  *Id.* ¶ 84.

Instead, Defendant solicited approximately $19 million in additional EB-5 funds from Chinese investors to cover the shortfall.  *Id.* ¶¶ 85, 96.  In doing so, Defendant and its marketing agents allegedly failed to disclose the damage from Superstorm Sandy and revised cost estimates that had affected the Station renovation.  *Id.* ¶ 96.  Defendant and its agents told the Phase 2 Investors that "Phase 1" of the renovations was complete and that additional capital was needed to fund "Phase 2" of the redevelopment.  *Id.* ¶ 98.  According to Plaintiffs, that characterization was untrue, as the Development Fund 1 investments were meant to finance the entire project and "Phase 2" was nothing more than a shortfall.  *Id.*  Defendant also allegedly misinformed the Phase 2 Investors that their funds would be added to the same capital stack as the Phase 1 funds and thus would enjoy a first mortgage security on the entire Station.  *Id.* ¶ 99.  Further, Defendant falsely claimed that the investments would be secured by collateral worth more than twice as much as the private funds and supported by government investments in the Station, which would comprise the vast majority of financing for Phase 2.  *Id.* ¶ 100.

The Phase 2 Investors' funds went to Development Fund 2—a second LLC Defendant organized pursuant to an operating agreement that generally paralleled that of Development Fund 1, but entitled Defendant to higher administrative fees.  *Id.* ¶¶ 87–89, 104.  Unlike Development Fund 1, Development Fund 2 did not fund the redevelopment project through a loan directly to GWBDV.  *Id.* ¶ 91.  Instead, Development Fund 2 extended a loan to GWBDV via a pass-through entity.  *Id.* ¶ 92.  That loan was secured by equity in GWBDV, rather than any kind of lien on the Station.  *Id.* ¶ 94.

Despite the influx of capital from the Phase 2 Investors, the Station redevelopment

project continued to face challenges. In early 2015, Tutor Perini, the general contractor, commenced a confidential arbitration against GWBDV alleging mismanagement and defective designs, while GWBDV counterclaimed that Tutor Perini and its subcontractors were responsible for the construction delays and overruns. *Id.* ¶ 105. Although Defendant was aware of that arbitration, it did not share that information with the Phase 1 or Phase 2 Investors. *Id.* In March 2016, the Port Authority amended the ground lease to defer the beginning of rent payments by four years and the anticipated completion date by six months in exchange for $880,000 in penalties for the delays. *Id.* ¶ 108. The following month, the Port Authority temporarily halted funding. *Id.* ¶ 109. GWBDV, in turn, paused payments to Tutor Perini and certain lenders, but continued to pay interest on the Development Fund 1 and Development Fund 2 loans. *Id.* The Station finally reopened in May 2017, but the retail portion remained closed at that time. *Id.* ¶ 113. Defendant did not declare a default in response to any of these events, nor did it inform the Investor Plaintiffs that they had transpired. *Id.* ¶¶ 111, 113. But Defendant continued to collect management fees. *Id.* ¶¶ 112, 114.

In October 2019, GWBDV filed for bankruptcy in the Southern District of New York. *Id.* ¶ 116. Defendant met with some of the Investor Plaintiffs to discuss the situation and reassured them that the Development Fund 1 and Development Fund 2 loans were secured by a first mortgage on the entire Station. *Id.* ¶ 117. Certain investors retained counsel. *Id.* ¶ 118. By April 2021, some of the Investor Plaintiffs had discovered that Defendant had misled them when soliciting funds, during the construction, and after the commencement of GWBDV's bankruptcy. *Id.*

As a result of GWBDV's bankruptcy, the Investor Plaintiffs lost the entirety of their investments in Development Fund 1 and Development Fund 2 (collectively, the "Funds"), *id.*

8

SPA-9

¶ 13, though most "receive[d] either temporary or permanent green cards," *id.* ¶ 15.  By contrast, Defendant made more than $20 million in fees.  *Id.* ¶ 13.

The parties entered a tolling agreement on September 1, 2021, halting all applicable statutes of limitations and repose.  *Id.* ¶ 119.  That agreement ended when Plaintiffs commenced this action.  *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed the operative Complaint against Defendant on August 30, 2022.[2]  *Id.* Plaintiffs claim that Defendant is liable for fraud in the inducement to both the Phase 1 Investors, *id.* ¶¶ 108–16, and the Phase 2 Investors, *id.* ¶¶ 117–24.  Plaintiffs further aver that Defendant's failure to declare defaults and disclose certain events to the Development Fund 1 and Development Fund 2 investors constituted a breach of fiduciary duty.  *Id.* ¶¶ 125–42.  The Phase 1 Investors bring their breach of fiduciary duty claim both on their own behalf and derivatively on behalf of Development Fund 1.  *Id.* ¶¶ 125–33.  Likewise, the Phase 2 Investors bring their breach of fiduciary duty claim on their own behalf and on behalf of Development Fund 2.  *Id.* ¶¶ 134–42.  Plaintiffs seek $57,780,000 in compensatory damages to the Investor Plaintiffs, additional damages to Development Fund 1 and Development Fund 2, punitive damages, prejudgment interest, fees, and costs.  *Id.* at ECF p. 205.  As an exhibit to their Complaint, Plaintiffs attached a purported transcript of a training session between Defendant's executives and Chinese marketing agents.  *Id.* at ECF pp. 206–38.

On October 31, 2022, Defendant filed the instant motion to dismiss the Complaint for failure to state a claim.  Dkt. No. 12.  Defendant also filed an accompanying memorandum of

---

[2] Plaintiffs initially filed a complaint on August 29, 2022, but they were instructed to refile due to a filing error.  *See* Dkt. No. 1.

law, Dkt. No. 13, and declaration of David Lender, Dkt. No. 14, which attaches *inter alia* the

Development Fund 1 and Development Fund 2 offering memoranda, Dkt. Nos. 14-3, 14-12, the

corresponding subscription agreements, Dkt. Nos. 14-1, 14-2, 14-11, the Development Fund 1

and Development Fund 2 operating agreements, Dkt. Nos. 14-6, 14-7, 14-8, 14-14, and the

Development Fund 1 and Development Fund 2 loan agreements, Dkt. Nos. 14-9, 14-16.

Plaintiffs filed a memorandum in opposition to the motion to dismiss on December 9,

2022. Dkt. No. 19. Defendant filed a reply in further support of its motion on January 17, 2023.

Dkt. No. 20.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 557 (2006)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* This "does not impose a probability requirement at the pleading

stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will

reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives,

Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same). That is, a complaint need not allege "detailed

factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Id.* at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual

allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town*

*cf Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When a pleading alleges fraud, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  In order to comply with Rule 9(b), "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## DISCUSSION

## I.  Documents Cognizable on the Motion to Dismiss

The Court first addresses the documents cognizable on the motion to dismiss.  Defendant asks the Court to examine the offering memoranda, subscription agreements, operating agreements, and loan agreements, *see* Dkt. No. 13 at 3 n.2, but Plaintiffs respond that those documents "should not be considered unless the Court opts to convert [Defendant's] Motion into a motion for summary judgment,"[3] Dkt. No. 19 at 16 n.4.

---

[3] Plaintiffs urge the Court to consider a training session transcript attached to the Complaint as an exhibit. *See* Dkt. No. 19 at 13; *see also* Dkt. No. 3 at ECF pp. 206–38.  Defendant does not

When adjudicating a 12(b)(6) motion, a court "may review only a narrow universe of materials." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 435 (S.D.N.Y. 2022). Generally, a court will "not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *Lateral Recovery*, 632 F. Supp. 3d at 436 (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)); *see also Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020). "[A] mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." *Lateral Recovery*, 632 F. Supp. 3d at 439 (quoting *SEC v. Medallion Fin. Corp.*, 2022 WL 3043224, at *1 (S.D.N.Y. Aug. 2, 2022)). In addition, the court may "consider on a motion to dismiss documents upon which the plaintiff relies in bringing suit, which are integral to the complaint, and as to which they had notice." *Gray*, 454 F. Supp. 3d at 383; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). A document is integral when "the complaint relies heavily upon its terms and effect." *Goel*, 820 F.3d at 559 (quoting *Chambers v. Time*

---

object to that request. The Court considers the training session transcript. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining documents "attached to the complaint as exhibits" are cognizable on a Rule 12(b)(6) motion); *Nam v. Permanent Mission of Republic of Korea to United Nations*, 581 F. Supp. 3d 643, 647 (S.D.N.Y. 2022) (Nathan, J.); *Sesa, Inc. v. Terrafina*, 2020 WL 6382919, at *3 (S.D.N.Y. Oct. 30, 2020).

