# 23-7506-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

BAI WEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CAO XIAOLING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CAO YAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George

*(For Continuation of Caption See Inside Cover)*
———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

MARK PINKERT
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100

GREGORY SILBERT
  *Counsel of Record*
DAVID J. LENDER
JESSICA LYNN FALK
A.J. GREEN
SHAI BERMAN
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
greg.silbert@weil.com

*Attorneys for Defendant-Appellee*

Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, CAO YEQIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN BIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN WEILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHEN FANGZHOU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, CHU MIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, FENG YING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, GAO GUANGFENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, GU DANHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HAN MINGYUAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU LAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU MIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HU WENSHU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development, HUANG HUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus

Station and Infrastructure Development Fund, Phase II, LLC, HUANG WEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HUANG XIUWEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG GUOSHUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG PEIYU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JIANG XUEFEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, JING LILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, HAN WENSHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, KIT PING JACKY KWOK, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LAI YONGHE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LAU KWAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI HUILING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI JINLONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI LIQIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI MINGHUA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI PEIJUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus

Station and Infrastructure Development Fund, Phase II, LLC, LI QINGHUA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI XUE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI YUHAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LI YUHUAI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIANG WEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIN SHUANGPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIN YONGQIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU JINGHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU MING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU WENJIE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, LIU ZHE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MA AIQIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MA ZHANHUA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, MAO ZHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, NI LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, PING JIE, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund,

Phase II, LLC, QI PEIXIN, Individually and derivatively on behalf of George
Washington Bridge Bus Station and Infrastructure Development Fund, LLC and
George Washington Bridge Bus Station and Infrastructure Development Fund,
Phase II, LLC, WU LIANGLIANG, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, QUE WEI, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, REN RONGRONG, Individually and derivatively on behalf
of George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHAN DANDAN, Individually and derivatively on behalf
of George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHAN WEI, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHEN CONGYING, Individually and derivatively on behalf
of George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHEN HUIYU, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHI YIQUN, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SHU LINGLI, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SONG CHAO, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SONG XIAOYING, Individually and derivatively on behalf
of George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SUN HAO, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SUN XIN, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SUN YAN, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, SUN YUXIN, Individually and derivatively on behalf of
George Washington Bridge Bus Station and Infrastructure Development Fund,
LLC and George Washington Bridge Bus Station and Infrastructure Development
Fund, Phase II, LLC, TAN MANFANG, Individually and derivatively on behalf

of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, TENG LEZHI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WAN LILI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YINGMING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG CHAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG CHUANHONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG NINGHONG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG YATAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WANG JIANPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, WU DING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XIONG XIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XU JIEPING, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, XU MINXIA, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG LI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG MENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YANG XUELI, Individually and derivatively on behalf of

George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YE QIANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YE XIN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YIN YOUGENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YING JIANFENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YU QIZHEN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YU ZHAOHUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, YVONNE ZHU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG HUI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG PINGJUN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG QIAN, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG SHOUTAO, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG XUEMEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG YUESHENG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG YUMEI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHANG ZEYU, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHAO JIAXU, Individually and derivatively on behalf of George

Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHAO MENGSHI, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, ZHAO YANG YANG, Individually and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC,

*Plaintiffs-Appellants,*

– v. –

NEW YORK CITY REGIONAL CENTER, LLC,

*Defendant-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure New York City Regional Center LLC states that it has no corporate parent nor are there any publicly held corporations that own 10% or more of its stock.

# TABLE OF CONTENTS

Introduction ............................................................................................. 1

Statement Of The Issues ....................................................................... 4

Statement Of The Case ......................................................................... 5

    A.  Factual Background ......................................................... 5

    B.  Procedural History ......................................................... 17

Standard of Review .............................................................................. 22

Summary of Argument ......................................................................... 23

Argument .............................................................................................. 26

  I.  The District Court Correctly Dismissed Plaintiffs' Fraud Claims
    As Time-Barred ............................................................................ 26

    A.  The Subscription Agreements Conclusively Establish That
        Plaintiffs Were On Inquiry Notice In 2011 And 2014 .............. 28

    B.  Plaintiffs' Arguments That They Were Not On Inquiry
        Notice Are Unpersuasive ............................................... 32

    C.  Plaintiffs Did Not Allege Any Form Of Concealment, Much
        Less Concealment That Warrants Tolling ................................ 41

  II.  In The Alternative, Plaintiffs' Fraud Claims Fail As Matter Of
     Law For Failure To Plead Resaonable Reliance ........................... 44

  III. The District Court Correctly Dismissed The Fiduciary Duty
      Claims ......................................................................................... 48

    A.  The District Court Correctly Held That The Business
        Judgment Rule Bars Plaintiffs' Claims Challenging
        NYCRC's Decision To Not Declare Defaults ............................ 50

    B.  The Exculpation Clause In The Funds' Operating
        Agreements Bars Plaintiffs' Breach Of Fiduciary Duty
        Claims ........................................................................ 57

    C.  Plaintiffs Failed To Allege NYCRC's Purported Failure To
        Declare Defaults Caused The Funds Any Damages ................. 60

Conclusion ............................................................................................ 62

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Addeo v. Braver*,
   956 F. Supp. 443 (S.D.N.Y. 1997)........................................... 39

*Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*,
   933 N.Y.S.2d 202 (App. Div. 2011)........................................ 57, 58

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................... 22, 23

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011) ................................................. 44

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................ 45, 46

*AXA Versicherung AG v. N.H. Ins. Co.*,
   391 F. App'x 25 (2d Cir. 2010) ........................................ 28, 39, 43

*Bai v. Tegs Mgmt., LLC*,
   No. 20-cv-4942 (DLC), 2022 WL 602711 (S.D.N.Y. Mar. 1, 2022) ............................................................... 6

*Corcoran v. N.Y. Power Auth.*,
   202 F.3d 530 (2d Cir. 1999) ........................................ 42, 43, 44

*Crewe v. Rich Dad Educ., LLC*,
   884 F. Supp. 2d 60 (S.D.N.Y. 2012)......................................... 34

*Crigger v. Fahnestock & Co.*,
   443 F.3d 230 (2d Cir. 2006) ................................................. 44

*Dodds v. Cigna Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993) .......................................... 27, 28, 39

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003) ................................................. 35

*Ficus Invs., Inc. v. Priv. Cap. Mgmt., LLC*,
   872 N.Y.S.2d 93 (App. Div. 2009)........................................... 53

*FIH, LLC v. Found. Cap. Partners LLC*,
   920 F.3d 134 (2d Cir. 2019) ................................................. 46

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016) .......................................................... 10

*Greenberg v. Joffee*,
   824 N.Y.S.2d 355 (App. Div. 2006) ........................................... 60, 61

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) ................................................................. 53

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007) ........................................................... 27

*Gutkin v. Siegal*,
   926 N.Y.S.2d 485 (App. Div. 2011) ........................................... 31, 39

*Hamrick v. Guralnick*,
   44 N.Y.3d 749 (App. Div. 2017) ..................................................... 31

*Hanson Tr. PLC v. ML SCM Acquisition, Inc.*,
   781 F.2d 264 (2d Cir. 1986) ........................................................... 50

*Holcomb v. TWR Express, Inc.*,
   782 N.Y.S.2d 840 (App. Div. 2004) ........................................... 21, 28

*Holzer v. Mondadori*,
   40 Misc. 3d 1233(A), 2013 WL 4523615 (N.Y. Sup. Ct.
   2013) ........................................................................................... 35

*Huff Energy Fund, L.P. v. Gershen*,
   No. 11116-VCS, 2016 WL 5462958 (Del. Ch. Sept. 29,
   2016) ........................................................................................... 53

*In re Ampal-Am. Israel Corp.*,
   543 B.R. 464 (Bankr. S.D.N.Y. 2016) ........................................... 54

*In re Ampal-Am. Israel Corp.*,
   No. 12-13689 (SMB), 2020 WL 2529337
   (Bankr. S.D.N.Y. May 14, 2020) ................................................... 55

*In re Executive Telecard Ltd. Sec, Litig.*,
   913 F. Supp. 280 (S.D.N.Y. 1996) ........................................... 37, 38

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
   815 F. Supp. 620 (S.D.N.Y. 1993) ................................................. 28

*In re Kenneth Cole Prods., Inc.*,
   52 N.E.3d 214 (N.Y. 2016) ........................................................ 50, 51

*In re LMI Legacy Holdings, Inc.*,
    625 B.R. 268 (D. Del. 2020) ............................................................ 53

*In re Lyondell Chem. Co.*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) ............................................. 58

*In re Lyondell Chem. Co.*,
    585 B.R. 41 (S.D.N.Y. 2018) ..................................................... 58, 59

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014) .............................................. 38

*In re Wonderwork, Inc.*,
    611 B.R. 169 (Bankr. S.D.N.Y. 2020) ........................................... 52

*Kagan v. HMC-New York, Inc.*,
    939 N.Y.S.2d 384 (App. Div. 2012) ............................................... 57

*Kenol v. Nelson*,
    581 N.Y.S.2d 415 (App. Div. 1992) ............................................... 21

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .......................................................... 28

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) .......................................................... 22

*MAFG Art Fund, LLC v. Gagosian*,
    998 N.Y.S.2d 342 (App. Div. 2014) .......................................... 47, 48

*Maheshwari v. City of New York*,
    810 N.E.2d 894 (N.Y. 2004) .......................................................... 61

*Matter of Ball (SFX Broad. Inc.)*,
    665 N.Y.S.2d 444 (App. Div. 1997) .......................................... 59, 60

*Matter of Izummi*,
    22 I&N Dec. 169 (BIA 1998) ........................................................... 6

*MBI Int'l Holdings Inc. v. Barclays Bank PLC*,
    57 N.Y.S.3d 119 (App. Div. 2017) ............................. 27, 30, 37, 39

*McBeth v. Porges*,
    171 F. Supp. 3d 216 (S.D.N.Y. 2016) ............................................ 35

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    643 N.E.2d 504 (N.Y. 1994) .......................................................... 59

*Muhan Cui v. Xia*,
  No. 19-CV-615 (NG)(SJB), 2021 WL 925480 (E.D.N.Y.
  Mar. 2, 2021) ................................................................................ 56

*Owen v. Hamilton*,
  843 N.Y.S.2d 298 (App. Div. 2007) ......................................... 22, 53

*Pokoik v. Pokoik*,
  45 N.Y.S.3d 50 (App. Div. 2017) ..................................................... 52

*Precision Mech., Inc. v. Dormitory Auth. of N.Y.*,
  774 N.Y.S.2d 734 (App. Div. 2004) ................................................ 59

*Riviera Cong. Assocs. v. Yassky*,
  223 N.E.2d 876 (N.Y. 1966) ............................................... 22, 55, 56

*RKA Film Fin., LLC v. Kavanaugh*,
  99 N.Y.S.3d 267 (App. Div. 2019) ........................................... 47, 48

*Royal Am. Managers, Inc. v. IRC Holding Corp.*,
  885 F.2d 1011 (2d Cir. 1989) .......................................................... 45

*S.H. & Helen R. Scheuer Fam. Found., Inc., ex rel. Scheuer
  v. 61 Assocs.*,
  582 N.Y.S.2d 662 (App. Div. 1992) ................................................ 55

*Schneider v. Wien & Malkin LLP.*,
  No. 601363/02, 2004 WL 2495843 (N.Y. Sup. Ct. 2004) ............... 55

*Schumaker v. Mather*,
  30 N.E. 755 (N.Y. 1892) ................................................................. 44

*Seaford Funding Ltd. Partnership v M & M Assocs. II,
  L.P.*,
  672 A.2d 66 (Del. Ch. 1995) ........................................................... 55