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  "Merely mentioning a document in the complaint will not satisfy this standard," nor will limited quotations from the document.  *Id.* Instead, the document must "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)).  There also cannot be a "dispute" as to the "accuracy of the document."  *Goe*, 43 F.4th at 29 (quoting *Nicosia*, 834 F.3d at 231); *see Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 2023 WL 35176, at *6 (S.D.N.Y. Jan. 4, 2023) ("Even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible." (alteration omitted) (quoting *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016))).

The Court can consider the offering memoranda, subscription agreements, and operating agreements on this motion without converting it to one for summary judgment.  First, the Complaint incorporates them by reference through its "clear, definite and substantial reference[s] to the documents."  *Lateral Recovery*, 632 F. Supp. 3d at 435.  Plaintiffs do not merely cite the offering memoranda; they dedicate paragraphs to detailing their contents.  *See* Dkt. No. 3 ¶¶ 67–69; *id.* at 87.  Similarly, the Complaint is replete with references to the subscription agreements,[4] and it describes the terms of the operating agreements in depth, *id.* ¶¶ 53–58, 89.

Second, even if those documents were not incorporated by reference, they are integral to the Complaint.  Plaintiffs aver that the offering memoranda included misrepresentations that

---

[4] *See* Dkt. No. 3 ¶ 67; *id.* at 33, 35–36, 38, 40, 42–43, 45–46, 48, 50, 52, 54–55, 57, 59–60, 62, 64, 66–67, 69–70, 71, 73, 74, 76, 78–79, 81, 83, 85–86, 87–89, 91–92, 94, 96, 98, 100–03, 105, 107–08, 110, 112–13, 115, 117–18, 120–22, 124–25, 127–28, 130, 132–33, 135–38, 140–45, 147–148, 150, 152–53, 155–56, 158, 160–61, 163–65, 167–70, 172–73, 175–178, 180–81, 183–84, 186, 188, 190–91, 193, 195–97, 199.

form the very foundation of their fraudulent inducement claims. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed."); *Backhaus v. Streamedia Commc'ns, Inc.*, 2002 WL 1870272, at *3 (S.D.N.Y. Aug. 14, 2002); *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 233 F. Supp. 2d 550, 553 & n.2 (S.D.N.Y. 2002).  Although Plaintiffs attempt to analogize to *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192 (2d Cir. 2013), in which the Second Circuit admonished that the district court had erred in reviewing certain collective bargaining agreements at the motion to dismiss stage, Dkt. No. 19 at 16 n.4, *Nakahata* is inapposite because those agreements were solely relevant to "an affirmative defense," rather than the merits of the plaintiffs' claim, 723 F.3d at 203 n.20.

The subscription agreements are also integral to Plaintiffs' Complaint, as Plaintiffs' fraud claims are premised on the assertion that the Investor Plaintiffs were induced into signing those agreements.  *See Lamothe v. Town of Oyster Bay*, 2009 WL 2160983, at *3 (E.D.N.Y. July 10, 2009) ("As the plaintiffs' fraud causes of action allege misrepresentations . . . in order to induce the plaintiffs to purchase the property, the [sales] contract is an integral part of the plaintiffs' claims."); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir. 2021); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("In most instances where this [integral document] exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.").

14

SPA-15

Plaintiffs argue that the offering memoranda and subscription agreements cannot be integral because Defendant and its marketing agents withheld the offering memoranda and full subscription agreements from certain Investor Plaintiffs. Dkt. No. 19 at 16 n.4. But possession is not the *sine qua non* of when a document is integral. *See Chambers*, 282 F.3d at 153. Rather, it is sufficient that the offering memoranda and subscription agreements were documents that Plaintiffs "had knowledge of and upon which they relied in bringing suit." *Id.* Thus, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

Likewise, the Development Fund 1 and Development Fund 2 operating agreements are integral to the Complaint. Plaintiffs' claims for breach of fiduciary duty rely on those agreements to establish that Defendant owed such a duty to both the Investor Plaintiffs and the Funds. *See* Dkt. No. 3 at 202–03. The operating agreements are therefore necessary for Plaintiffs' "short and plain statement" of their fiduciary-duty claims. *Sahu*, 548 F.3d at 68 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, the Court may consider the loan agreements as integral to the Complaint. Plaintiffs' breach of fiduciary claims rest on the contention that certain events constituted defaults under the loan agreements and thus "requests judicial interpretation of their terms." *Chambers*, 282 F.3d at 154 n.4. In such circumstances, "[i]nsofar as the complaint relies on the terms of [an] agreement, . . . [courts] need not accept [a plaintiff's] description of those terms, but may look to the agreement itself." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).

Having determined that the offering memoranda, subscription agreements, operating

agreements, and loan agreements fall within the universe of materials the Court can properly

review in adjudicating Defendant's motion to dismiss, the Court addresses that motion in light of

those documents.

## II. Fraud Claims

Defendant argues that the Investor Plaintiffs' fraud claims are time-barred under the

governing statute of limitations. Dkt. No. 13 at 8.  Plaintiffs respond that statute-of-limitations

defenses are premature at the pleading stage and, in any event, their fraud claims are timely.

Dkt. No. 19 at 17–18.

### A.    Affirmative Defenses at the Pleadings Stage

The expiration of a statute of limitations is "an affirmative defense that a defendant must

plead and prove."  *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  As a result, the

requirement that a plaintiff provide "a short and plain statement of the claim showing that the

pleader is entitled to relief," Fed. R. Civ. P. 8, does "not compel a litigant to anticipate potential

affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in

avoidance of such defenses," *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) (citing *Jones v.

Bock*, 549 U.S. 199, 215 (2007)).

However, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if

the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros.*, 774

F.3d 791, 798 n.12 (2d Cir. 2014).  Nor is a court limited to the complaint in determining

whether a claim is time-barred, as the court may consider the full range of documents properly

reviewed at the motion to dismiss stage.  *See Staehr*, 547 F.3d at 425.  If a review of the

complaint and other permissible documents reveals "that the claims are prima facie time-barred,

the burden is on the plaintiff to 'plausibly alleg[e] that they fall within an exception to the applicable statute of limitations.'" *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 611–12 (S.D.N.Y. 2021) (quoting *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014)), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order) .

Those principles apply with equal force when the question is whether a statute of limitations forecloses a fraud claim based on a plaintiff's ability to discover the wrongdoing— *i.e.*, whether the plaintiff was on inquiry notice of the fraud.  The Second Circuit has "recognized in the past that determining 'whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'" *Staehr*, 547 F.3d at 412 (quoting *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).  But the Second Circuit has "also stated that courts can 'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss—as has been done in 'a vast number of cases' in this circuit—where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'"[5] *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362 (2d Cir. 2013); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 155–56 (2d Cir. 2012); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 127–28 (E.D.N.Y. 2013).

Thus, Plaintiffs' broad assertion that Defendant's "affirmative defense that this action should be dismissed on statute-of-limitations grounds is not applicable at the pleading stage,"

---

[5] Although *Staehr* concerned storm warnings under federal securities law, it is nevertheless instructive in assessing inquiry notice under New York law.  *See AXA Versicherung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 29 n.3 (2d Cir. 2010) ("[F]ederal law on inquiry notice is analogous to New York law.").

Dkt. No. 19 at 17, is contrary to precedent.  The Court therefore must determine whether it is "evident on the face of the complaint and documents properly considered at the motion to dismiss stage" that Plaintiffs' fraud claims are time-barred.  *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (quotation omitted).

**B.    Timeliness of the Investor Plaintiffs' Fraud Claims**

New York's statute of limitations dictates that "an action based on fraud" must be commenced "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8).