*Sharma v. Walia*,
  157 N.Y.S.3d 722 (App. Div. 2022) ..................................... 21, 32, 34

*Shklovskiy v. Khan*,
  709 N.Y.S.2d 208 (App. Div. 2000) ................................................. 36

*Simmons v. Reich*,
  No. 20-4114, 2021 WL 5023354 (2d Cir. Oct. 29, 2021) ............... 43

*Staehr v. Hartford Fin. Servs. Grp.*,
  547 F.3d 406 (2d Cir. 2008) ........................................................... 38

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006) .......................................................... 53

*Unique Goals Int'l, Ltd. v. Finskiy*,
    116 N.Y.S.3d 223 (App. Div. 2019) .......................................... 47, 48

*Vill. Green E. Holdings LLC v. Blaakman*,
    197 N.Y.S.3d 393 (App. Div. 2023) ................................................ 61

*Zazu, Inc. v. Manor*,
    539 N.Y.S.2d 348 (App. Div. 1989) .......................................... 45, 46

*Zuckerbrod v. 355 Co., LLC*,
    979 N.Y.S.2d 119 (N.Y. App. Div. 2014) .................................. 21, 50

## Statutes

8 U.S.C. § 1153(b)(5) ................................................................................ 49

N.Y. C.P.L.R. 213(8) ..................................................................... 19, 26, 27

N.Y. Ltd. Liab. Co. Law § 417(a).................................................... 58, 60

## Other Authorities

8 C.F.R. § 103.2 ............................................................................ 7, 10, 38

8 C.F.R. § 204.6(j) ................................................................ 1, 6, 7, 10, 38

8 C.F.R. § 216.6 ........................................................................................ 7

Experience and Track Record, New York City Regional
    Center, https://nycrc.com/experience.html ...................................... 7

Press Release, New York City Regional Center, New York
    City Regional Center Announces I-829 Petition
    Approvals in Its GWB Bus Station and Infrastructure
    Project II (Feb. 23, 2024),
    https://www.globenewswire.com/news-
    release/2024/02/23/2834512/0/en/new-york-city-
    regional-center-announces-i-829-petition-approvals-in-
    its-gwb-bus-station-and-infrastructure-project-ii.html.................. 16

# INTRODUCTION

Plaintiffs-Appellants are sophisticated foreign investors, who each invested $500,000 in funds managed by Defendant-Appellee New York City Regional Center, LLC ("NYCRC"). The funds then loaned the money to the George Washington Bridge Bus Station Development Venture LLC ("GWBDV") to redevelop the George Washington Bridge Bus Station.

These were no ordinary investments. The funds' stated investment objective was to help foreign investors qualify for lawful permanent residency in the United States, under the federal government's EB-5 Immigrant Investor Program. NYCRC met that investment objective, and all Plaintiffs qualified for permanent U.S. green cards. One of the EB-5 requirements under federal law was that Plaintiffs' investments had to remain "at risk." 8 C.F.R. § 204.6(j)(2). The offering materials for the funds accordingly disclosed that the investment opportunity involved "a high degree of risk." A-398; A-1205. In this case, unfortunately, the risk materialized when the borrower of EB-5 capital, GWBDV, declared bankruptcy and was unable to repay the loans.

After GWBDV's bankruptcy court wiped out Plaintiffs' investments (over NYCRC's objection), Plaintiffs sued NYCRC, alleging fraudulent inducement and breach of fiduciary duty. Now that Plaintiffs have obtained lawful U.S. residency through their investments, they claim that NYCRC, as manager of the funds, should reimburse them for their investment losses

caused by GWBDV's failure to repay the loans. But Plaintiffs' fraud claims are untimely, and all their claims are meritless. The district court (Liman, J.) therefore correctly dismissed the Complaint.

The untimeliness of Plaintiffs' fraud claims is conclusively established by the documents incorporated into the Complaint. Plaintiffs freely signed investment contracts a decade ago or more. In doing so, they represented that they had carefully reviewed and understood the very documents that would have put them on notice of the alleged fraud. Not only are those documents incorporated into the Complaint (which Plaintiffs do not dispute), but Plaintiffs submitted the same documents to the U.S. government as part of their successful petitions to obtain green cards. This dooms their fraud claim because the information in the funds' offering documents clearly and objectively conflicts with the supposed oral misrepresentations that form the basis of the alleged fraud. A person exercising reasonable diligence would therefore have discovered the purported fraud at the time Plaintiffs made their investments, so the limitations period expired years before Plaintiffs asserted these claims.

Plaintiffs try to escape the terms and effects of their binding contracts. They now claim they did not actually read the entire contract or the other offering documents they represented they had carefully reviewed; and they

claim, because they are non-native English speakers, they could not understand the documents that they represented they understood. These allegations are irrelevant. When Plaintiffs signed the contracts, they assented to the agreements' terms. Failing to read or obtain the entire agreement, or not having proficiency in English, does not relieve Plaintiffs of the obligations they assumed. That is especially true here, because Plaintiffs are sophisticated investors who each invested half a million dollars in NYCRC-managed funds. It was incumbent on them to take whatever steps were needed to understand the investment opportunity before making that commitment.

The district court dismissed the fraud claims as untimely for these reasons, and this Court should affirm. This Court can also affirm dismissal of the fraud claims on the alternative ground that Plaintiffs did not allege reasonable reliance on NYCRC's purported oral representations. Again, the contracts Plaintiffs signed established that they carefully reviewed and received documents describing the loan terms—so Plaintiffs could not reasonably rely on conflicting oral representations. Not only that, Plaintiffs expressly disclaimed reliance on any oral or other extra-contractual representations, and those disclaimers are binding.

Plaintiffs also claim that NYCRC breached its fiduciary duty by declining to declare events of default years before the borrower GWBDV went into bankruptcy. But as the district court correctly held, NYCRC's management

decisions are protected by the business judgment rule. Plaintiffs' sole response is to claim that NYCRC was "self-interested" because it received management fees as long as the project continued. But managers regularly obtain fees as compensation for their work (as Plaintiffs knew NYCRC would when they signed their agreements). That does not taint NYCRC's management decisions with self-interest, as numerous courts have held.

Plaintiffs' fiduciary duty claims fail for other reasons too. Plaintiffs agreed to a contractual exculpation clause that precludes their claims. And Plaintiffs do not allege or explain how the decision not to declare a default ultimately caused their damages. Just the opposite: the Complaint makes clear it was GWBDV's bankruptcy—not the earlier, unrelated events that Plaintiffs now claim were defaults—that caused Plaintiffs' investment losses.

## STATEMENT OF THE ISSUES

**I.** Were Plaintiffs on inquiry notice of the alleged fraud when they signed contracts expressly representing that they had carefully reviewed and understood documents that would put a reasonable person on notice—even if Plaintiffs claim years later that they did not review or understand the documents?

**II**. In the alternative, do Plaintiffs fail to allege reasonable reliance when they claim to have relied on oral misrepresentations, but they (a) represented that they carefully reviewed and understood documents with contrary information, (b) signed a contract expressly disclaiming reliance on oral or other extra-contractual representations, and (c) concededly failed to do any due diligence to uncover the alleged fraud?

**III.** Do Plaintiffs' fiduciary duty claims fail when (a) the fiduciary's decisions are protected by the business judgment rule and the fiduciary receives a management fee that was disclosed in the parties' agreements, (b) the relevant agreements exculpate the manager for liability on such claims, and (c) Plaintiffs' losses were caused by a third party's bankruptcy, not the alleged breach of fiduciary duty?

## STATEMENT OF THE CASE

### A. Factual Background

Plaintiffs are sophisticated foreign investors. Each Plaintiff invested $500,000 in one of two funds managed by NYCRC, in order to obtain lawful permanent residency in the United States. NYCRC achieved that objective—all Plaintiffs qualified for U.S. residency. When Plaintiffs signed their subscription documents and made their investments, they specifically disclaimed reliance on oral representations, including the alleged misrepresen-

tations that form the basis of Plaintiffs' fraud claims. Plaintiffs also represented that they had each "carefully reviewed" and "underst[ood]" the fund's offering materials (A-290; A-1161), which contain extensive risk disclosures and detailed descriptions of each investment opportunity. As the district court found—and Plaintiffs concede—the offering documents unequivocally contradict the alleged oral misrepresentations.

### 1. The EB-5 Program Provides Green Cards To Foreign Investors Who Put $500,000 "At Risk" In Order To Create American Jobs

Enacted by Congress in 1990 to stimulate the economy, the EB-5 program allows foreign investors to obtain legal permanent residency in the United States (colloquially known as a "green card") by investing in real estate and infrastructure projects that will create American jobs. A-46 ¶ 5. For investors to become eligible for a green card, federal law requires that capital invested through the EB-5 program must remain "at risk." 8 C.F.R. § 204.6(j)(2); *Bai v. Tegs Mgmt., LLC*, No. 20-cv-4942 (DLC), 2022 WL 602711, at *1 (S.D.N.Y. Mar. 1, 2022) ("The applicable regulations on qualifying investments require evidence that the '[foreign investor] has placed the required amount of capital at risk."), *aff'd*, 2023 WL 6458542 (2d Cir. 2023). If the investment involves little or no downside risk, the foreign investor will not qualify for a green card. *See e.g.*, *Matter of Izummi*, 22 I&N Dec. 169, 186-88 (BIA 1998).

Investors in the EB-5 program first must seek conditional U.S. residency. To do so, they must submit I-526 petitions to U.S. Citizenship and Immigration Services ("USCIS") with supporting evidence proving that they have in fact placed at least $500,000 "at risk" in a qualifying project expected to create sufficient jobs for American workers. 8 C.F.R. §§ 103.2(b), 204.6(j). Two years after obtaining conditional residency, investors may apply for permanent residency by submitting I-829 petitions showing, among other things, that that they have maintained the investment and that each petitioner's capital investment created at least ten full-time jobs. *Id*. § 216.6.

### 2. NYCRC Is An Authorized And Sucessful EB-5 Regional Center

Defendant-Appellee NYCRC is a "regional center" approved by USCIS to raise capital via the EB-5 program. A-46 ¶ 4; A-50–51 ¶¶ 24–26. NYCRC has helped over 5,600 foreigner nationals secure permanent residency in the United States. *See* Experience and Track Record, New York City Regional Center, https://nycrc.com/experience.html (last visited March 12, 2024). Since 2008, NYCRC has raised EB-5 capital for 22 economic development projects in New York City, including the installation of high-speed Wi-Fi in all subway stations, the construction of the Barclays Center Arena, and the redevelopment of the Brooklyn Navy Yard. *See id.* To date, $852.5 million in EB-5 capital loans has been repaid to NYCRC-managed funds.

### 3. NYCRC Raises EB-5 Capital For Renovations To The George Washington Bridge Bus Station In Two Phases

The EB-5 project at issue here involves the George Washington Bridge Bus Station on the New York side of the George Washington Bridge. In 2005, the Port Authority of New York and New Jersey decided to upgrade the retail spaces and bus terminals at the site. A-53 ¶¶ 40–41. After soliciting bids, the Port Authority entered into a public-private partnership with GWBDV, a private venture owned by a real estate development firm. A-49–50 ¶¶ 18–19; A-53–54 ¶¶ 42–43. GWBDV agreed to invest $100 million to upgrade the retail spaces at the station, in exchange for a 49-year lease, while the Port Authority agreed to spend $78 million to improve the bus terminal. A-54 ¶ 44. The parties entered the partnership at the onset of the 2008 financial crisis, which delayed GWBDV's ability to obtain capital for the project. A-54 ¶ 45.