Plaintiffs do not challenge Defendant's assertion that "the alleged fraud occurred more than six years before September 1, 2021 (the date of the tolling agreement)."  Dkt. No. 13 at 9; *see* Dkt. No. 19 at 18.  "Under New York law, '[a] cause of action to recover damages for fraud cannot accrue until every element of the claim, including injury, can truthfully be alleged.'" *Landow*, 966 F. Supp. 2d at 126 (quoting *Carbon Cap. Mgmt., LLC v. Am. Express Co.*, 932 N.Y.S.2d 488, 495 (2d Dep't 2011)).  There is no dispute here that the fraud claims "accrued upon plaintiffs' making their investments," *Hamrick v. Guralnick*, 146 A.D.3d 606, 607 (1st Dep't 2017)—in 2011 for the Phase 1 Investors, Dkt. No. 3 ¶ 76, and 2014 for Phase 2 Investors, *id.* ¶ 98.

Instead, the parties dispute whether Plaintiffs filed suit "two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8); *see* Dkt. No. 13 at 9; Dkt. No. 19 at 18.  Plaintiffs broadly allege that "[i]t was not until April 2021, at the earliest, that any of the Investor Plaintiffs [were] in possession of sufficiently complete information to recognize that [Defendant] had misled them in connection with their investment decisions, mislead them in

connection with the status and progress of the [Station redevelopment] Project, and misled them regarding the protection their supposed security interests provided them in connection with the bankruptcy." Dkt. No. 3 ¶ 118. Defendant argues that the Investor Plaintiffs "all possessed information that was materially inconsistent with the alleged misrepresentations by the time they invested," Dkt. No. 13 at 9, and that "a reasonable investor *could* have discovered the alleged fraud by simply reviewing the offering documents by the time [Investor] Plaintiffs signed the agreements," Dkt. No. 20 at 1 (emphasis in original).

"[P]laintiff bears the burden of establishing that the fraud could not have been discovered before the two-year period prior to the commencement of the action." *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007). "The test as to when fraud should with reasonable diligence have been discovered is an objective one." *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (1st Dep't 2011) (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)). Under that test, "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Armstrong*, 699 F.2d at 88 (quoting *Higgins v. Crouse*, 42 N.E. 6, 7 (N.Y. 1895)); *see also Gutkin*, 926 N.Y.S.2d at 486; *In re Merrill, BoA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *6 (S.D.N.Y. Mar. 4, 2021), *a'f'd sub nom. Gamma Traders–I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022).

The duty to inquire is triggered when plaintiffs acquire "information that relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" *Landow*, 966 F. Supp. 2d at 130 (quoting *Cohen*, 711 F.3d at 361); *see also Sargiss v. Magarelli*, 909 N.E.2d 573, 576 (N.Y. 2009) ("The inquiry as to whether a plaintiff

could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which the fraud could be reasonably inferred."); *Rosenshein v. Meshel*, 688 F. App'x 60, 63 (2d Cir. 2017); *Bai*, 2022 WL 602711, at *9. "The triggering information 'need not detail every aspect of the [subsequently] alleged fraudulent scheme.'" *Cohen*, 711 F.3d at 361 (quoting *Staehr*, 547 F.3d at 427); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 201 (S.D.N.Y. 2003) (Lynch, J.). Rather, the information must "alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the [transaction]." *Brimo v. Corp. Express, Inc.*, 2000 WL 1506083, at *2 (2d Cir. 2000) (summary order) (quoting *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 343 (S.D.N.Y.1999)). "In turn, the date on which knowledge of a fraud will be imputed to a plaintiff can depend on the plaintiff's investigative efforts. If the plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose. And if some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." *Cohen*, 711 F.3d at 361–62 (cleaned up).

Inquiry notice fulfills the two "primary purposes of limitations statutes: 'preventing surprises' to defendants and 'barring a plaintiff who has slept on his rights.'" *Artis v. District of Columbia*, 583 U.S. 71, 91 (2018) (quoting *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)). By requiring plaintiffs to reasonably and diligently investigate evidence of fraud, the law prevents a contracting party from turning a blind eye to obvious falsehoods. Otherwise, one who suspects misrepresentation could remain willfully ignorant, enjoy the benefits of a bargain, and then strategically "discover" a fraud that she had suspected all along to avoid performance if

circumstances worsen. Fraud in the inducement is not an insurance policy. The doctrine of

reasonable diligence prevents a party who is on notice of misrepresentations from overlooking

her claim in order to enjoy the benefits of an agreement and to shift its risks onto her

counterparty. *See* Robert T. Miller, *The RMBS Put-Back Litigations and the Efficient Allocation

of Endogenous Risk over Time*, 34 Rev. Banking & Fin. L. 255, 263 (2014) (examining the risk-

shifting function of fraud statutes of limitations).

Here, the Investor Plaintiffs were on inquiry notice of the fraud that they allege when

they executed the subscription agreements. Plaintiffs aver that Defendant misrepresented the

collateral that secured their investments. The Phase 1 Investors were allegedly told that

Development Fund 1 would have a first lien mortgage on both the retail and bus-terminal

portions of the Station; that if GWBDV was in default, Development Fund 1 could take

possession of the Station's bus terminal and redevelop it into additional retail space; that the

value of the collateral, which was misrepresented as the entire bus Station including the bus

terminal, was worth more than twice the anticipated $72 million EB-5 investment; that the

collateral was comprised of two buildings, when in fact the Station is a single building and the

collateral was the ground lease, not the real property itself; that construction on the Project had

already commenced using public funds; and that the government was providing $277 million for

the project "so that the EB-5 investments would only provide 19% of the total capital but obtain

a first lien on the entire Project." Dkt. No. 3 ¶ 121.1.D.[6] The Phase 2 Investors were told that

---

[6] *See also id.* ¶¶ 121.2.D, 121.4.D, 121.5.C, 121.6.D, 121.7.D, 121.8.D, 121.11.C, 121.12.D,
121.13.D, 121.14.C, 121.15.D, 121.16.C, 121.17.C, 121.19.D, 121.20.E, 121.21.C, 121.22.D,
121.23.C, 121.25.D, 121.26.C, 121.27.B, 121.28.C, 121.29.D, 121.31.D, 121.32.C, 121.33.C,
121.35.D, 121.38.D, 121.39.C, 121.41.C, 121.42.D, 121.45.D, 121.46.C, 121.47.C, 121.48.D,
121.50.C, 121.51.C, 121.52.D, 121.53.E. 121.54.D, 121.55.C, 121.56.C, 121.57.C, 121.58.C,
121.60.C, 121.61.D, 121.62.C, 121.63.C, 121.64.C, 121.66.C, 121.67.C, 121.68.C, 121.71.C,
121.72.C, 121.73.C, 121.74.C, 121.75.D, 121.76.C, 121.77.C, 121.78.C, 121.79.C, 121.80.C,

Phase 1 of the redevelopment project was complete and had been a success, that Development

Fund 2 would have the first lien mortgage on both the retail and bus-terminal portions of the

Station, and that the government was providing $277 million for the project so that the EB-5

investments would only provide a small percentage of the total capital but obtain a first lien on

the entire project. *Id.* ¶ 121.3.D.[7]

But the offering memoranda for Development Fund 1 and Development Fund 2

contradicted those alleged misrepresentations. Under the heading for "Priority and Security," the

Development Fund 1 offering memorandum states that the loan to GWBDV would be "secured

by a leasehold mortgage . . . on the GWB Marketplace," which consisted of "approximately

120,000 square feet of retail space that makes up the Broadway Marketplace at GWB, containing

the newly constructed retail concourse and street level retail complex." Dkt. No. 14-3 at ECF

p. 31. It says nothing about a mortgage on real property. That disclosure is directly inconsistent

with any understanding that the investors in Development Fund 1 would obtain security in the

entire project or in the form of a first lien mortgage on real property.[8] Likewise, the

Development Fund 2 offering memorandum explains that in the event of a default, Development

Fund 2 would have only "contractual remedies pursuant to the Venture LLC Agreement" which