In 2011, to secure funding for the project, GWBDV agreed to borrow capital from an NYCRC-managed fund that would seek foreign investors pursuing permanent residency in the United States. A-55 ¶ 53. Ultimately, NYCRC obtained capital from two sets of investors: Phase 1 investors (in 2011) and Phase 2 investors (in 2014). A-66–67 ¶¶ 76, 86. Phase 1 investors each invested $500,000 in Infrastructure Development Fund, LLC ("Fund I"), which in turn provided a loan to GWBDV. A-55 ¶ 54. Phase 2 investors each invested the same sum in Infrastructure Development Fund, Phase II,

LLC, ("Fund II"), which extended a loan to GWBDV via a pass-through entity. A-67–68 ¶¶ 87–89, 92. One hundred and seven of those investors are now Plaintiffs in this case.

The "Offering Memorandum" for each Fund provided detailed, accurate descriptions of the investment opportunity. The Fund I Offering Memorandum provided that Fund I would make a $72 million secured loan to GWBDV, under a "Loan Agreement." A-392, 412–13. This loan would fund part of the George Washington Bridge Bus Station and Infrastructure Project, which included two components: "1) the redevelopment of the [Station] into a modern transit and retail facility; and 2) infrastructure work to allow for the redevelopment, expansion, improved efficiency, and continued use of the [Station]." A-404.

The Fund II Offering Memorandum provided that Fund II was formed to finance "the second phase of construction work related to the redevelopment of the [Station] and adjacent infrastructure improvements."A-1209. The second phase would encompass "new construction work," including "a series of additional base building upgrades and code modifications necessary to continue the transformation of this critical transportation facility into a modern transit hub." A-1210–11. The memorandum explained that Fund II would fund that work by making a $19 million loan to GWB Development

9

Partners LLC pursuant to the "Venture LLC Agreement." (That loan would be passed on to GWBDV.) A-1214–15.

### 4. Plaintiffs Are Sophisticated Investors Who Knowingly Assumed Significant Risk And Disclaimed Reliance On Extra-Contractual Representations

To invest in either Fund I or II, each Plaintiff was required to execute an investment contract called a "Subscription Agreement." The Subscription Agreements were accompanied by and incorporated (1) the Fund's Offering Memorandum, (2) the Fund's "LLC Operating Agreement," and (3) an "Escrow Agreement." A-286–93; A-1156–64.[1] Plaintiffs would later rely on all these documents when they submitted their I-526 petitions for conditional residency to USCIS, petitions which Plaintiffs certified under penalty of perjury were true and correct. *See* 8 C.F.R. §§ 103.2(a)(2), 204.6(j); A-49 ¶¶ 15, 17 (acknowledging receipt of green cards).[2] The documents establish several facts relevant to this appeal.

***Sophisticated Investors***. By signing the Subscription Agreements, all Plaintiffs acknowledged they were "accredited investor[s]" who each had an annual income above $200,000 (or a joint income with their spouses above

---

[1] Like the district court, this Court can consider these documents because they are incorporated by reference into, and integral to, Plaintiffs' complaint. *See* SPA-11-15; *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Plaintiffs do not argue otherwise. *See generally* App. Br.

[2] There is no dispute that Plaintiffs submitted these documents along with their petitions. *See* Dist. Ct. Dkt. ECF No. 19 at 18.

$300,000), and a net worth of over $1,000,000. A-288; A-1159. Plaintiffs also agreed they were "qualified purchaser[s]," meaning each Plaintiff had at least $5,000,000 in other investments. A-288; A-1159.[3] Plaintiffs further represented that they have "knowledge and experience in financial and business matters," are "capable of evaluating the merits and risks of an investment in the [Fund]," and are "able to bear the economic risk of a complete loss of [their] investment." A-289; A-1160. As explained below, these various representations mean that Plaintiffs are sophisticated investors as a matter of law. *See infra* p.35 & n.11.

The Offering Memoranda for both Funds likewise advised Plaintiffs that the offers were "DESIGNED SOLELY FOR SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT." A-399; A-1206; *see also* A-385, 392, 398, 427; A-1191, 1198, 1205, 1233.

***Investment Objective***. The Offering Memoranda for Funds I and II explained that each Fund's "investment objective" was to make a "qualified investment" under the EB-5 program so that investors could "obtain conditional or permanent U.S. resident status." A-392; A-1199. They likewise

---

[3] The Subscription Agreements are short documents (7 and 9 pages, respectively). A-286–93; A-1156–64. The instructions to the agreements advised Plaintiffs to "strik[e] any representation that is untrue." A-286.

stated that the Funds' "principal focus … is to make an investment that satisfies the [EB-5] Program … so that investors are in a position to obtain conditional or permanent U.S. resident status." A-391; A-1197; *see also* A-718, 746; A-1309, 1338 (similar statements in Operating Agreements).

***Risk Disclosures***. All Plaintiffs represented that they had "carefully reviewed the Offering Memorandum and under[stood] the nature of the proposed investment." A-290; A-1161. The Offering Memorandum for each Fund contains extensive risk disclosures. The memoranda disclosed, for example, that each Fund was "a speculative investment," which "involves significant risks, and … is designed only for sophisticated persons who are able to bear a substantial risk of loss of their capital contributions." A-391–392; A-1197–98; *see also* A-398 ("high degree of risk"); A-1205 (same); A-422 ("possibility of partial or total loss of … capital"); A-1224 (same).

More specifically, the memoranda explained that prospective investors would face "Counterparty Risk," because "[t]he Borrower [*i.e.*, GWBDV] will be the sole obligor on the Loan," and "[r]epayment of the Loan will not be guaranteed by any person or entity, including the Port Authority." A-423; A-1225. They also disclosed that GWBDV's "ability and willingness" to repay the loan "will depend on a number of factors that are beyond the [Fund's] control," that "there is no assurance that [GWBDV] would be able to make the [Fund] whole for any losses … and the [Fund] may lose the value of all

of its assets." A-423; A-1226. "Accordingly, prospective investors … should understand that … there is no certainty that [GWBDV] will be able to repay the Loan and, therefore, an investment in the [Fund] is speculative and subject to substantial repayment risk." A-423; A-1226.

***Collateral for the Loan***. The Offering Memoranda for both Funds accurately described the security for each respective loan. Plaintiffs concede that the "offering memoranda … contradict[]" the alleged oral misrepresentations "about the collateral securing the loans." App. Br. 31.

The Fund I Offering Memorandum explained that GWBDV would "enter into a 49-year net ground lease with the Port Authority" for the "GWB Marketplace," which comprised the retail portion of the Station, and that Fund I would have a "Leasehold Mortgage" on the "GWB Marketplace." A-413. The Memorandum further emphasized that "[t]here will be no other security for the Loan," and that Fund I's "only recourse in the event of a Loan default" would "be to realize on the Collateral and exercise its rights under the Leasehold Mortgage." A-413. It also advised that the Fund's "ability to foreclose and recognize its rights may be subject to any lenders making senior Third Party Loans to [GWBDV]." *Id.*

The Fund II Offering Memorandum provided that in the event of "a failure or default" by GWB Development Partners LLC, Fund II would have only "contractual remedies pursuant to the Venture LLC Agreement," and

the "security" for Fund II's investment was solely the ability to "remove GWB Development Partners, LLC as the Venture Managing Member for Cause." A-1215, 1226.

***Disclaimers of Reliance***. When making their investments, Plaintiffs specifically disclaimed reliance on any oral or other extra-contractual representations. Plaintiffs represented, for example, that they were "entering into this Agreement relying solely on the facts and terms set forth in" the Subscription Agreement, the accompanying Offering Memorandum, and the Operating Agreement—and that they "ha[d] received copies of all such documents." A-289; A-1160. Each Plaintiff additionally agreed that NYCRC had not "made any representations of any kind or nature to induce [them] to enter into this Agreement except as specifically set forth in such documents." A-289; A-1160. The Fund I Offering Memorandum likewise stated that prospective investors "may rely only on the information" in such documents, "and not on any other written materials or any oral statements of" NYCRC "or any other person." A-391. Underscoring the importance of these disclaimers, the Offering Memoranda prominently advised: "NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED HEREIN OR IN A SUPPLE-

14

MENT HERETO AND, IF GIVEN OR MADE, SUCH OTHER INFOR-MATION OR REPRESENTATION MUST NOT BE RELIED UPON." A-387; A-1193.

Plaintiffs all represented that they had "carefully reviewed the Offering Memorandum and under[stood] the nature of the proposed investment in the Company," and had "made an investigation of the pertinent facts." A-289–90; A-1160–61.

***NYCRC's Authority, Fees, and Exculpation from Liability***. To ac-complish the investment objective of qualifying for U.S. residency, the Funds' Operating Agreements, which each Plaintiff signed, "irrevocably appoint[ed] [NYCRC]" as the Fund's "Manager" and vested NYCRC "with all specific rights and powers," including the power to "make all decisions concerning" the "management," "monitoring and disposition of Investments." A-731; *see also* A-1323. NYCRC was expressly empowered to weigh "compliance with the job creation requirements of the [EB-5] Program" when exercising its managerial role. A-731; A-1323. The Operating Agreements explained that NYCRC would receive an annual management fee, calculated based on the amount of funds invested in the redevelopment project. A-724–25; A-1315.

The Operating Agreements also contain exculpation clauses, which are complete defenses against Plaintiffs' claims for breach of fiduciary duty. Plaintiffs agreed that NYCRC would not be liable for acts or omissions taken

"in good faith" and within the scope its authority, except in cases of "gross negligence, willful misconduct or willful breach of th[e Operating] Agreement." A-734; A-1326.

### 5. NYCRC Manages The Funds Pursuant To The Operating Agreements And Plaintiffs Receive Green Cards

As contemplated by the parties and their agreements, the NYCRC-managed funds loaned the Funds' money into the redevelopment project. GWBDV made all its required interest payments to the Funds from 2012-2018. A-67, 72–73 ¶¶ 80, 82, 85, 107, 112, 114, 115. As a result of NYCRC arranging and maintaining these investments with GWBDV, Phase 1 investors—including 80 Plaintiffs—obtained legal permanent residency under the EB-5 program by the time their complaint was filed. A-49 ¶¶ 15, 17. Phase 2 investors began to obtain permanent residency during the pendency of this appeal.[4]

### 6. The Bus Station Opens And GWBDV Declares Bankruptcy

The Project was completed and the redeveloped George Washington Bridge Bus Station opened in 2017. A-73 ¶ 113. GWBDV, however, became

---

[4] *See* Press Release, New York City Regional Center, New York City Regional Center Announces I-829 Petition Approvals in Its GWB Bus Station and Infrastructure Project II (Feb. 23, 2024), https://www.globenewswire.com/news-release/2024/02/23/2834512/0/en/new-york-city-regional-center-announces-i-829-petition-approvals-in-its-gwb-bus-station-and-infrastructure-project-ii.html.

embroiled in litigation with its general contractor and filed for bankruptcy in October 2019. A-72–73 ¶¶ 105, 116. Despite NYCRC's best efforts to protect the Funds' investments, including by providing debtor-in-possession financing, the Bankruptcy Court approved a transaction (over NYCRC's objection) that gave no consideration on account of the EB-5 loans. *See In re George Washington Bridge Bus Station Development Venture LLC,* No. 19-13196 (DSJ) (Bankr. S.D.N.Y. Aug. 25, 2021), ECF Nos. 587, 604. Thus, Plaintiffs allege, "[a]s a result of" GWBDV's bankruptcy, Plaintiffs "lost the entirety of their investments." A-49 ¶ 13.

On September 1, 2021, one week after their investments were lost due to GWBDV's bankruptcy, Plaintiffs entered into a tolling agreement with NYCRC, pausing the statute of limitations. A-74 ¶ 119.