---

121.81.D, 121.82.D, 121.83.C, 121.84.C, 121.85.C, 121.86.D, 121.87.D, 121.88.C, 121.89.C,
121.90.D, 121.92.D, 121.93.C, 121.94.C, 121.95.D, 121.96.C, 121.97.D, 121.98.D, 121.99.C,
121.100.D, 121.101.D, 121.102.C, 121.103.C, 121.104.D, 121.105.C, 121.106.C, 121.107.C.
[7] *See also id.* ¶¶ 121.9.C, 121.10.G, 121.18.E, 121.24.C, 121.30.D, 121.34.C, 121.36.D,
121.37.D, 121.40.C, 121.43.C, 121.44.C, 121.49.D, 121.59.D, 121.65.C, 121.69.C, 121.70.C,
121.91.D.
[8] The Development Fund 1 offering memorandum also warned potential investors that "[t]here
will be no other security for the Loan. . . . The Company's only recourse in the event of a Loan
default under the Promissory Note, as the lender, will be to realize on the Collateral and exercise
its rights under the Leasehold Mortgage. The Company's ability to foreclose and recognize its
rights may be subject to any lenders making senior Third Party Loans to the Borrower." Dkt.
No. 14-3 at ECF p. 31.

allowed it to remove the pass-through entity's managing member for cause. Dkt. No. 14-12 at

ECF pp. 27, 38.[9] That disclosure is inconsistent with Defendant's alleged oral misrepresentation

that "Dev. Fund 2 would have a first lien mortgage on both the retail and public (bus terminal)

portions of the Station." Dkt. No. 3 ¶ 100.B. And each subscription agreement attested that the

investor "has carefully reviewed the Offering Memorandum and understands the nature of the

proposed investment in the Company." Dkt. No. 14-1 at ECF p. 6; Dkt. No. 14-11 at ECF p. 7.

An investor of ordinary intelligence would realize that the offering memoranda

incorporated into the subscription agreements conflicted with Defendant's alleged misstatements

regarding the collateral that would secure their investments in the Station redevelopment project.

*See Hamrick*, 146 A.D.3d at 607 ("Plaintiffs were placed on inquiry notice of the alleged

fraud . . . when they received the private placement memorandum, which expressly contradicted

defendants' alleged oral representations."); *cf. Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 347 (2d

Cir. 1993) (applying the same standard under federal securities laws). The language of the

offering memoranda thus put Plaintiffs on inquiry notice of the alleged fraud. Defendant's

alleged misrepresentations about the nature of collateral went to "the fundamental nature of the

investments," *Coleman & Co. Sec. v. Giaquinto Fam. Tr.*, 236 F. Supp. 2d 288, 310 (S.D.N.Y.

2002) (Chin, J.), and is "[t]he crux of [Plaintiffs'] fraudulent inducement claims," *AXA*

*Versicherung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 29 (2d Cir. 2010). Indeed, the other alleged

misrepresentations—regarding the value of the collateral, the extent of and benefits of the

---

[9] The Development Fund 2 offering memorandum states that if there is a "failure or default of
the Borrower, . . . the Company will have contractual remedies pursuant to the Venture LLC
Agreement, although there is no assurance that the Borrower would be able to make the
Company whole for any losses or damages suffered and the Company may lose the value of all
of its assets," and that, as a result, "an investment in the Company is speculative and subject to
substantial repayment risk." Dkt. No. 14-12 at ECF p. 38.

government investment in the bus terminal portion of the Station, and the progress made on the
Station redevelopment—would have been of note to investors only if they believed the loans
would be secured by first lien mortgages in the entire Station.  They would have been of no
particular significance to a person whose investment was secured only by a leasehold mortgage
or an interest in GWBDV.  Accordingly, the offering memoranda would have enabled an
investor of ordinary intelligence to "perceiv[e] the general fraudulent scheme" Plaintiffs allege in
their Complaint.  *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997); *see
also In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014),
*aff'd*, 616 F. App'x 442 (2d Cir. 2015).  Put differently, Defendant's misrepresentation of the
nature of the collateral was sufficiently related to the other misrepresentations at issue in this
case for the offering memoranda to provide inquiry notice as to "*the* fraud" as a whole.  N.Y.
C.P.L.R. 213(8) (emphasis added).  The Investor Plaintiffs were therefore under "a duty to
inquire further."  *Dodds*, 12 F.3d at 352; *see also Addeo v. Braver*, 956 F. Supp. 443, 449
(S.D.N.Y. 1997) (Sotomayor, J.).  They do not allege that they did so.  And even if they had
made "some inquiry," in the exercise of reasonable diligence they would have discovered the
fraud at the time they entered the subscription agreements, given the disclosures in the offering
memoranda.  *Cohen*, 711 F.3d at 362 (quoting *Lentell*, 396 F.3d at 168).  Thus, the statute of
limitations began running upon the date of their investment and, as a result, the Investor
Plaintiffs' fraud claims are time-barred.

Plaintiffs do not address the manifest tension between the offering memoranda, which the
Investor Plaintiffs attested to reading and understanding in their subscription agreements, and the
misrepresentations regarding collateral that form the basis of Plaintiffs' fraud claims.  *See* Dkt.
No. 19 at 17–18.  Instead, Plaintiffs argue that those documents could not furnish storm warnings

because "numerous Plaintiffs specifically alleged they were given only a signature page of a subscription agreement in English and did not receive any formal documentation." *Id.* at 18.

As a matter of New York law, "[a] party who executes a contract is presumed to know its contents and to assent to them." *Holcomb v. TWR Express, Inc.*, 782 N.Y.S.2d 840, 841 (2d Dep't 2004) (internal quotation marks and citation omitted); *see also Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209 (2d Dep't 2000) ("[A] party will not be excused from his failure to read and understand the contents of a [contract]. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms."). That rule applies even when a party to a contract receives only a portion of the agreement: She must request and read the remainder of the contract as she remains bound by the omitted terms. *See Brundage v. Pension Assocs. Ret. Plan., LLC*, 2019 WL 2465146, at *4 (S.D.N.Y. June 13, 2019) ("If Plaintiffs had reviewed the document they signed, they would have noticed that a portion of the contract was missing."); *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 74 (S.D.N.Y. 2012) ("[Plaintiff] alone is accountable for his decision to sign the Agreement without reading it and without first requesting a copy of the Terms and Conditions that it expressly incorporated."). A party who receives only a portion of an agreement cannot avoid its effect by disclaiming knowledge of the remainder. New York law assumes a reasonably diligent investor would have requested and reviewed the remainder of the subscription agreement and offering memorandum.[10] *See Sharma v. Walia*, 157 N.Y.S.3d 722, 723 (1st Dep't 2022).

---

[10] Defendant also asserts that the Investor Plaintiffs certified that they had read the offering memoranda in their immigration petitions to the USCIS. *See* Dkt. No. 20 at 1. Because those petitions are neither incorporated by reference in nor integral to the Complaint, the Court will not consider them at the motion to dismiss stage. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001).

Nor were the Investor Plaintiffs relieved of their obligation to read the agreements and offering memoranda due to their inability to understand English. *See* Dkt. No. 3 ¶ 67. "[A] claim of illiteracy in the English language is, by itself, insufficient to avoid the rule that '[a] party who signs a contract without any valid excuse for having failed to read it is conclusively bound by its terms.'" *Kenol v. Nelson*, 581 N.Y.S.2d 415, 417 (2d Dep't 1992) (alteration in original) (quoting *Scfio v. Hughes*, 162 A.D.2d 518, 519 (2d Dep't 1990)). Instead, "[a] person who is illiterate in the English language . . . must make a reasonable effort to have the contract read to them." *Holcomb*, 782 N.Y.S.2d at 842; *Emigrant Mortg. Co., Inc. v. Pub. Adm'r cf Kings Cnty.*, 172 N.Y.S.3d 45, 50 (2d Dep't 2022); *Kassab v. Marco Shoes Inc.*, 723 N.Y.S.2d 352, 353 (1st Dep't 2001). True, the New York Court of Appeals stated in the seminal case *Pimpinello v. Swft & Co.*, 170 N.E. 530 (N.Y. 1930), that "[i]f the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger, unless the signer be negligent, the writing is void." *Id.* at 531. But New York courts have since clarified:

> [T]he rule stated in the *Pimpinello* case is applicable only when the signer of the document is free of negligence. Persons who are blind or illiterate are not automatically excused from complying with the terms of the contracts which they sign simply because their disability might have prevented them from reading the contracts. The cases consistently hold that a person with such a disability must make a reasonable effort to have the document read to him. The same should be true of a person who claims not to understand English. Even assuming [plaintiff] was unable to understand the [contract], he should not have signed it before having it explained to him.