## B. Procedural History

### 1. Plaintiffs Sue To Recover Their Investments A Decade After Making Them

After entering the tolling agreement in 2021, Plaintiffs filed this lawsuit on August 30, 2022, eleven years after the Phase 1 investments and eight years after the Phase 2 investments. Each set of investors asserted two claims under New York law—one charging NYCRC with fraudulently inducing Plaintiffs' investments (Claims 1 and 2) and another accusing NYCRC of breaching its fiduciary duty as the Manager of each Fund (Claims 3 and 4). A-242–47 ¶¶ 108–42.

17

***Fraud Claims***. With respect to fraudulent inducement, Plaintiffs claimed that NYCRC misled them about the risks of their investments, especially with regard to the nature of the collateral protecting the investment. A-59–60, 70–71 ¶¶ 70, 100. Specifically, they alleged that NYCRC falsely made oral representations that both Funds would have a first lien mortgage on both the retail and bus terminal portions of the Station, that the value of that first lien mortgage was more than twice the Funds' respective investments, and that the Funds received this first lien mortgage despite only contributing a small fraction of the capital for the redevelopment project. *Id.* The Phase 1 investors also claimed that NYCRC misinformed them that the project had begun and was continuing under the supervision of Skanska (a general contractor), while the Phase 2 investors claimed they were misled to believe that the redevelopment project had been a success up to the point of their investment. *Id.*

Plaintiffs claim that these alleged oral misrepresentations induced them into signing the agreements. A-243–44 ¶¶ 112, 113, 119. They do not allege that NYCRC forced or pressured them into signing the investment documents or that NYCRC denied them access to those documents, which concededly contradict the alleged oral misrepresentations concerning collateral.

***Fiduciary Duty Claims***. Plaintiffs further asserted derivative claims on behalf of each Fund claiming that NYCRC breached its fiduciary duty by declining "to declare defaults under the operative loan agreements" in response to various events that occurred during the redevelopment project. A-245–47 ¶¶ 130, 139.[5]

## 2. The District Court Dismisses Plaintiffs' Claims

In a thorough and well-reasoned decision, the district court granted NYCRC's motion to dismiss.

***Fraud Claims.*** The district court first ruled that Plaintiffs' fraud claims were barred by the applicable statute of limitations. "Plaintiffs d[id] not" contest that "the alleged fraud occurred more than six years before September 1, 2021 (the date of the tolling agreement)." SPA-18. Accordingly, under New York's discovery rule, their claims could be timely only if September 1, 2021 was within "two years from the time [Plaintiffs] discovered the fraud, or could with reasonable diligence have discovered it." *Id.* (quoting N.Y. C.P.L.R. 213(8)).

---

[5] Plaintiffs also brought direct claims for breach of fiduciary duty, but on appeal, they do not challenge the district court's ruling that "Plaintiffs lack standing to bring those claims individually." SPA-31. Plaintiffs also do not pursue the complaint's theory that NYCRC breached its fiduciary duty by failing to disclose the alleged events of default to Plaintiffs. *See* SPA-30 (holding that "Plaintiffs abandoned those claims" in the district court).

Applying the discovery rule, the district court held that "Plaintiffs were on inquiry notice of the fraud that they allege when they executed the [Funds'] subscription agreements,"—in other words, that a reasonable investor could have discovered the alleged fraud in 2011 and 2014. SPA-21. Plaintiffs' fraud claims allege that NYCRC "misrepresented the collateral that secured their investments." *Id.* But the Offering Memoranda, which the Plaintiffs had "attested to reading and understanding in the[] subscription agreements" "contradicted those alleged misrepresentations." SPA-22, 24.

Because "[a]n investor of ordinary intelligence" would have appreciated these clear contradictions concerning the collateral, "Plaintiffs were … under 'a duty to inquire further'" once they signed the Subscription Agreements, SPA-23–24. But Plaintiffs concededly did not make any such inquiry, so "the statute of limitations began running upon the date of their investment," well over two years before the effective date of the parties' tolling agreement. SPA-24. "[A]s a result," the court concluded, "Plaintiffs' fraud claims are time-barred." *Id.*

The district court rejected Plaintiffs' argument that the limitations period did not begin to run because Plaintiffs supposedly "were given only a signature page of a subscription agreement in English and did not receive any formal documentation." SPA-25. As the court explained, "New York law [provides that] '[a] party who executes a contract is presumed to know its

contents and to assent to them,'" even if the party claims it "receive[d] only a portion of an agreement." *Id.* (quoting *Holcomb v. TWR Express, Inc.*, 782 N.Y.S.2d 840, 841 (App. Div. 2004), and citing *Sharma v. Walia*, 157 N.Y.S.3d 722, 723 (App. Div. 2022)). And a "claim of illiteracy in the English language is, by itself, insufficient to avoid" the application of those rules. SPA-26 (quoting *Kenol v. Nelson*, 581 N.Y.S.2d 415, 417 (App. Div. 1992)).

The district court also rejected Plaintiffs' attempt to "rely on the doctrine of fraudulent concealment" to toll the statute of limitations because, among other reasons, NYCRC "could not have fraudulently concealed the facts regarding its misrepresentations at the time the investments were made because the offering memoranda disclosed facts that placed the Investor Plaintiffs on inquiry notice of the alleged fraud." SPA-27–28.

***Fiduciary Duty Claims.*** The district court held the business judgment rule defeated Plaintiffs' fiduciary duty claims. SPA-41. The rule "bars judicial inquiry into actions of corporate directors [and LLC managers] taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." SPA-33 (quoting *S.H. & Helen R. Scheuer Fam. Found., Inc., ex rel. Scheuer v. 61 Assocs.*, 582 N.Y.S.2d 662, 664 (App. Div. 1992), and citing *Zuckerbrod v. 355 Co., LLC*, 979 N.Y.S.2d 119, 120–21 (N.Y. App. Div. 2014)).

"Plaintiffs' sole counterargument" was that NYCRC was supposedly "interested in" the decision not to declare defaults because NYCRC received management fees. SPA-41. Plaintiffs' counterargument failed for two reasons. SPA-37. First, like any corporate officer "motivated by a desire to maintain her salary," an LLC manager's interest in its bargained-for "compensation" does not render its decisions "self-interested." SPA-38 (citing *Owen v. Hamilton*, 843 N.Y.S.2d 298, 302 (App. Div. 2007)). Second, because "the offering memoranda fully disclosed" NYCRC's management fees, Plaintiffs could not rely on those fees to create a conflict of interest. SPA-39–40 (citing *Riviera Cong. Assocs. v. Yassky*, 223 N.E.2d 876, 880 (N.Y. 1966)).

The district court "conclude[d] that any amendment would be futile," and dismissed Plaintiffs' complaint with prejudice. SPA-42 n.20. Plaintiffs appealed.

## STANDARD OF REVIEW

This Court reviews a Rule 12(b)(6) dismissal de novo. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). It assesses whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court need not credit "a legal conclusion couched as a factual allegation." *Id*. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation

22

of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## SUMMARY OF ARGUMENT

**I.** Plaintiffs' fraud claims are untimely.

**A.** Plaintiffs could have discovered the alleged fraud more than two years before the tolling agreement, as conclusively established by the Subscription Agreements and accompanying documents. In signing the Subscription Agreements, Plaintiffs expressly represented they had carefully reviewed and understood the Offering Memoranda. In turn, the Offering Memoranda clearly contradicted the alleged oral misrepresentations. Plaintiffs (like any reasonable investor) were therefore on inquiry notice of the alleged fraud at the time they made their investments. This remains true despite Plaintiffs' post-hoc claims that they did not review or understand the documents, because parties are deemed to know and assent to the terms of agreements they voluntarily sign. Plaintiffs concede these basic principles of contract law, which render their claims untimely.

**B.** Plaintiffs' attempts to resist these dispositive (and conceded) contract principles all fail. Plaintiffs introduce no facts or law supporting their argument that they are not bound by their contractual representations. They merely rehash the same subjective excuses that courts routinely reject—*i.e.*, that they did not review or could not understand the contracts they freely

signed, and did not understand documents that the represented they had carefully reviewed and understood. Plaintiffs' counterarguments are precluded by their concessions, and by well-settled New York law applying an objective (not subjective) standard of inquiry notice.

Plaintiffs' alternative argument that the Offering Memoranda could not have put them on notice is also meritless. Plaintiffs concede those documents directly contradicted the alleged oral misrepresentations with respect to the crux of the alleged fraud—the loan collateral. That concession establishes inquiry notice as a matter of law because all that is required is that Plaintiffs have "storm warnings," not that every detail of the alleged fraud be revealed. In any event, the other alleged oral misrepresentations are also clearly and objectively contradicted by the offering documents.

**C.** There is no basis to toll the statute of limitations. The offering documents put Plaintiffs on notice of the alleged fraud, so NYCRC could not have concealed the fraud. In any event, Plaintiffs concededly did not conduct any due diligence, as is required for tolling. Moreover, Plaintiffs fail to allege any form of concealment, much less active concealment that meets the high bar for tolling.

**II.** Although the Court need not reach the merits, Plaintiffs' fraud claims separately fail because Plaintiffs did not allege the necessary element

of "reasonable reliance." Again, the Offering Memoranda explicitly contradicted the alleged oral misrepresentations, so Plaintiffs could not have reasonably relied on those alleged misrepresentations. Plaintiffs also signed Subscription Agreements that unambiguously disclaimed reliance on any oral or extra-contractual representations. New York courts routinely hold that such disclaimers negate any claim to reasonable reliance. Moreover, Plaintiffs do not allege they conducted the due diligence New York law requires of sophisticated investors who claim to have relied on fraudulent misrepresentations.

**III.** Plaintiffs' fiduciary duty claims fail on the merits.

**A.** Plaintiffs do not dispute that the business decisions at issue are covered by the business judgment rule. Instead, they claim an exception to that rule, arguing that those decisions were purportedly tainted with self-interest because NYCRC earned annual management fees. But courts routinely hold that a fiduciary's motivation in receiving compensation from its principal does not establish self-interest. In any event, NYCRC's management fees and discretion to make the decisions Plaintiffs challenge were both clearly disclosed in the Operating Agreements. Where a purported conflict is disclosed and agreed upon, principals cannot later claim that the conflict created impermissible self-interest.

**B.** The Funds' Operating Agreements also contained an exculpation

25

clause eliminating any liability for NYCRC's good-faith actions that did not stem from gross negligence or willful misconduct. NYCRC's alleged decisions not to place the Funds' loans into default do not rise to the level of gross negligence or willful misconduct.

**C.** Plaintiffs also failed to allege that NYCRC's supposed failure to declare defaults under the loans caused them any damages. The only potential damages Plaintiffs identify are the loss of the Funds' investment principal. But the Complaint admits that this loss resulted from GWBDV's bankruptcy. And there are no allegations that NYCRC's alleged failure to declare defaults caused GWBDV's bankruptcy years later.

## ARGUMENT

## I. The District Court Correctly Dismissed Plaintiffs' Fraud Claims As Time-Barred

Plaintiffs' claims are time-barred because they filed their complaint more than "six years from the date the cause of action accrued or two years from the time [they] … could with reasonable diligence have discovered the [fraud]." N.Y. C.P.L.R. 213(8).

There is no dispute that Plaintiffs' fraud claims accrued in 2011 and 2014, when they made their investments—well over six years before the September 2021 tolling date. *See* App. Br. 21 ("Where a plaintiff alleges that he was fraudulently induced into making an investment, the fraud claim accrues at the time the investment was made"); A-66 ¶ 76; A-69, 71 ¶¶ 98, 103.

Thus, the only way the fraud claims could be timely is if an investor of ordinary intelligence could not have discovered the alleged fraud with "reasonable diligence" by September 2019, two years before the September 2021 tolling date. N.Y. C.P.L.R. 213(8). Plaintiffs carry the "burden of establishing that the fraud could not have been discovered" two years before the tolling date. *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007).