*Scfio*, 556 N.Y.S.2d at 719 (citations omitted). Here, each Investor Plaintiff invested over half a million dollars in a sophisticated venture. *See* Dkt. No. 3 ¶¶ 116, 124. The law expected the Investor Plaintiffs to have the subscription agreements translated before signing them. That

expectation is conclusive notwithstanding the Investor Plaintiffs' decision to enter into an agreement in a language they could not understand.[11]

Finally, Plaintiffs suggest that their fraud claims are not time-barred because Defendant concealed its misrepresentations. *See* Dkt. No. 19 at 18. Plaintiffs allege that "[i]t was not until April 2021" and through the efforts of counsel that they came into possession of sufficiently complete information to recognize that they had been defrauded. Dkt. No. 3 ¶ 118. Plaintiffs further allege that in meetings with investors after GWBDV filed for bankruptcy protection in October 2019, Defendant "reiterated its misrepresentations regarding the collateral pledged to Dev. Fund 1 and Dev. Fund 2, in order to prevent the investors from taking any formal actions, and to conceal the falsity of their earlier misrepresentations." *Id.* ¶ 117.

Plaintiffs rely on the doctrine of fraudulent concealment—a particular kind of equitable tolling and equitable estoppel[12]—but that reliance is misplaced. Fraudulent concealment "is an 'extraordinary remedy,'" *Twersky*, 993 F. Supp. 2d at 442 (quoting *Pulver v. Dougherty*, 871 N.Y.S.2d 495, 496 (3d Dep't 2009)), that tolls a statute of limitations when a plaintiff shows: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled," *Roeder*, 523 F. Supp. 3d at 617 (quoting

---

[11] Indeed, the offering memoranda specifically advised: "IF THE ENGLISH LANGUAGE IS NOT THE PROSPECTIVE PURCHASER'S PRINCIPAL LANGUAGE, IT IS STRONGLY RECOMMENDED THAT THE PROSPECTIVE PURCHASER SEEK ADVICE FROM ADVISORS WHO CAN INTERPRET FOR HIM/HER AND ADEQUATELY EXPLAIN THIS MEMORANDUM." Dkt. No. 14-3 at ECF p. 9; *see* Dkt. No. 14-12 at ECF p. 9.

[12] Plaintiffs' argument sounds in equitable estoppel. *See Roeder*, 523 F. Supp. 3d at 617 (explaining "equitable tolling under federal law . . . is similar to the principles of equitable estoppel under New York law," and that "fraudulent concealment" is a "particular type of tolling").

*Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999)); *see also Koral v. Saunders*, 36 F.4th 400, 409–10 (2d Cir. 2022). Accordingly, "[r]easonable diligence is a prerequisite" to fraudulent concealment. *Koch*, 699 F.3d at 157; *see Brean Murray, Carret & Co. v. Morrison & Foerster LLP*, 87 N.Y.S.3d 178, 180 (1st Dep't 2018). Defendant could not have fraudulently concealed the facts regarding its misrepresentations at the time the investments were made because the offering memoranda disclosed facts that placed the Investor Plaintiffs on inquiry notice of the alleged fraud. The reasonable diligence requirement thus precludes the application of fraudulent concealment because the Investor Plaintiffs failed to uncover the alleged fraud despite material discrepancies between the offering memoranda and alleged oral misrepresentations. *See AXA Versicherung AG*, 391 F. App'x at 30 ("[A]ny actions taken by [defendant] or its brokers to 'conceal' the language from [plaintiff] would not toll the statute of limitations in this case because the [contracts] themselves would have given [plaintiff] sufficient knowledge to place it under a duty of inquiry."). And, to the extent Plaintiffs would rely on Defendant's alleged misrepresentations in 2019, those misrepresentations could not have "prevented plaintiff[s'] discovery of the nature of the claim within the limitations period." *Roeder*, 523 F. Supp. 3d at 617. "[T]he statute of limitations had already run by that time," and "the tolling period cannot delay the expiration of a deadline when that deadline has already expired." *Koch*, 699 F.3d at 157 (internal quotation marks and citation omitted); *see also Roeder*, 523 F. Supp. 3d at 618 (collecting cases).

    In sum, the Investor Plaintiffs were on inquiry notice of the alleged frauds when they entered the subscription agreements. Their failure to exercise reasonable diligence is no excuse.[13] *See Pimpinello*, 170 N.E. at 531 ("If the signer could read the instrument, not to have

--------

[13] The Court need not and does not reach Defendant's alternative argument that Plaintiffs' fraud

read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."). As Plaintiffs did not bring their fraud claims within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it," N.Y. C.P.L.R. 213(8), those claims are time-barred. The Court therefore grants Defendant's motion to dismiss the Investor Plaintiffs' fraud claims.

## III. Breach of Fiduciary Duty Claims

Defendant also contends that the Complaint fails to state a claim for breach of fiduciary duty. Dkt. No. 13 at 19. According to Defendant, the business judgment rule shields its actions from judicial scrutiny. *Id.* at 21. Plaintiffs contest that assertion. Dkt. No. 19 at 19–25.

The Court first clarifies the precise claims Plaintiffs are pursuing and then addresses Defendant's substantive arguments.

### A.      The Nature of Plaintiffs' Claims

Plaintiffs' Complaint claims that Defendant violated its fiduciary duties to the Investor Plaintiffs as well as to Development Fund 1 and Development Fund 2. Dkt. No. 3 at ECF pp. 202–04. The Investor Plaintiffs bring those claims both on their own behalf and derivatively

---

claims also fail on the merits because the Investor Plaintiffs have not pleaded reasonable reliance. *See* Dkt. No. 13 at 12–18. The Court observes, however, that while reasonable diligence and reasonable reliance are often similar standards in practice, *see, e.g.*, *Stone v. Schulz*, 647 N.Y.S.2d 822, 823 (2d Dep't 1996) ("Where, as here, there is a meaningful conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of a reasonable reliance upon the oral representation."), it is nevertheless "important to bear in mind the [formal] distinction between 'reasonable diligence,' an element of the statute of limitations defense, and 'justifiable reliance,' an element of the substantive fraud claim," *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1231 (S.D.N.Y. 1995). Notably, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011).

on behalf of Development Fund 1 and Development Fund 2.[14]  *Id.*  Plaintiffs' fiduciary-duty claims also allege two distinct breaches:  Defendant's failure to disclose the default-trigger events to the Investor Plaintiffs, and Defendant's failure to declare defaults in response to those events.  *Id.*

In its motion to dismiss, Defendant contends that Plaintiffs' nondisclosure theory fails to state a claim because Defendant "had no duty to disclose negative information."  Dkt. No. 13 at 24.  Plaintiffs' response does not oppose that argument; it merely asserts that Defendant breached its fiduciary duty "by failing to declare defaults."  Dkt. No. 19 at 19.  A court can "properly deem a represented party to have abandoned claims if, in opposing a motion to dismiss multiple claims, it addressed only some of them."  *Sullivan v. City of New York*, 2015 WL 5025296, at *4 (S.D.N.Y. Aug. 25, 2015), *aff'd*, 690 F. App'x 63 (2d Cir. 2017); *see also Lonstein L. Gp., P.C. v. Evanston Ins. Co.*, 2022 WL 311391, at *12 n.7 (S.D.N.Y. Feb. 2, 2022); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).  By failing to respond to Defendant's arguments for dismissing Plaintiffs' nondisclosure claims, Plaintiffs abandoned those claims so the Court will dismiss them.

Next, Defendant contends that Plaintiffs' fiduciary-duty claims based on Defendant's failure to declare defaults are "at best, derivative" such that "the direct claims should be dismissed."  Dkt. No. 13 at 24 n.20.