To meet that burden, Plaintiffs must satisfy an *objective* test. *See* N.Y. C.P.L.R. 213(8) (limitation period begins when plaintiff "could with reasonable diligence have discovered" alleged fraud). New York's discovery rule does not require that these Plaintiffs had subjective knowledge of the alleged fraud. Rather, "where the circumstances are such as to suggest to a *person of ordinary intelligence* the probability that he has been defrauded, a duty of inquiry arises, and if he … shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *MBI Int'l Holdings Inc. v. Barclays Bank PLC,* 57 N.Y.S.3d 119, 121 (App. Div. 2017) (alterations omitted and emphasis added) (quoting *Higgins v. Crouse*, 42 N.E. 6, 7 (1895)). In other words, "the means of knowledge are the same thing in effect as knowledge itself." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993)

(citation omitted)).[6] When the means of knowledge exist, a plaintiff is on "inquiry notice," and the limitation period begins to run.

### A. The Subscription Agreements Conclusively Establish That Plaintiffs Were On Inquiry Notice In 2011 And 2014

**1.** The allegations and the documents incorporated into the Complaint conclusively establish that Plaintiffs were on inquiry notice of the alleged fraud from the moment they signed the Subscription Agreements and made their investments in 2011 or 2014. This Court has "readily resolve[d] the issue" of inquiry notice as a matter of law on a motion to dismiss—as has been done in "a vast number of cases"—where, as here, "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers … integral to the complaint." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005); *Dodds*, 12 F.3d at 352 n.3; *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 639 n.7 (S.D.N.Y. 1993) (collecting cases).

When Plaintiffs voluntarily executed the Subscription Agreements, they were "presumed to know [their] contents and to assent to them" and are therefore bound by their terms. *Holcomb v. TWR Express, Inc.*, 782 N.Y.S.2d

---

[6] Although *Dodds* arose under federal securities law, "it is nevertheless instructive in assessing inquiry notice under New York law," SPA-17 n.3, because "federal law on inquiry notice is analogous to New York law," *AXA Versicherung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 29 n.3 (2d Cir. 2010).

840, 841 (App. Div. 2004) (citation omitted).[7] The Subscription Agreements that Plaintiffs signed referred to and incorporated the Offering Memoranda. A-289; A-1160. And Plaintiffs expressly represented that they had "carefully reviewed the Offering Memorandum and underst[ood] the nature of the proposed investment." A-290; A-1161. Again, that contractual representation is binding on Plaintiffs.

In turn, the Offering Memoranda (that Plaintiffs carefully reviewed and understood) contained information that concededly contradicted the alleged oral misrepresentations regarding the loan collateral. App. Br. 31. Plaintiffs' central complaint is that NYCRC misrepresented the collateral for each investment, telling Plaintiffs they would receive a first lien mortgage on the entire station (the retail and bus terminal portions) despite only providing a portion of the capital for the redevelopment. *See* A-59–60, 70–71 ¶¶ 70, 100. But the Offering Memoranda explicitly contradict those alleged oral misrepresentations. For example:

| Alleged Oral Misrepresentation | Offering Memorandum |
|---|---|
| Fund I would have a *first lien* mortgage on both *the retail and bus terminal portions* of the Station. A-59 ¶ 70 (emphases added). | Fund I's loan "will be secured by a *leasehold* mortgage … on the *GWB Marketplace*," defined to include "approximately 120,000 square feet of *retail space* … containing the |

---

[7] It is undisputed that Plaintiffs voluntarily executed the Subscription Agreements in 2011 and 2014. *See* A-75–242 (alleging each investor "signed a subscription agreement" to become a Phase 1 or Phase 2 Investor).

| Alleged Oral Misrepresentation | Offering Memorandum |
|---|---|
| | newly constructed *retail* concourse and street level *retail* complex." A-392; A-412–13 (emphases added). |
| If GWBDV was in default, Fund I "could take possession of the Station's bus terminal and redevelop it into additional retail space." A-59 ¶ 70. | Fund I's "*only recourse* in the event of a Loan default" would "be to realize on the Collateral and exercise its rights under the *Leasehold Mortgage.*" A-413 (emphases added). |
| Fund II "would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (just as Phase 1 had)." A-70 ¶ 100. | Identifying the "security" for the loan as the ability, "[u]nder the Venture LLC Agreement, … [to] remove GWB Development Partners, LLC as the Venture Managing Member for Cause." A-1215. |
| In the event of a default, the Phase 2 investors "could take possession of the Station's bus terminal and redevelop it into additional retail space." A-70 ¶ 100. | "If there is such a failure or default by the Borrower, the Company will have contractual remedies pursuant to the Venture LLC Agreement, although there is no assurance that the Borrower would be able to make the Company whole for any losses or damages suffered and the Company may lose the value of all of its assets." A-1226. |

These disclosures and others in the Offering Memoranda would have alerted a "person of ordinary intelligence [to] the probability that he has been defrauded" according to the allegations in the Complaint, so "a duty of inquiry [arose]" for Plaintiffs. *MBI Int'l*, 57 N.Y.S.3d at 121, 125. Plaintiffs do not allege that they made a diligent inquiry in 2011 or 2014, when the claims

accrued. Accordingly, "Plaintiffs were placed on inquiry notice of the alleged fraud" at the time of their investment by the "memorand[a] which expressly contradicted defendants' alleged oral representations." *Hamrick v. Guralnick*, 44 N.Y.S.3d 749, 749 (App. Div. 2017). That was well over two years before the September 1, 2021 tolling date, so Plaintiffs' fraud claims are time-barred.

**2.** Because "[t]he test as to when fraud should with reasonable diligence have been discovered is an objective one," *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (App. Div. 2011) (citation omitted), it makes no difference whether these Plaintiffs had actual or subjective knowledge of the facts placing them on inquiry notice. As long as "a person of ordinary intelligence" could perceive "the probability that he has been defrauded, a duty of inquiry arises." *Id.* (citation omitted).

The objective test for inquiry notice has three corollaries that are so well-established, even Plaintiffs describe them as "non-controversial." App. Br. 26. These corollaries, in Plaintiffs' own words, are:

> (1) a party who executes a contract is presumed to know its contents and to assent to its terms;
>
> (2) the presumption of knowledge applies even when a party to a contract receives only a portion of an agreement, as it is incumbent on the party to request and read the remainder; and
>
> (3) a claim of illiteracy in the English language does not defeat the presumption of knowledge, as it is the responsibility of the

> illiterate party to have the contract read or otherwise interpreted for him.

*Id.* (internal quotation marks and citation omitted).

Although Plaintiffs concede that all three principles are "non-controversial" and "unremarkable," *id.*, Plaintiffs contend all three are somehow inapplicable "*in this case.*" *Id.* But Plaintiffs provide no reason to think the objective test for inquiry notice applies any differently here than it does in every other case.

## B. Plaintiffs' Arguments That They Were Not On Inquiry Notice Are Unpersuasive

In the face of the dispositive facts and law showing Plaintiffs were on inquiry notice in 2011 and 2014, Plaintiffs raise two counterarguments. Each fails—primarily because each argument contradicts the legal principles Plaintiffs have already conceded, and re-raises or re-packages the subjective excuses that New York courts routinely reject.

1. Plaintiffs first argue they were not on inquiry notice because they supposedly were not "actually provided with the documents that plainly contradicted [the alleged oral] representations." App. Br. 27. That argument runs headlong into principles (1) and (2) above. These Plaintiffs, like all plaintiffs, are presumed to know and assent to the contents of the agreements they signed, even if they received only portions of those documents. The very cases Plaintiffs rely on refute their position. For example, Plaintiffs (correctly) cite *Sharma v. Walia*, 157 N.Y.S.3d 722, 723 (App. Div. 2022), for

the proposition that a plaintiff was on inquiry notice when she "signed forms … acknowledging each time that [she] had received … and understood … lease documents" that contradicted alleged oral misrepresentations. App. Br. 27. But that is exactly what happened here. Plaintiffs all signed Subscription Agreements acknowledging that they "received copies of all [loan] documents" and had "carefully reviewed the Offering Memorandum and underst[ood] the nature of the proposed investment." A-289–90; A-1160–61.

Plaintiffs similarly argue that NYCRC "concealed" or "*purposefully withheld*" documents that "*would have alerted the plaintiff to the fraudulent scheme*." App. Br. 29, 30. The allegations in the complaint do not support that assertion.[8] Plaintiffs admit some investors "were provided with offering

---

[8] Plaintiffs cite paragraph 67 in the Complaint for the proposition that "NYCRC's explicit instructions" were that investors should never be given the documents. App. Br. 8. But all that paragraph 67 alleges, in relevant part, is that "a small minority of investors *were* provided with offering memoranda." A-58 (emphasis added). Plaintiffs also focus on NYCRC's purported instruction to its representatives to not "answer questions with documents." App. Br. 6, 25 (quoting A-255). But even assuming its veracity, that is not an instruction to withhold documents. Rather, it instructs salespeople not to quote from documents when fielding questions from investors, and instead to "[r]espond to the[ir] question[s] … confiden[tly]" in a manner that relays that they "know … all the [relevant] information." App. Br. 6 (quoting A-255).

33

memoranda," A-58, and as to the others, Plaintiffs' allegations suggest at most that NYCRC did not volunteer the documents.[9]

But even if NYCRC had withheld the memoranda, it would make no difference. Plaintiffs willingly signed the Subscription Agreements representing they had carefully reviewed and understood the Offering Memoranda. They "alone [are] accountable for [their] decision to sign the Agreement without reading it and without first requesting a copy of the [Offering Memorandum] that it expressly incorporated." *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 74 (S.D.N.Y. 2012); *see also Sharma*, 157 N.Y.S.3d at 723 ("Even if plaintiff did not have the leases until the closings, she failed to exercise ordinary diligence by asking for them beforehand.").

Relatedly, Plaintiffs complain that the signature pages of the Subscription Agreements did not identify the Offering Memoranda and that the body of the Subscription Agreements did not "emphasize[]" the Offering Memoranda. App. Br. 28. None of this changes the settled rule that parties are bound by the agreements they sign, even if they receive only a portion of the document.[10]

---

[9] *See e.g.*, A-155 ("Ni Li signed the signature page of a subscription agreement …. Ni Li *did not receive* any formal documentation that described the actual structure of the investment") (emphasis added).

[10] As noted, Plaintiffs would later rely on all these documents when they submitted full sets of these agreements as part of their I-526 petitions for

If anything, that rule has extra force here because Plaintiffs are sophisticated investors. Each Plaintiff invested $500,000 in a Fund involving a "high degree of risk" (A-398; A-1205) in order to obtain U.S. residency. All Plaintiffs represented that they had "such knowledge and experience in financial and business matters that" they could "evaluat[e] the merits and risks of [the] investment." A-289; A-1160. And Plaintiffs confirmed, among other things, that each had a net worth over $1,000,000 and over $5,000,000 in other investments. A-288; A-1159. These representations establish that Plaintiffs were sophisticated investors as a matter of law.[11] And as "relatively sophisticated investors," Plaintiffs "should have understood the risks of investing … without conducting a due diligence investigation or consulting their lawyers and accountants." *Holzer v. Mondadori*, 40 Misc. 3d 1233(A), 2013 WL 4523615, at *5 (N.Y. Sup. Ct. 2013).

---

conditional residency to USCIS—petitions whose contents Plaintiffs certified under penalty of perjury were true and correct.