Under New York law, a member of an LLC does not have an "individual cause of action" for wrongs to the LLC, "though he loses the value of his investment."  *Abrams v. Donati*,

---

[14] Defendant does not challenge the Investor Plaintiffs' standing to sue derivatively on behalf of Development Fund 1 and Development Fund 2.

489 N.E.2d 751, 751 (N.Y. 1985).  Instead, to vindicate wrongs to the company, "members of

LLCs may sue derivatively."  *Tzolis v. Wo.,f*, 884 N.E.2d 1005, 1010 (N.Y. 2008).  But members

can bring claims on their own behalf "when the wrongdoer has breached a duty owed to the

[members] independent of any duty owing to the [LLC] wronged."  *Abrams*, 489 N.E.2d at 752.

Thus, the Court must decide whether "the defendant has violated an independent duty to the

[members]."  *Excimer Assocs., Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 140 (2d Cir. 2002)

(quoting *Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir. 1993)).

Defendant's alleged failure to declare defaults under the loan agreements concerns a duty

owed directly to Development Fund 1 and Development Fund 2.  Claims based "allegations of

mismanagement or diversion of assets by officers or directors to their own enrichment, without

more, plead a wrong to the [LLC] only, for which a [member] may sue derivatively but not

individually."  *Abrams*, 489 N.E.2d at 752.  Indeed, the Investor Plaintiffs aver that they were

damaged because Defendant's failure to declare defaults led Development Fund 1 and

Development Fund 2 to lose value.  *See* Dkt. No. 3 at 203–04.  As Defendant's actions "only

harmed [the Investor Plaintiffs] indirectly by reducing the value of [their] ownership stake[s],"

Plaintiffs' claims predicated on Defendant's failure to declare defaults are "quintessentially

derivative."  *Weidberg v. Barnett*, 752 F. Supp. 2d 301, 308 (E.D.N.Y. 2010); *see HSM*

*Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *23 (S.D.N.Y. Mar. 10, 2021).

Accordingly, the Investor Plaintiffs lack standing to bring those claims individually,[15] so the

Court dismisses them to the extent the Investor Plaintiffs bring them in an individual capacity.

---

[15] Although New York courts recognize a limited exception to the general rule that breaches of
duties to entities must be brought derivatively "where the [member] has sustained a loss
disproportionate to that sustained by the [company]," *Cortazar v. Tomasino*, 54 N.Y.S.3d 89, 92
(2d Dep't 2017), that exception is inapplicable here because both the Investor Plaintiffs and the
LLCs suffered a total loss.

Having determined that Plaintiffs' remaining breach of fiduciary duty claims are derivative and predicated on Defendant's failure to declare defaults, the Court must decide whether those claims withstand Defendant's arguments on the merits.

**B.      The Merits of Plaintiffs' Claims**

Plaintiffs claim that by failing to declare defaults under the loan agreements, Defendant "placed [its] economic interests above those of non-managing members" of Development Fund 1 and Development Fund 2, thereby breaching its "duty of undivided and undiluted loyalty" to the Funds. Dkt. No. 3 at ECF pp. 202–04. Specifically, Plaintiffs aver that Defendant did not declare defaults because its "economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised." *Id.* ¶ 6. They further allege Defendant acted to preserve its reputation with developers in New York and investors in China. *Id.* ¶ 7. Defendant argues that Plaintiffs' fiduciary-duty claims must be dismissed because, even if events of default occurred, the business judgment rule would insulate Defendant's decisions not to declare defaults from judicial scrutiny. Dkt. No. 13 at 6.

"A managing member of an LLC owes a fiduciary duty to the LLC." *McKinnon Doxsee Agency, Inc. v. Gallina*, 132 N.Y.S.3d 144, 148 (2d Dep't 2020). That fiduciary duty consists of several obligations, including "the duty of care [and] duty of loyalty." *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, 2017 WL 2240235, at *4 (S.D.N.Y. Mar. 29, 2017) (citing *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438 (S.D.N.Y. 2010)); *see also* N.Y. Ltd. Liab. Co. Law § 409(a) ("A manager shall perform his or her duties as a manager . . . in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.").

The duty of care dictates that a "fiduciary, in the discharge of his responsibilities[,] must use at least that degree of diligence that an 'ordinarily prudent' person under similar circumstances would use." *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (citation omitted); *see Gray on Behalf of Furia Org., Inc. v. Furia Org., Inc.*, 896 F. Supp. 144, 148 (S.D.N.Y. 1995). The duty of loyalty imposes "a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989) (quoting *In re Ryan's Will*, 52 N.E.2d 909, 923 (N.Y. 1943)). "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). A fiduciary breaches that duty by "taking 'an action for [its] own improper personal benefit' that is not in the best interests of the party to whom a duty is owed." *Kalajian v. Grahel Assocs., LLC*, 142 N.Y.S.3d 377, 378 (2d Dep't 2021) (quoting *McKinnon Doxsee*, 132 N.Y.S.3d at 148).

"The business judgment rule 'bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *S.H. & Helen R. Scheuer Fam. Found., Inc., ex rel. Scheuer v. 61 Assocs.*, 582 N.Y.S.2d 662, 664 (1st Dep't 1992) (quoting *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979)). Although the doctrine originated in suits against corporate directors, it also protects the managers of LLCs. *See In re L&N Twins Place LLC*, 2020 WL 7211235, at *5 n.10 (S.D.N.Y. Dec. 4, 2020) (citing *Zuckerbrod v. 355 Co., LLC*, 979 N.Y.S.2d 119, 120–21 (N.Y. App. Div. 2014)). "[T]he business judgment rule . . . provides that, where corporate officers or directors exercise unbiased judgment in determining that certain actions will promote

33

the corporation's interests, courts will defer to those determinations if they were made in good faith." *In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214, 218 (N.Y. 2016) (citation omitted).

For the business judgment rule to apply, the manager must "possess a disinterested independence and [must] not stand in a dual relation which prevents an unprejudicial exercise of judgment." *Auerbach*, 393 N.E.2d at 1001; *see also In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a director has an interest in a decision, the business judgment rule does not apply."). Under New York law, a manager "may be interested under either of two scenarios: self-interest in the transaction or loss of independence due to the control of an interested [third party]." *In re Comverse Tech., Inc.*, 866 N.Y.S.2d 10, 15 (1st Dep't 2008). Managers are "self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to [members] generally." *Marx v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996). The possibility that a manager could "be held liable for their actions is not enough." *Jiminian v. Seabrook*, 760 F. App'x 38, 42 (2d Cir. 2019) (quoting *Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*, 871 N.Y.S.2d 102, 105 (1st Dep't 2009)). A manager "is considered to have lost his/her independence where she/he is dominated or otherwise controlled by an individual or entity interested in the transaction at issue." *Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 357 (Sup. Ct. 2005); *see also Auerbach v. Klein*, 859 N.Y.S.2d 901, 901 (Sup. Ct. 2008), *aff'd*, 887 N.Y.S.2d 248 (2d Dep't 2009). "To establish loss of independence resulting from [a third party's] dominance, plaintiffs must allege particularized facts sufficient to raise the suspicion that [the manager was] beholden to [that party's] . . . coercive control." *Higgins*, 806 N.Y.S.2d at 357.

Plaintiffs argue that Defendant was interested in the alleged defaults, so the business judgment rule does not apply: "while the non-managing members, including the Investor Plaintiffs here, wanted their capital to be carefully managed to optimize the possibility of a quick repayment, [Defendant's] economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised." Dkt. No. 3 ¶ 6. Plaintiffs also argue that Defendant had an interest in preserving its reputation as a flexible lender in the world of New York developers and in maintaining its image in the Chinese capital market as a company that uses EB-5 funds to finance only safe investment projects, neither of which were aligned with the interests of the Investor Plaintiffs.[16] *Id.* ¶ 7.

Those allegations are insufficient to show Defendant was interested in the purported defaults such that its actions fall outside the business judgment rule. On Plaintiffs' theory, any decision by Defendant to forego declaring a default would trigger a violation of the duty of loyalty and would eliminate the protection accorded Defendant by the business judgment rule because every such decision, by definition, would prolong the period of time during which Defendant would continue to earn its management fee. But the decision whether or not to declare a default inherently involves the exercise of business judgment on behalf of each Fund. And Plaintiffs do not allege self-dealing, self-interest in the transaction pursuant to which Development Fund 1 and Development Fund 2 extended capital to GWBDV, or loss of independence.