[11] *See, e.g.*, *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (finding plaintiff to be "a sophisticated investor" where it "represented that it had 'knowledge and experience in financial and business matters' *and* that it could readily evaluate the risks of the transaction") (emphasis added and citation omitted); *McBeth v. Porges*, 171 F. Supp. 3d 216, 226 (S.D.N.Y. 2016) (plaintiff "plainly qualifie[d] as a sophisticated investor as a matter of law" where plaintiff "specifically affirmed" in subscription documents that, *inter alia*, he was a "qualified purchaser").

Plaintiffs further contend they were not on inquiry notice because they are "non-English speaking investors." App. Br. 30. This argument contradicts principle (3), above. And it is squarely foreclosed by precedent:

> [A] party will not be excused from his failure to read and understand the contents of a [contract]. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms. Persons who are illiterate in the English language are not automatically excused from complying with the terms of a contract which they sign simply because they could not read it. Such persons must make a reasonable effort to have the contract read to them.

*Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209-10 (App. Div. 2000). Not only that, the Offering Memoranda in this case expressly advised Plaintiffs: "IF THE ENGLISH LANGAUGE IS NOT THE PROSPECTIVE PURCHASER'S PRINCIPAL LANGUAGE IT IS STRONGLY RECOMMENDED THAT THE PROSPECTIVE PURCHASER SEEK ADVICE FROM ADVISORS WHO CAN INTERPRET FOR THEM AND ADEQUATELY EXPLAIN THIS MEMORANDUM." A-387.

Plaintiffs offer no factual or legal basis to depart from the "non-controversial" principles (App. Br. 26) establishing that they are deemed to know and assent to the agreements they signed, and were therefore on inquiry notice. Contrary to Plaintiffs' arguments, the discovery rule does not present a subjective test; it does not ask what a particular plaintiff did or didn't know,

or about a specific plaintiff's proficiency in English or other particular circumstances. Rather, the test for inquiry notice is objective. It focuses on how "a person of ordinary intelligence" would be expected to conduct herself. *MBI Int'l*, 57 N.Y.S.3d at 121, 125. Plaintiffs freely signed the Subscription Agreement. When they did so, they were bound by and deemed aware of all if its terms, including the representation that they carefully reviewed and understood the Offering Memoranda. It would not matter if—as they now claim—they, in fact, failed to take the steps the law expects of reasonable people when entering a contract.

That explains why Plaintiffs cannot find any support in case law. Almost every case Plaintiffs cite when arguing they were not on inquiry notice is one they attempt (unsuccessfully) to *distinguish*. App. Br. 26–30. And the single case Plaintiffs cite that supposedly supports their position is unavailing. In *In re Executive Telecard Ltd. Securities Litigation*, 913 F. Supp. 280, 285 (S.D.N.Y. 1996) (cited App. Br. 28–29), the defendants argued the plaintiffs were on inquiry notice based on complicated financial information, gleaned from three years of SEC filings by two different companies, one of which was only a minority shareholder of the company at issue. The court could not conclude "a reasonable investor … of ordinary intelligence would go to the length of reading or investigating the financial reports of a 15% shareholder of the company in which he or she had invested simply to see if

there was adequate provision in [the company's] financials for possible un-
collectibility of a large account receivable due from that shareholder." *Id.*
This case is fundamentally different. Here, unlike *Executive Telecard*, Plain-
tiffs all represented that they had "carefully reviewed" and "underst[ood]"
the Offering Memoranda that would have put them on notice of their claims.
A-290; A-1161. And Plaintiffs then submitted these same documents to
USCIS to obtain permanent residency. *See* 8 C.F.R. §§ 103.2(b), 204.6(j); A-
49 ¶¶ 15, 17 (acknowledging receipt of green cards).

**2.** Plaintiffs concede (as they must) that the Offering Memoranda "con-
tradicted what Investors were [allegedly] told about the collateral securing"
their investments. App. Br. 31. But Plaintiffs argue that, even if they had
asked for and reviewed the Offering Memoranda, it would not have alerted
them to the full scope of fraud. *See* App. Br. 31–35. This argument also fails.

For one thing, the legal premise of Plaintiffs' argument is incorrect. In-
quiry notice does not require that a party "have notice of the entire fraud
being perpetrated," only that it receive "storm warnings." *Staehr v. Hartford
Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008); *see also In re Magnum
Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014) (a stat-
ute of limitations "is not somehow tolled until the appearance of disclosures
that perfectly match the allegations that a plaintiff chooses to include in its
complaint"). All that is needed are "circumstances … [that would] suggest to

38

a person of ordinary intelligence the probability that he has been defrauded," thereby triggering a "duty of inquiry." *MBI Int'l*, 57 N.Y.S.3d at 121.

In other words, once plaintiffs are "left with reason to be suspicious of defendant," it is "no longer reasonable for them to defer to his representations." *Dodds*, 12 F.3d at 350; *accord Addeo v. Braver*, 956 F. Supp. 443, 451–52 (S.D.N.Y. 1997). Even if the Offering Memoranda had been merely unclear or "ambiguous" as to the relevant facts, Plaintiffs would still be on inquiry notice and required to seek "clarification." *Gutkin v. Siegal*, 926 N.Y.S.2d 485 (App. Div. 2011). Plaintiffs do not cite any case or authority in support of their argument (App. Br. 31–35), much less any case or authority that contradicts these well-established principles.

And here, the Offering Memoranda were not ambiguous. They directly contradicted the supposed false impressions about loan collateral, which are "'the crux of [Plaintiffs'] fraudulent inducement claims,'" *AXA Versicherung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 29 (2d Cir. 2010) (applying New York law), and implicate almost every single one of the alleged oral misrepresentations. *See* A-48 ¶ 11 (NYCRC allegedly misled investors about "collateral protecting the investment vehicles' loans to the developer"); A-49, 59–60, 70–71 ¶¶ 14, 70, 100. A loan secured by a first-lien mortgage on the retail and bus-terminal portions of the Station, *see id.*, is fundamentally different (and much more valuable) than a loan secured by mortgage on a leasehold

interest in the retail space, *see* A-392; A-413, A-423. The loan terms Plaintiffs allege would have made the investment substantially less risky, if not almost risk-free. The discrepancies between the alleged oral misrepresentations about collateral and the statements in the Offering Memoranda were sufficient to put Plaintiffs on inquiry notice of the alleged fraud.

In any event, the Offering Memoranda also refuted the other purported oral misrepresentations. Plaintiffs contend that NYCRC represented that "the government"—i.e., the Port Authority—"and EB-5 together were funding the entire $358 million Project." App. Br. 31. But the Fund I Offering Memoranda stated only that "[t]he Port Authority *expects* to invest a total of approximately $279 million of capital into the Project." A-404 (emphasis added). It also warned that "ACTUAL EVENTS … MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS," and explained that the Port Authority "IS NOT AND SHALL NOT BE OBLIGATED … TO PROVIDE ANY CAPITAL FUNDING OR OTHER MONETARY CONTRIBUTIONS TO THE PROJECT." A-388, A-389.

Similarly, Plaintiffs claim NYCRC represented that "Skanska, one of the largest contractors in the world, had provided the developer with a completion guarantee." App. Br. 31. But the Offering Memorandum stated only that the developer "*will* obtain a bonded completion guaranty from

40

Skanska," while also noting that NYCRC had not "UNDERTAKEN ANY IN-DEPENDENT INVESTIGATION TO CONFIRM THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION" from the developer, and cautioning that actual events may differ from such forward-looking statements. A-388, A-411 (emphasis added).[12] And while Plaintiffs contend that NYCRC represented that the "project had already begun and would happen," the Offering Memorandum described the project using forward-looking language, which it expressly cautioned prospective investors not to rely on. *See, e.g.*, A-405 ("The Project *will* transform the current station …. The station *will* be reconfigured ….") (emphasis added); A-388 (identifying "FORWARD-LOOKING TERMINOLOGY SUCH AS … 'WILL'" or " 'EXPECT'").

In light of all these disclosures, Plaintiffs were on inquiry notice at the time they made their investments, so their fraud claims are untimely.

## C. Plaintiffs Did Not Allege Any Form Of Concealment, Much Less Concealment That Warrants Tolling

Plaintiffs argue the statute of limitations should be tolled because NY-CRC "active[ly] conceal[ed]" the alleged fraud. App. Br. 35–37. As the district court correctly held, this tolling argument is not supported by the allegations in the Complaint.

---

[12] Plaintiffs have no basis to allege NYCRC did not believe the developer's statements at the time. The Ground Lease identified Skanska as the general contractor when it was executed three days *after* the Fund I Offering Memorandum in 2011. A-1031 § 5.7(a).

Fraudulent concealment tolls a statute of limitations only when a plaintiff shows: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999) (citation omitted).

Plaintiffs' tolling argument fails before it gets out of the starting gate. As the district court held, NYCRC "could not have fraudulently concealed the facts regarding its misrepresentations at the time the investments were made because the offering memoranda disclosed facts that placed the Investor Plaintiffs on inquiry notice of the alleged fraud." SPA-28. In other words, NYCRC could not have concealed a fraud of which Plaintiffs were already on notice. Plaintiffs expressly represented that they carefully reviewed and understood the Offering Memoranda, and the Offering Memoranda disclosed the facts that Plaintiffs claim NYCRC concealed. Thus, it would be impossible for NYCRC to have done anything at that point to "prevent" Plaintiffs' discovery of the fraud. *Corcoran*, 202 F.3d at 543.

Plaintiffs' tolling argument fails for other reasons too. When there is a duty to inquire, plaintiffs "may not rely on allegations of fraudulent conceal-

ment to avoid the limitations bar unless they exercised due diligence in attempting to ascertain the facts related to the alleged fraud, but were nevertheless unable or prevented from discovering the nature of their claim." *Simmons v. Reich*, No. 20-4114, 2021 WL 5023354, at *3 (2d Cir. Oct. 29, 2021) (citation omitted). Plaintiffs do not allege they undertook any due diligence at any time during the limitations period. *See Corcoran*, 202 F.3d at 543.

Plaintiffs also do not allege any "active concealment" by NYCRC. They claim NYCRC provided the Offering Memoranda to some (but not all) Plaintiffs. If that were enough to toll the statute of limitations, it would negate the "non-controversial" rule that "the presumption of knowledge applies even when a party to a contract receives only a portion of an agreement, as it is incumbent on the party to request and read the remainder." App. Br. 26. Plaintiffs also claim that NYCRC omitted information about the purported fraud in "marketing updates" (App. Br. 35–36). This argument fails for the reason above: "because the [Subscription Agreements] themselves" gave Plaintiffs' "sufficient knowledge to place it under a duty of inquiry," any subsequent "actions taken by [NYCRC] to 'conceal' the" true nature of Plaintiffs' investment "would not toll the statute of limitations." *AXA Versicherung AG*, 391 F. App'x at 30. The argument also fails as a matter of basic logic. Plaintiffs allege, at most, an omission—that NYCRC did not freely volunteer the alleged fraud in the updates—not an affirmative act of concealment that

could have "prevented" Plaintiffs' discovery of the fraud despite due diligence. *Corcoran*, 202 F.3d at 543. Tolling is inapplicable.

## II. In The Alternative, Plaintiffs' Fraud Claims Fail As Matter Of Law For Failure To Plead Resaonable Reliance

While the Court should affirm the dismissal of the fraud claims as time-barred, Plaintiffs also failed to state a claim for fraud because they did not allege reasonable reliance on the purported oral misrepresentations. "Reasonable reliance is a required element of common law fraud … under New York law." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011). As NYCRC argued below, Plaintiffs' complaint fails to plead reasonable reliance for at least three reasons. *See* Dist. Ct. Dkt. ECF No. 13 at 12–18.