Every decision Defendant could have made at any of the critical time periods between 2012 and 2016 would have come with both costs and benefits. On the cost side, as Plaintiffs

---

[16] Plaintiffs further note that the Investor Plaintiffs would never be repeat customers due to the nature of the EB-5 program and that Defendant did not invest its own capital in the Station redevelopment project. *Id.* ¶¶ 9–10.

now emphasize, the decision not to declare a default increased the risk to the Funds and thus indirectly to each of the Investor Plaintiffs.  Defendant's decision to maintain the loans to GWBDV after the delays from Superstorm Sandy, the increase in costs beyond the Project Cost Statement, Tutor Perini's arbitration against GWBDV, the Port Authority's amendment of the Station ground lease, and GWBDV's temporary pause on interest payments—each of which was an event of default according to Plaintiff, Dkt. No. 19 at 21–22—increased the risk that the redevelopment project would not be complete and that the Investor Plaintiffs would lose their principal and any remaining interest.  By the same token, however, a decision to declare a default would also have imposed costs on Plaintiffs.  Had Defendant done so, the loans to GWBDV would have become "immediately due and payable."  Dkt. No. 14-9 at ECF p. 41; Dkt. No. 14-16 at ECF p. 37.  Plaintiffs would have no longer enjoyed the continuing income stream of interest payments from the loans.  Moreover, withdrawing the Investor Plaintiffs' capital from the Station redevelopment project early would have jeopardized the express purpose of Development Fund 1 and Development Fund 2—"making the Qualifying Investment" under the "EB-5 Immigrant Investor Program," Dkt. No. 14-6 at ECF pp. 8, 36; Dkt. No. 14-14 at ECF pp. 8, 37—as EB-5 investments must be at risk for at least two years, *see* 8 U.S.C. § 1153(b)(5)(A)(i), and often significantly longer, *see Kaur v. Mayorkas*, 2023 WL 4899083, at *2–3 (S.D.N.Y. Aug. 1, 2023), before the investors become lawful permanent residents of the United States.  Indeed, as a result of Defendant's managerial strategy, eighty of the Investor Plaintiffs are now lawful permanent residents.[17]  Dkt. No. 3 ¶ 16.

---

[17] Defendant represents, and Plaintiffs do not contest, that "every Plaintiff who pursued permanent residency is now a permanent U.S. resident or has an application pending as a result of their investments."  Dkt. No. 13 at 1.

It is only by virtue of hindsight that it appears that Defendant's choice not to declare a default—if Defendant had such a right[18]—was the wrong one.  But the business judgment rule was developed to prevent precisely that kind of judicial Monday-morning quarterbacking of good faith business decisions.  *See In re Kenneth Cole Prods.*, 52 N.E.3d at 218 ("The doctrine is based, at least in part, on a recognition that: courts are ill equipped to evaluate what are essentially business judgments [and] there is no objective standard by which to measure the correctness of many corporate decisions (which involve the weighing of various considerations)."); *Auerbach*, 393 N.E.2d at 1000 ("[B]y definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility."); *Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 224 (S.D.N.Y. 2004) ("[Plaintiffs'] claims are essentially an attack on the wisdom of defendants' decision.  But the business judgment rule is intended to protect directors against just such attacks because their decisions are not to be second-guessed by courts with the benefit of hindsight.").

The fact that, so long as the loans remained extended, Defendant stood to continue to earn "management fees on the outstanding loans," Dkt. No. 19 at 23, cannot take Defendant's judgments outside the protections of the business judgment rule.  Pursuant to the Development Fund 1 and Development Fund 2 operating agreements, Defendant was paid those fees to

---

[18] It is by no means free from doubt whether Defendant had the right to declare a default.  While Plaintiffs raise colorable arguments that the delay following Superstorm Sandy, the increase in costs beyond the Project Cost Statement, and GWBDV's pause on payments may have constituted defaults, *see* Dkt. No 19 at 21–22, the other purported defaults lack support in the loan agreements.  The Tutor Perini arbitration was not brought under a "federal, state or foreign bankruptcy, insolvency, receivership, or similar law."  Dkt. No. 14-9 at ECF p. 39; *see also* Dkt. No. 14-16 at ECF p. 35.  And even if the Port Authority's modification of the Station ground lease were material, Plaintiffs have not alleged that the modification occurred without Defendant's prior written consent.  *See* Dkt. No. 14-9 at ECF p. 40; Dkt. No. 14-16 at ECF p. 36.

SPA-38

"manage the business affairs of the [Funds], carry on the activities of the [Funds] and to do and to perform any and all things necessary for, or incidental to or connected with carrying on the activities of the [Funds]." Dkt. No. 14-6 at ECF p. 21; Dkt. No. 14-14 at ECF p. 21.  That included the decision whether or not to declare a default.  The operating agreements also specified that Defendant had the power to "make all decision concerning the . . . management . . . , monitoring and disposition of Investments." Dkt. No. 14-6 at ECF p. 21; Dkt. No. 14-14 at ECF p. 22.  A fiduciary does not become self-interested merely because she is paid by her principal.  Nor is a fiduciary obligated to terminate her agency at the earliest possible moment, lest any decision she takes that extends that agency deprives the fiduciary of her right to exercise business judgment free from judicial second-guessing.  Alleging that a fiduciary's decision was motivated by a desire to maintain her salary is, without more, insufficient to take that decision outside the protections of the business judgment rule. *See Owen v. Hamilton*, 843 N.Y.S.2d 298, 302 (1st Dep't 2007) (concluding receipt of a salary did not render a director interested in a challenged transaction); *In re LMI Legacy Holdings, Inc.*, 625 B.R. 268, 287–88 (D. Del. 2020) (applying New York law and dismissing a breach of fiduciary duty claim against two director who allegedly pursued a transaction to "maximiz[e] personal compensation, interests, and keep[] their management positions"); *see also Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc.*, 2021 WL 665031, at *2 (S.D.N.Y. Feb. 19, 2021) ("[Plaintiff's] conclusory allegation that the Directors were motivated to retain their seats on the board, is wholly insufficient to constitute self-interested conduct.").  Virtually every fiduciary is compensated for their services, so treating compensation alone as rendering a fiduciary interested would "permit[] plaintiff[s] to frame their complaint in such a way as to automatically [avoid the business judgment rule], thereby allowing the exception to swallow the rule." *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey*

*Grp., Inc.*, 2012 WL 3542196, at *3 (S.D.N.Y. Aug. 15, 2012) (Nathan, J.) (quoting *Marx*,

666 N.E. 2d at 1040); *see also In re Wonderwork, Inc.*, 611 B.R. 169, 202 (Bankr. S.D.N.Y.

2020) ("If that were the law, most if not all corporate officers would be in breach.").

      The same principle applies when the claim is that the decision at issue has the effect of

continuing the fiduciary relationship.  A manager is not invariably conflicted if it decides to

continue operating a company—and thus retains its position—rather than dissolving the

business.  Even if it turns out that decision made the company "less valuable as an entity" and

the company "eventually became insolvent," courts will not "undercut the utility of the business

judgment rule by permitting [members] to second-guess good faith action simply because the

[company] ultimately became insolvent."  *In re Trib. Co. Fraudulent Conv. Litig.*, 2018 WL

6329139, at *7 (S.D.N.Y. Nov. 30, 2018) (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young,

L.L.P.*, 906 A.2d 168, 201, 203 (Del. Ch. 2006)), *aff'd*, 10 F.4th 147 (2d Cir. 2021).  Thus,

Plaintiffs' assertion that the purported events of default increased the risk that Development

Fund 1 and Development Fund 2 would fail does not deprive Defendant of the right—and the

obligation—to exercise business judgment.  Any event of default presumably results in increased

risk.  Defendant still was under "no absolute obligation . . . to cease operations and to liquidate."