1. Plaintiffs cannot claim reasonable reliance because, as explained above, the alleged misrepresentations conflicted with the terms of the Offering Memoranda Plaintiffs represented they carefully reviewed and understood. *Supra* § I.A. If a plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006); *Schumaker v. Mather*, 30 N.E. 755, 757 (N.Y. 1892). For that reason, "reliance on [alleged] misrepresentations [is] not justified … [where] plaintiff was placed

on guard or practically faced with the facts." *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) (citation omitted).

**2.** Plaintiffs also expressly disclaimed reliance on any extra-contractual representations when they signed the Subscription Agreements, including the alleged oral misrepresentations that form the basis of their fraud claims. Plaintiffs all confirmed that they were "entering into this Agreement relying solely on the facts and terms set forth in this Agreement, the Confidential Private Offering Memorandum of the Company … and the LLC Agreement … and neither the Company nor [NYCRC] has made any representations of any kind or nature to induce [Plaintiffs] to enter into this Agreement except as specifically set forth in such documents." A-289; A-1160; *see also* A-391 (investors may "not [rely] on any other written materials or any oral statements").

Courts "quickly dispose of" fraud claims based on oral representations in cases like this, where the agreements "plainly" state "that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). That is especially true where, as here, "the plaintiff is a sophisticated investor." *Id.*

In the district court, Plaintiffs attempted to avoid their disclaimers by arguing that a "general merger clause does not preclude parol testimony

where a claim is based on fraud in the inducement." Dist. Ct. Dkt. ECF No. 19 at 16 (quoting *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 143 (2d Cir. 2019)). But NYCRC does not rely on a "general merger clause." *Id.* Rather, the parties' agreements repeatedly and affirmatively "disclaim[] … any kind of [extra-contractual] representation," *FIH,* 920 F.3d 134 at 144, by providing, for example, that NYCRC had not "made any representations of any kind or nature to induce [Plaintiffs] to enter into this Agreement except as specifically set forth in such documents," A-289; A-1160. *See FIH*, 920 F.3d at 144 (distinguishing the "general merger clause" in that case, from the provision in *ATSI*, which "contained an explicit disclaimer … stating that '[t]here are no restrictions, promises, warranties, or undertakings, other than those set forth or referred to herein'").

The disclaimers here are indistinguishable from disclaimers held to negate reasonable reliance as a matter of law. In *Pappas v. Tzolis*, for example, the New York Court of Appeals dismissed a fraud claim based on an alleged extra-contractual representation because the parties' agreement "in the plainest language announced" that the plaintiffs were "not relying on any representation …, except as set forth in the assignments & other documents delivered to the" plaintiffs. 982 N.E.2d 576, 578, 580 (N.Y. 2012). And in *Zazu, Inc. v. Manor*, the Appellate Division held that a lessee could not claim

"it was fraudulently induced to enter into the [lease] agreement by defendants' oral representations" where the agreement stated that "[t]he Landlord has made no representations or promises in respect to said building or to the demised premises except those contained herein, and those, if any, contained in some written communication to the Tenant, signed by the Landlord." 539 N.Y.S.2d 348, 349 (App. Div. 1989). The disclaimers here are, if anything, even more explicit, *see supra* p.45, precluding any claim of reasonable reliance.

**3.** Plaintiffs' failure to "allege that they conducted due diligence to verify [NYCRC's] representations" also dooms their fraud claims. *Unique Goals Int'l, Ltd. v. Finskiy*, 116 N.Y.S.3d 223, 225 (App. Div. 2019). "[A] sophisticated investor claiming to have been defrauded must allege that it took reasonable steps to protect itself against deception." *Id.* (citation omitted). New York Courts routinely hold that "[a]s a matter of law … sophisticated plaintiffs cannot demonstrate reasonable reliance [when] they conduct[] no due diligence" to corroborate alleged misrepresentations about the "value" of their investments. *MAFG Art Fund, LLC v. Gagosian*, 998 N.Y.S.2d 342, 343 (App. Div. 2014) (citation omitted). The same rule applies when sophisticated investors do no diligence to "verify the nature and quality of [their] investment" to ensure it conforms to the alleged representations. *RKA Film Fin.,*

47

*LLC v. Kavanaugh*, 99 N.Y.S.3d 267, 270 (App. Div. 2019); *see also Unique Goals*, 116 N.Y.S.3d at 225.

Plaintiffs are sophisticated investors as a matter of law (*see supra* p.35 & n.11), with a net worth over $1,000,000, annual salaries over $200,000, and at least $5,000,000 in other investments, who each invested half a million dollars in the Funds. *See* A-288; A-1159. They acknowledged that their investments were "DESIGNED SOLELY FOR SOPHISTICATED INVESTORS." A-399; A-1206. Yet they allege that they invested without reviewing "any formal documentation that described the actual structure" or "disclosed any risks relating to" the investments. *E.g.*, A-76. In fact, Plaintiffs premise their entire appeal on the assertion that they made these investments without reviewing any documents or doing anything at all to learn the investments' true "nature and quality." *RKA Film*, 99 N.Y.S.3d at 270; *see also MAFG Art Fund*, 998 N.Y.S.2d at 343. That lack of diligence forecloses their fraud claims.

## III. The District Court Correctly Dismissed The Fiduciary Duty Claims

When Plaintiffs invested in the Funds, they "irrevocably appoint[ed] NYCRC" as the Fund's "Manager" and vested it with "with all specific rights and powers" to control the Fund. A-731; A-1322. As Manager, NYCRC's mandate was to ensure the Funds "ma[de a] Qualifying Investment" under

the EB-5 program and "compli[ed] with the [program's] job creation require-ments." A-718, 731, 746; A-1309, 1323, 1338. In return, Plaintiffs' agreed that NYCRC would receive an annual management fee, to be calculated based on the amount of funds invested in the redevelopment project. A-724; A-1315. NYCRC delivered on its mandate: All Plaintiffs qualified for perma-nent green cards under the EB-5 program. *See* A-49 ¶¶ 15, 17. For its ser-vices, NYCRC earned the management fees provided for in the parties' agreements.

Having already qualified for legal permanent residency in the United States, Plaintiffs have turned around and sued NYCRC, claiming that it breached its fiduciary duty by not declaring defaults during the loans' early stages, based on events that bear no relation to the borrower GWBDV's ulti-mate inability to repay the loans. Never mind that calling a default—assum-ing an event of default actually existed, which Plaintiffs have not plausibly alleged—would have prevented Plaintiffs from obtaining permanent green cards through their EB-5 investments. *See* 8 U.S.C. § 1153(b)(5)(A) (discuss-ing EB-5 program requirements).

As shown below, Plaintiffs fail to state a plausible claim for breach of fiduciary duty for at least three reasons. First, the claims are barred by the business judgment rule. Second, the claims are barred by the contractual

49

exculpation clause. And third, it was GWBDV's bankruptcy—not the purported events of default that occurred years earlier—that caused Plaintiffs' losses.

### A. The District Court Correctly Held That The Business Judgment Rule Bars Plaintiffs' Claims Challenging NYCRC's Decision To Not Declare Defaults

The business judgment rule precludes Plaintiffs' fiduciary duty claims. NYCRC's business decision not to declare a default (assuming a contractual event of default even existed) falls squarely within that rule, and within NYCRC's discretion as Manager of the Funds.

The business judgment rule "provides that, where corporate officers or directors exercise unbiased judgment in determining that certain actions will promote the corporation's interests, courts will defer to those determinations if they were made in good faith." *In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214, 218 (N.Y. 2016). As this court has put it, the rule imposes "a presumption of propriety [that] inures to the benefit of directors." *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (applying New York law). The rule applies not just to directors of corporations but of LLCs as well. *See Zuckerbrod v. 355 Co., LLC*, 979 N.Y.S.2d 119, 121 (App. Div. 2014). "The doctrine is based, at least in part, on a recognition that: courts are ill equipped to evaluate what are essentially business judgments; there is no objective standard by which to measure the correctness of

many corporate decisions (which involve the weighing of various considerations); and corporate directors are charged with the authority to make those decisions." *Kenneth Cole*, 52 N.E.3d at 218.

As the district court recognized, NYCRC's decision-making regarding potential loan defaults were quintessential business decisions shielded by the business judgment rule. Any decision regarding defaults necessarily involved weighing incommensurable "costs and benefits." SPA-35. On the one hand, maintaining a loan with any entity necessarily presents a "risk" that an investor will eventually "lose their principal and any remaining interest." SPA-36. On the other hand, calling a default would not only have stemmed the "income stream of interest payments from the loans," but also "jeopardized the [Funds'] express purpose" to "mak[e] the Qualifying Investment' under the 'EB-5 Immigrant Investor Program.'" *Id.* And all of this assumes that NYCRC even "had the right to declare a default" under the loan agreements, a proposition the district court concluded "is by no means free from doubt." SPA-36 n.18.[13]

On appeal, Plaintiffs do not contest that NYCRC's decisions fall within the business judgment rule. Instead, they attempt to sidestep the rule on the

---

[13] For the reasons stated in NYCRC's motion to dismiss, NYCRC maintains that none of the incidents alleged in Plaintiffs' complaint would have provided grounds for NYCRC to declare an Event of Default. *See* Dist. Court. Dkt. ECF No. 13 at 19–20. NYCRC reserves all rights with respect to this issue.

sole ground that NYCRC was supposedly "self-interested" in declining to declare defaults. App. Br. 38. That argument fails. While a manager's self-interested decisions are generally not subject to the business judgment rule, *Pokoik v. Pokoik*, 45 N.Y.S.3d 50, 52 (App. Div. 2017), Plaintiffs have not alleged that NYCRC's decision to maintain the loans in the EB-5 project and thereby pursue the stated investment objective were tainted with self-interest.

Plaintiffs' sole allegation of self-interest is that NYCRC would cease receiving the management fees (*i.e.*, its compensation) provided for in the Operating Agreements if it put the loans into default. But, as the district court concluded, "treating compensation alone as rendering a fiduciary interested would [impermissibly] permit plaintiffs to frame their complaint in such a way as to automatically avoid the business judgment rule, thereby allowing the exception to swallow the rule." SPA-38 (cleaned up) ("Virtually every fiduciary is compensated for their services."); *cf. In re Wonderwork, Inc.*, 611 B.R. 169, 202 (Bankr. S.D.N.Y. 2020) ("An officer does not breach his fiduciary duty by asking for a raise or bonus. If that were the law, most if not all corporate officers would be in breach.").

Virtually all investment managers are compensated for their work. If the incentive to continue receiving compensation made them self-interested, then no decision to maintain an investment could benefit from the business

judgment rule. And the same would be true of any corporate director's decision to keep the corporation in business. In other words, if Plaintiffs were correct, it would completely "undercut the utility of the business judgment rule" and, for all intents and purposes, impose an improper "absolute obligation … to cease operations and to liquidate." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 201, 203-04 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billet*, 931 A.2d 438 (Del. 2007).[14]

For these reasons, courts routinely hold that a fiduciary's motivation to maintain, or even maximize, its compensation from its principal does not render its decisions self-interested and unprotected by the business judgment rule. *See Owen v. Hamilton*, 843 N.Y.S.2d 298, 302 (App. Div. 2007) (receipt of salary insufficient to create self-interest); *In re LMI Legacy Holdings, Inc.*, 625 B.R. 268, 287–88 (D. Del. 2020) (rejecting claim of self-interest under New York law based on defendants' motivation to "maximiz[e] personal compensation, interests, and keep[] their management positions"); *Huff Energy Fund, L.P. v. Gershen*, No. 11116-VCS, 2016 WL 5462958, at *11 (Del. Ch. Sept. 29, 2016) ("[T]he possibility of receiving … benefits [from a transaction] pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law."); *Grobow v. Perot*, 539

---

[14] New York law considers corporate law decisions from "Delaware courts … instructive." *Ficus Invs., Inc. v. Priv. Cap. Mgmt., LLC*, 872 N.Y.S.2d 93, 99 (App. Div. 2009).