*Trenwick*, 906 A.2d at 204.[19]

      In any event, Defendant's management fees did not create an impermissible conflict of

interest because the offering memoranda fully disclosed them.  *See* Dkt. No. 14-3 at ECF p. 14

(detailing how the "Management Fee" would be calculated); Dkt. No. 14-12 at ECF p. 15 (same

for the "Service Fee").  "[A] breach of fiduciary duty claim may not be based on a conflict of

---

[19] Although *Trenwick* applied Delaware law, its holding is instructive.  *See Ficus Invs., Inc. v. Priv. Cap. Mgmt., LLC*, 61 A.D.3d 1, 9 (1st Dep't 2009) ("Delaware courts have had ample opportunity to address these issues . . . [so] their holdings can be instructive.").

interest or even self-dealing where the conflict was specifically disclosed in the partnership agreement or prospectus." *Schneider v. Wien & Malkin LLP*, 2004 WL 2495843, at *14 (Sup. Ct. 2004); *see also Riviera Cong. Assocs. v. Yassky*, 18 N.Y.2d 540, 548 (1966); *Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *15 (Del. Ch. July 31, 2020); *Seacfood Funding Ltd. P'shp v. M&M Assocs. II, L.P.*, 672 A.2d 66, 72 (Del. Ch. 1995) ("A conflict of interest disclosed in a prospectus or partnership agreement and a plaintiff's acceptance of the terms of the prospectus or Partnership Agreement precludes the plaintiff from bringing a derivative claim based on the facts disclosed in those documents.").

Plaintiffs' alternative theory—that Defendant was self-interested because it "sought to impress both future project developers and potential new investors," Dkt. No. 19 at 23—is also insufficient.  Every fiduciary presumably has an interest in impressing not only her principal but all potential future principals with her business acuity and sound judgment.  That does not make every fiduciary self-interested.  If anything, such reputational effects should help guard against the imprudent exercise of business judgment.  *See* Jonathan G. Rohr, *Corporate Governance, Collective Action and Contractual Freedom: Justfying Delaware's New Restrictions on Private Ordering*, 41 Del. J. Corp. L. 803, 832 (2017) ("When [reputational] forces exert their pressure on corporate fiduciaries, there is simply less work for corporate law to do."); *cf.* Claire A. Hill & Richard W. Painter, *Better Bankers, Better Banks: Promoting Good Business Through Contractual Commitment* 103–04 (2015) (examining the changing role of reputation in capital markets).  In any event, those reputational considerations do not qualify as "*direct financial benefit[s]*" that would render Defendant interested for purposes of the business judgment rule. *Marx*, 666 N.E.2d at 1042 (emphasis added).  Nor do Defendant's alleged ties to unnamed New York developers and potential Chinese investors establish that Defendant was "controlled or

dominated" by those developers or investors, let alone that those developers or investors were themselves interested in the defaults. *Owen*, 843 N.Y.S.2d at 302; *see also In re Cadus Corp. S'holders Litig.*, 138 N.Y.S.3d 2, 4 (1st Dep't 2020) ("Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence." (quoting *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014))); 3 Fletcher Cyclopedia Corporations § 941 (2023) ("[T]he fact that a director has or had an association with entities that have had a commercial relationship with the corporation does not necessarily establish that the director is interested in a given transaction.").

The business judgment rule defeats Plaintiffs' claims. Defendant argues that its decisions not to declare defaults were made "in good faith and in the best interests of the Funds." Dkt. No. 13 at 21 (internal quotation marks and citation omitted). Plaintiffs' sole counterargument is that Defendant was interested in the defaults, Dkt. No. 19 at 23, but Plaintiffs' allegations of interest are inadequate for the reasons discussed above. Accordingly, the Court cannot conclude Defendant lacked a good faith belief that refraining from declarations of default would serve the best interests of Development Fund 1 and Development Fund 2. *See In re Kenneth Cole Prods.*, 52 N.E.3d at 218; *see also Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005) ("New York's business judgment rule creates a presumption that a corporation's directors act in good faith and in the best interests of the corporation."). Indeed, by not declaring defaults, Defendant ensured that the Funds continued to receive interest on their loans to GWBDV and that the Investor Plaintiffs' funds remained in an EB-5-qualified investment while the Investor Plaintiffs pursued lawful permanent residency in the United States. Thus, the Court must "respect

SPA-42

[Defendant's] determinations" pursuant to the business judgment rule, *Auerbach*, 393 N.E.2d at 1000, and dismiss Plaintiffs' fiduciary-duty claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, Dkt. No. 13, is GRANTED.[20] The Clerk is respectfully directed to close Dkt. No. 13 and to close this case.

SO ORDERED.

Dated: September 28, 2023
     New York, New York

                                     LEWIS J. LIMAN
                           United States District Judge

---

[20] Plaintiffs do not request leave to replead and do not "identify [any] additional facts or legal theories that [they] might assert if given the opportunity to replead. For this reason and because the Court concludes that any amendment would be futile," the Complaint is dismissed with prejudice. *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 401 (S.D.N.Y. 2022), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
BAI WEN, CAO XIAOLING, CAO YAN, CAO YEQIAN,
CHEN BIN, CHEN LI, CHEN QIANG, CHEN WEILI,
CHENG FANGZHOU, CHU MIN, FENG YING, GAO
GUANGFENG, GU DANHUI, HAN MINGYUAN, HU
LAN, HU MIN, HU WENSHU, HUANG HUI, HUANG
WEI, HUANG XIUWEN, JIANG GUOSHUN, JIANG
PEIYU, JIANG XUEFEN, JING LILI, HAN WENSHENG,
KIT PING JACKY KWOK, LAI YONGHE, LAU KWAN,
LI HUILING, LI JINLONG, LI LIQIAN, LI MINGHUA,
LI PEIJUN, LI QIANG, LI QINGHUA, LI XUE, LI YUHAO,
LI YUHUAI, LIANG WEI, LIN SHUANGPING, LIN
YONGQIANG, LIU JINGHUI, LIU MING, LIU WENJIE,
LIU ZHE, MA AIQIN, MA ZHANHUA, MAO ZHENG, NI LI,
PING JIE, QI PEIXIN, WU LIANGLIANG, QUE WEI, REN
RONGRONG, SHAN DANDAN, SHAN WEI, SHEN
CONGYING, SHEN HUIYU, SHI YIQUN, SHU LINGLI,
SONG CHAO, SONG XIAOYING, SUN HAO, SUN XIN,
SUN YAN, SUN YUXIN, TAN MANFANG, TENG LEZHI,
WAN LILI, WANG YINGMING, WANG CHAO, WANG
CHUANHONG, WANG NINGHONG, WANG YANG, WANG
YATAO, WANG JIANPING, WU DING, XIONG XIN, XU
JIEPING, XU MINXIA, YANG LI, YANG MENG, YANG
XUELI, YE QIANG, YE XIN, YIN YOUGENG, YING
JIANFENG, YU QIZHEN, YU ZHAOHUI, YVONNE ZHU,
ZHANG HUI, ZHANG PINGJUN, ZHANG QIAN, ZHANG
SHOUTAO, ZHANG XUEMEI, ZHANG YUESHENG,
ZHANG YUMEI, ZHANG ZEYU, ZHAO JIAXU, ZHAO
MENGSHI, ZHAO YANGYANG, ZHENG HONGFEI,
ZHENG YONG, ZHOU LINA, ZHOU YIN, ZHU FENGBO,
and ZHU LIYI, individually and derivatively on behalf of
GEORGE WASHINGTON BRIDGE BUS STATION AND
INFRASTRUCTURE DEVELOPMENT FUND, LLC and
GEORGE WASHINGTON BRIDGE BUS STATION AND
INFRASTRUCTURE DEVELOPMENT FUND, PHASE
II, LLC,,

                              Plaintiff,

              -against-


NEW YORK CITY REGIONAL CENTER, LLC,,

                              Defendant.
------------------------------------------------------------------------X

22 **CIVIL** 7383 (LJL)


**JUDGMENT**

SPA-44

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated September 28, 2023, Defendants motion to dismiss, Dkt. No.13 is GRANTED. Accordingly, the case is closed.

**Dated:** New York, New York

September 28, 2023

**RUBY J. KRAJICK**
**Clerk of Court**

BY: _____

**Deputy Clerk**