A.2d 180, 188 (Del. 1988) (The "averment … that … directors are paid for their services … do[es] not establish any financial interest."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Plaintiffs concede that "compensation of a fiduciary may not rise to the level of self-interest." App. Br. 39. Yet they argue this case is different because it involves "a steady stream of millions of dollars in management fees" that, in their view, could have "be[en] sustained *only* by disregarding the interests of the principals." *Id.* But in every case alleging a breach of fiduciary duty, the plaintiff contends the challenged decision "disregard[ed] the interests of the principals." *Id.* So Plaintiffs' theory would negate the application of the business judgment rule whenever a plaintiff alleges a fiduciary was motivated to receive compensation. As shown above, however, the incentive to receive compensation for one's work does not taint a fiduciary's decisions with self-interest.

Unsurprisingly, then, Plaintiffs cannot find any support for their position. The only case they point to, *In re Ampal-Am. Israel Corp.*, 543 B.R. 464 (Bankr. S.D.N.Y. 2016) (cited at App. Br. 39), did not concern a claim that a fiduciary was self-interested in a decision simply because it would enable him to continue receiving compensation. Rather, the case addressed an officer's decision to approve payments to a different company that was controlled by an individual to whom the officer was financially beholden. *See id.*

at 482. As that court later explained, its decision stood for the proposition that fiduciaries can lack self-interest when they are "controlled by [someone else] who did have an interest." *In re Ampal-Am. Israel Corp.*, No. 12-13689 (SMB), 2020 WL 2529337, at *2 (Bankr. S.D.N.Y. May 14, 2020). Plaintiffs have not alleged that NYCRC was controlled by or acted with an ulterior motive to please a different party with an interest in NYCRC's decisions.

Even if NYCRC's alleged motivation to earn management fees could render it self-interested in the abstract, the disclosure of those fees in the Operating Agreements means they cannot support a claim of self-interest here. The New York Court of Appeals has long held that members of a business entity "may include … 'any agreement they wish'" in the entity's foundational documents, and if the asserted conflicted behavior "was actually contemplated and authorized [in those documents], it would not, ipso facto, be impermissible and deemed wrongful." *Riviera Cong. Assocs. v. Yassky*, 223 N.E.2d 876, 880 (N.Y. 1966). For this reason, "a breach of fiduciary duty claim may not be based on a conflict of interest or even self-dealing where the conflict was specifically disclosed." *Schneider v. Wien & Malkin LLP.*, No. 601363/02, 2004 WL 2495843, at *14 (N.Y. Sup. Ct. 2004).[15]

---

[15] Delaware courts follow the same rule. *See Seaford Funding Ltd. Partnership v M & M Assocs. II, L.P.*, 672 A.2d 66, 72 (Del. Ch. 1995) (holding a plaintiff may not "bring[] a derivative claim based on" "[a] conflict of interest disclosed in a prospectus or partnership agreement").

Here, the Operating Agreements Plaintiffs signed explicitly provided for NYCRC's management fees, so those fees did not taint NYCRC's decisions with self-interest. "These are the financial terms to which plaintiff (who, it bears mentioning, became a lawful permanent resident as a result of his investment) agreed—nothing more." *Muhan Cui v. Xia*, No. 19-CV-615 (NG)(SJB), 2021 WL 925480, at *8 (E.D.N.Y. Mar. 2, 2021); *see also Riviera Cong.*, 223 N.E.2d at 880. Plaintiffs cannot complain that NYCRC's "economic interests … were not aligned with" theirs, A-47 ¶ 6, when they unambiguously agreed to that arrangement when appointing NYCRC to manage the Funds.

Notwithstanding that NYCRC (like all managers) was paid for its work, the Operating Agreements "vested" NYCRC with the "rights and powers" to "make all decisions concerning the … management … and disposition of [the Fund's] Investments," and to "exercise all rights, powers, privileges and other incidents of ownership or possession with respect to [the Fund's] Investments." A-731; A-1322–23. Decisions regarding purported events of default doubtlessly concern the management and disposition of the Fund's investments, and implicate NYCRC's right, powers, and privileges. *Id.* NYCRC's discretionary decisions are therefore protected by the business judgment rule.

### B. The Exculpation Clause In The Funds' Operating Agreements Bars Plaintiffs' Breach Of Fiduciary Duty Claims

The business judgment rule suffices to affirm the dismissal of the fiduciary duty claims. Alternatively, the Court may affirm on the ground that the Operating Agreements explicitly exculpate NYCRC from liability for claims like Plaintiffs' here. As NYCRC explained below, a "contractual clause[] limit[ing]" a fiduciary's "liability to losses caused by gross negligence [or] willful misconduct … serve[s] to exculpate [the fiduciary] from breach of fiduciary duty claims that do not involve allegations of this misconduct." *Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*, 933 N.Y.S.2d 202, 203 (App. Div. 2011) (quotation marks omitted); *see also Kagan v. HMC-New York, Inc.*, 939 N.Y.S.2d 384, 386-87 (App. Div. 2012). This principle independently disposes of Plaintiffs' fiduciary duty claims.

Both Operating Agreements contain an "Exculpation" clause precluding NYCRC's liability for good-faith business decisions within the scope of its authority, except in cases of "gross negligence, willful misconduct or willful breach of th[e Operating] Agreement." A-734; A-1326.

Plaintiffs' allegations fail to overcome that exculpation. The Complaint does not allege that NYCRC engaged in gross negligence or willful misconduct in declining to call defaults (assuming potential events of default even existed). Plaintiffs merely discuss the supposed differing incentives between Plaintiffs and NYCRC—which, again, the Operating Agreements disclosed

and Plaintiffs agreed to—and claim that NYCRC should have declared a default before GWBDV entered bankruptcy years later. But allegations that NYCRC failed to place the loans in default "at a time when there was sufficient liquidity" are "insufficient to allege 'gross negligence [or] willful misconduct,'" *Aris*, 933 N.Y.S.2d at 203.

In the district court, Plaintiffs attempted to avoid the exculpation clauses on public policy grounds. But the public policy of New York is that exculpation clauses that limit liability to acts of gross negligence or willful misconduct are permissible. *See* N.Y. Ltd. Liab. Co. Law § 417(a). Exculpation clauses violate public policy only when they cover "bad faith or … intentional misconduct or a knowing violation of law" or the receipt of a "financial profit or other advantage to which [a fiduciary] [i]s not legally entitled." *Id*. The exculpation clauses here are well within the bounds permitted by New York law.

In the court below, Plaintiffs also attempted to take cover under a supposed "Disparity in Bargaining Power" exception to limitations on liability, set out in a federal bankruptcy court decision. *See* Dist. Ct. Dkt. ECF No. 19 at 24 (citing *In re Lyondell Chem. Co.*, 544 B.R. 75, 85 (Bankr. S.D.N.Y. 2016)). As the district court in that case later observed, however, "disparity in bargaining power … is not enough under New York law" to "invalidate[]

a contractual limitation-of-liability." *In re Lyondell Chem. Co.*, 585 B.R. 41, 53 (S.D.N.Y. 2018).

The "dicta from a number of decisions of" lower federal courts upon which that bankruptcy court relied, *id.*, trace back to a footnote in the Court of Appeals' decision in *Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc.*, 643 N.E.2d 504 (N.Y. 1994). In discussing the general enforceability of limitations on liability clauses, *Metropolitan Life* noted two possible "exceptions": "contracts of adhesion," and where an alleged "breach [of contract] is also tortious." *Id.* at 885 n.*. Some lower federal courts appear to have misunderstood "contracts of adhesion," *id.*, to mean any contract between parties with unequal bargaining power.

That is wrong. Under New York law, "inequality of bargaining power" (coupled with "high pressure tactics or deceptive language") represents only a necessary, not a sufficient, condition for a contract to carry the adhesion label. *Matter of Ball (SFX Broad. Inc.)*, 665 N.Y.S.2d 444, 446 (App. Div. 1997). "In addition, it must be shown that the contract inflicts substantive unfairness on the weaker party" in order for "[a]dhesion [to be] found." *Id.* at 446-47; *accord Precision Mech., Inc. v. Dormitory Auth. of N.Y.*, 774 N.Y.S.2d 734, 734 (App. Div. 2004).

Plaintiffs do not allege that "the [Operating] agreement was unfair" in general. *Precision Mech*, 774 N.Y.S.2d at 734. They also cannot credibly

claim the Operating Agreement's exculpation clause in particular is "substantive[ly] unfair[]," *Matter of Ball*, 665 N.Y.S.2d at 446-47, as it complies with New York's substantive law permitting such clauses, *see* N.Y. Ltd. Liab. Co. Law § 417(a).

Moreover, even if New York recognized a naked disparity in bargaining power exception to limitations on liability, Plaintiffs' claims of unequal power ring hollow. Again, Plaintiffs are "sophisticated investors" as a matter of law with a net worth of over $1,000,000 and at least $5,000,000 in other investments, who freely invested $500,000 so they could emigrate to the United States. A-288; A-399; A-1159; A-1206.

## C. Plaintiffs Failed To Allege NYCRC's Purported Failure To Declare Defaults Caused The Funds Any Damages

Even putting the business judgment rule and exculpation clause aside, Plaintiffs have not stated a fiduciary duty claim because, as NYCRC explained in the lower court, they do not allege the failure to call defaults years before GWBDV's bankruptcy was a proximate cause of their losses. *See* Dist. Ct. Dkt. ECF No. 13 at 23-24; *Greenberg v. Joffee*, 824 N.Y.S.2d 355, 356 (App. Div. 2006) (plaintiff must allege that the fiduciary's purported "misconduct was the direct and proximate cause of the losses claimed") (cleaned up).

The only loss Plaintiffs assert is the Funds' "loss of capital," A-47. But Plaintiffs "fail[] to establish that [NYCRC's alleged] breach of fiduciary duty"

in declining to declare defaults "was the cause of" the Funds losing their capital. *Vill. Green E. Holdings LLC v. Blaakman*, 197 N.Y.S.3d 393, 396 (App. Div. 2023). On the contrary, the Complaint makes clear that the Funds "lost the entirety of their investments" "[a]s a result" of the "the beleaguered developer [GWBDV] … declar[ing] bankruptcy." A-49; *see also In re George Washington Bridge Bus Station Development Venture LLC,* No. 19-13196 (DSJ) (Bankr. S.D.N.Y. Aug. 25, 2021), ECF No. 604 (bankruptcy court order approving transaction providing no compensation to the Funds).

Accordingly, GWBDV's bankruptcy—not NYCRC's alleged failure to declare defaults years before the bankruptcy—"was the direct and proximate cause of the losses claimed" by Plaintiffs. *Greenberg*, 824 N.Y.S.2d at 356. And Plaintiffs never allege that NYCRC, by maintaining the Funds' loan to GWBDV or otherwise, caused GWBDV's bankruptcy or that the bankruptcy was "a normal or foreseeable consequence of the situation created by" NYCRC's declining to declare defaults. *Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004). Because Plaintiffs' fiduciary duty claims lack plausible allegations of causation, the Court may affirm the judgment below on this alternative ground as well.

## CONCLUSION

For the foregoing reasons, the judgment of dismissal should be affirmed.

Respectfully submitted,

/s/ Gregory Silbert

Gregory Silbert
David J. Lender
Jessica Lynn Falk
A.J. Green
Shai Berman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
greg.silbert@weil.com

Mark Pinkert
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave., Suite 1200
Miami, FL 33131
(305) 577-3148

*Attorneys for New York City
Regional Center, LLC*

March 12, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 13,710 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Gregory Silbert*

Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
greg.silbert@weil.com

March 12, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ *Gregory Silbert*

Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
greg.silbert@weil.com

March 12, 2024

64